Marcus R. Mumford (admitted *pro hac vice*)
405 South Main, Suite 850
Salt Lake City, UT 84111
(801) 428-2000
mrm@mumfordpc.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| | Case No. 3:17-mc-00348-JCC |
| IN RE MARCUS R. MUMFORD | RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED APRIL 12, 2017, AND ISSUED IN *UNITED STATES v. AMMON BUNDY, ET AL.*, CASE NO. 3:16-CR-00051 [DOC. 2069] |
| | Judge John C. Coughenour |

## I.  INTRODUCTION

On April 12, 2017, Judge Michael W. Mosman issued an Order to Show Cause ("**OSC**"), ordering me to respond in writing to show why my admission *pro hac vice* should not be revoked for any remaining proceedings in the case captioned *United States v. Ammon Bundy, et al.*, Case No. 3:16-cr-00051-BR (hereinafter, the "***Bundy* matter**"), and why I should not be permanently barred from practicing law in the United States District Court for the District of Oregon. Judge Anna J. Brown presided over the *Bundy* trial, which concluded on October 27, 2016, with the jury's verdict acquitting my client, Ammon Bundy, and the other six co-defendants, on all charges of conspiracy and possession of firearms in a federal facility. At no point during the trial did Judge Brown ever sanction me, or make any findings of contempt or misconduct on my part. Nevertheless, without citing any applicable rule or legal standard, Judge Mosman's OSC accuses me of the following five general allegations:

- **OSC ¶ 1** ("Repeated failures or refusals to observe Court rulings.");

- **OSC ¶ 2** ("Repeated instances of improperly arguing with the Court, including at times in the presence of the jury and/or with a raised voice.");

- **OSC ¶ 3** ("Inappropriate commentary on the testimony of a witness in the presence of the jury.");

- **OSC ¶ 4** ("Proffering … [a fact witness] … without first disclosing … that … [the witness] was present in the courtroom throughout the trial [contrary to the Court's witness exclusion order] … and without timely disclosing that the same individual was also a client of yours…."); and

- **OSC ¶ 5** ("Arguing for Ammon Bundy's release … without a good-faith basis …, repeatedly refusing to accept the Court's rulings …, and yelling at the Court….").

1

In what follows, I dispute in detail every allegation made in the OSC. But to summarize: I never intentionally failed or refused to observe court rulings in defending Mr. Bundy, and it concerns me that Judge Mosman's OSC gives such a misleading presentation of what actually occurred at trial. Nor did I improperly argue with Judge Brown or make improper commentary in front of the jury throughout the trial, as the government alleged. Regarding the inclusion of Claud R. Koerber (aka Rick Koerber) on a proffer of potential defense witnesses made by the joint defense team in October 2016, the OSC is even more misleading, as it mischaracterizes the nature and purpose of the joint proffer that Judge Brown requested, including my role in drafting the document, and omits the specific disclosures that I made to Judge Brown on several prior occasions regarding my relationship with Mr. Koerber – among other things, the OSC suggests that I tried to conceal that Mr. Koerber had been in the courtroom during the trial, but it fails to acknowledge that portion of the transcript early in the case where Judge Brown herself personally invited Mr. Koerber to sit in the courtroom area set aside for members of the defense team. (In other words, I could not have misled Judge Brown regarding Mr. Koerber's identity or courtroom presence, even if I wanted to.)

Finally, the OSC presents an unduly biased and skewed view of court proceedings on October 27, 2016, where U.S. Marshals attacked and tasered me while I was arguing for my client's release after the jury acquitted him on all charges. Contrary to the OSC, I did have a good faith basis to argue for Mr. Bundy's post-acquittal release, and Judge Brown even agreed with my argument in significant part. In fact, as set forth below, the U.S. Marshals later confirmed to my staff and co-counsel that evening that they did not have – or they could not find – the necessary order to keep Mr. Bundy in custody following the jury's verdict acquitting him. And the record attached to the OSC reveals how the U.S. Marshals who attacked me were acting

contrary to Judge Brown's orders. The fact that Judge Mosman would single me out for discipline, while excusing the marshals' open defiance of Court orders, causes me grave concern about the fairness of this proceeding. To say nothing of the other issues I raise below calling into question the validity and propriety of the OSC in the first place. And where the OSC accuses me of "yelling" during my argument for Mr. Bundy's release, it fails to acknowledge how, as soon as Judge Brown made an issue of how loudly I was talking, I rectified matters by moving closer to the microphone and lowering my voice while I continued to argue passionately but professionally for my client's release.[1] Relatedly, as the Court may know, I suffer a life-long speech impediment, and a review of the record that Judge Mosman inexplicably left out of the excerpts attached to the OSC reveals how much more frequently Judge Brown complained during trial that she could **not** hear what I was saying, and to insist that I talk more loudly, not less, when addressing the Court.[2]

---

[1] See courtroom surveillance footage, published by The Oregonian on Feb. 16, 2017, available at https://www.youtube.com/watch?time_continue=43&v=2FKGZAuePKM, and embedded in Maxine Bernstein, *Lawyer Urges Judge To Dismiss Criminal Charges Against Marcus Mumford*, THE OREGONIAN/OREGONLIVE, Feb. 16, 2017, available at http://www.oregonlive.com/oregon-standoff/2017/02/lawyer_urges_judge_to_dismiss.html.

[2] *See, e.g*, *United States v. Ammon Bundy, et al.*, Case No. 3:16-cr-00051-BR, Docket No. 2069-11 (excerpt of Oct. 4, 2016, transcript) at 10:22-11:11 (**"THE COURT: I can't hear you at all, Mr. Mumford."**); Docket No. 2069-12 (excerpt of Oct. 5, 2016, transcript) at 70:8-14 (**"THE COURT: Speak up, please, so we can all hear you."**)). Unless otherwise specified, references to "Docket No. ##" or refer to the filings docketed in the *Bundy* matter, Case No. 3:16-cr-00051-BR, including the exhibits attached to the OSC. For additional instances where Judge Brown directed me to speak more loudly or otherwise indicated that she was having a hard time hearing me, see the following references to the rough transcript of trial proceedings (hereinafter referenced as "[DATE] Rough Tr."): **9/15/2016 Rough Tr. at 107**; **9/22/2016 Rough Tr. at 3, 6 & 63**; **9/29/2016 Rough Tr. at 265**; **10/04/2016 Rough Tr. at 18 & 91**; **10/5/2016 Rough Tr. at 111, 151 & 234**; and **10/11/2016 Rough Tr. at 349**. In referencing the rough transcripts without quoting from them, I understand that I am complying with Judge Brown's prior orders limiting how parties may use and reference those materials. *See* Docket No. 2069-1 at 4:25-5:1; Docket No. 2069-12 at 71:15-18. And I still intend to move for final transcripts to be provided pursuant to the Court's prior order. See *United States v. Ammon Bundy, et al.*, Case No. 3:16-cr-00051-BR, at Docket Nos. 2141 & 2192.

## II. PRELIMINARY OBJECTIONS TO THE OSC

### 1. The OSC Should Be Vacated For Having Been Issued By A Judge Lacking Authority.

As an initial matter, the baseless and misleading nature of Judge Mosman's OSC lead me to question its propriety. Let me acknowledge that I do not know Judge Mosman. I have never appeared before him, and I have never met or spoken with him. After the verdict in the Bundy matter and the events of October 27, 2016, I wrote several times to request his assistance.[3] Among other things, my emails described other instances of misconduct by the U.S. Marshals during the *Bundy* trial and asked that Judge Mosman help me obtain the relevant records I need for my defense.[4] (In one of those other instances of marshal misconduct, my female associate had been forced to physically place herself between me and the marshal coming after me as I turned away from a potential confrontation during a joint defense conference held in the courtroom during an afternoon break.)[5] After initially confirming that he had preserved the relevant records, Judge Mosman either did not respond to my emails or responded to say that he could not assist with my requests for information and materials **because he was recused**.[6]

As I understand the law of recusal, once a judge recuses himself from a matter, he cannot take any further action or later reconsider that decision. *See Stringer v. United States*, 233 F.2d 947, 948 (9th Cir. 1956) (reversing a district judge's order suspending an attorney because "once

---

[3] See email correspondence attached as Exhibit A.

[4] *Id.*

[5] *See id*. The circumstances of that incident were described in my emails to Judge Mosman and also the following sworn declarations, of which I request the Court take judicial notice: Affidavit of Amanda B. Mendenhall ("Mendenhall Decl."), attached as Exhibit B, at ¶¶ 12-14; Affidavit of Per C. Olson ("Olson Decl."), attached as Exhibit C, at ¶ 7; Affidavit of Lisa J. Ludwig ("Ludwig Decl."), attached as Exhibit D, at ¶¶ 7-8; Declaration of Robert L. Salisbury ("Salisbury Decl."), attached as Exhibit E, at ¶ 7; and Declaration of Matthew Schindler ("Schinlder Decl."), attached as Exhibit F, at ¶ 15.

[6] See email correspondence attached as Exhibit A.

4

having disqualified himself for cause, on his own motion, it was incurable error for the district judge to resume full control and try the case"); *see also Shell Oil Co. v. United States*, 672 F.3d 1283, 1290-91 (Fed. Cir. 2012) (vacating the district judge's judgment, and the orders it was based on, because the judge "should have recused himself … and should have taken no further action other than the ministerial act of transferring the case to another judge"); *United States v. O'Keefe*, 128 F.3d 885, 891 (5th Cir. 1997) (holding that "[o]nce a judge recuses himself from a case, [he] may take no action other than the ministerial acts necessary to transfer the case to another judge, even when recusal is improvidently decided," and noting that "[a] ministerial act is usually defined as an act that is essentially clerical and does not involve the exercise of discretion or judgment");  *Moody v. Simmons*, 858 F.2d 137, 143 (3d Cir. 1988) ("Once a judge has disqualified himself, he … may enter no further orders in the case …. [as] [h]is power is limited to performing ministerial duties necessary to transfer the case to another judge (including the entering of 'housekeeping' orders)."); *DeFazio v. Hollister, Inc.*, 2007 WL 926510, at *2-*3 (E.D. Cal. Mar. 27, 2007) (noting that "once a judge recuses himself, he should not resume control of the case," even where his "initial reason for disqualification is no longer present" (citing *Stringer*, 233 F.2d at 948)).

Here, Judge Mosman twice recused himself *sua sponte* from matters raised in the OSC: first, several months before issuing the OSC, he declined to help me secure information helpful to my defense to the incidents raised in OSC ¶ 5 – after initially giving me indications that he could help – because, as he said, he was "recused";[7] and second, within a few weeks of issuing the OSC, after admitting that his partiality could reasonably be questioned in this matter.[8] Make no mistake: I appreciate that Judge Mosman would candidly admit that he is unable to render

---

[7] See emails attached as Exhibit A.

[8] *Bundy* matter, Docket No. 2101 at 2-3.

impartial judgments in matters brought against me. In *Liteky v. United States*, Justice Kennedy observed how judges do not always "heed the judicial oath and step down" in the face of a disqualifying predisposition or circumstance, whether "through obduracy, honest mistake, or simple inability to attain self-knowledge."[9] But Judge Mosman issued the OSC only a few months after he had recused himself in a December 2, 2016, email responding to my requests for materials regarding one of the incidents later raised in the OSC.[10] Judge Mosman issued the OSC on April 12, 2017. And he recused himself again on filed May 17, 2017, only a few weeks after he issued the OSC.[11] Given the timing of such matters, **what makes anyone think that Judge Mosman momentarily possessed the necessarily impartial judicial faculties to issue a qualifying order to show cause in the first place? <u>The obvious answer is that he did not.</u>** And I am left to suffer the consequences of his inappropriate actions, including, among other things, the time, resources, and relationships that it has cost me to prepare this Response to the false and misleading OSC that he issued.

Courts have noted that the values underlying 28 U.S.C. § 455 include "protecting the litigants' constitutional entitlement to an unbiased adjudication and the public's perception of the integrity of the judicial process." *O'Keefe*, 128 F.3d at 891 (citing *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 457 (5th Cir. 1996)). Here, the fact that Judge Mosman recused himself from matters raised in the government's criminal prosecution of me for my October 27, 2016 courtroom conduct, but then raises that same conduct in paragraphs 1, 2, and 5 of the OSC requires that the Court vacate Judge Mosman's OSC. There is simply no other way to purge the perception of

---

[9] *Liteky v. United States*, 510 U.S. 540, 563 (1994) (Kennedy J., concurring, joined by Blackmun, J.; Stevens, J.; and Souter, J.).

[10] *See* attached Exhibit A.

[11] *Bundy* matter, Docket No. 2101 at 2-3

partiality that otherwise pervades the substance of allegations asserted in the OSC. *Mangini v. United States*, 314 F.3d 1158, 1161 (9th Cir. 2003) (citing *Preston v. United States*, 923 F.2d 731, 735 (9th Cir. 1991), where the court vacated after finding there was no other way "to purge the perception of partiality" from the case).

   To summarize this point: I object to the OSC having been issued by a district court judge whose partiality could and should have been questioned at the time – as he appears to admit – and who issued the order despite lacking the authority to issue it. And I request that the OSC be vacated on that basis. On similar bases and other grounds more fully described below, I object to Judge Mosman's designation of Mr. Weaver as counsel for the District Court in this matter, and request that he also be disqualified.

   2. *The OSC Fails To Give Me Notice Of The Rules It Accuses Me Of Violating.*

   The issue of Judge Mosman's disqualification is related to another issue: whether the OSC meets the due process requirements of "notice" that, with the "opportunity to be heard," must be given to any attorney subject to discipline. *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1198 (9th Cir. 1999) ("At a minimum … an attorney subject to discipline is entitled to procedural due process, including notice and an opportunity to be heard." (quoting *Standing Comm. on Discipline v. Ross*, 735 F.2d 1168, 1170 (9th Cir. 1984))). Other courts applying this standard have been more explicit, pointing out that notice includes **both** "notice of the **conduct placing [the lawyer's]** *pro hac vice* **status at risk**" **and** "notice of **the standard the … court will apply in deciding whether to revoke that status**." *Raub v. U.S. Airways, Inc.*, No. CV 16-1975, 2017 WL 5172603, at *2-*3 (E.D. Pa. Nov. 8, 2017) (quoting on *Eagan by Keith v. Jackson*, 855 F. Supp. 765, 791 (E.D. Pa. 1994), and citing *Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 910 (3d Cir. 1992) (emphasis added)). Additional considerations may include the level of harm or prejudice to the adversary. *See id.* at *2 (citing *Republic of the Philippines v.*

*Westinghouse Elec.*, 43 F.3d 65, 74 (3d Cir. 1994), which directed courts to consider patterns of wrongdoing; the severity of the infraction; and the level of harm or prejudice to the adversary).

One of the issues that has made this Response so difficult and time-consuming is that Judge Mosman's OSC fails to cite the applicable rules that he accuses me of violating. It appears that Judge Mosman attempted to remedy this in the same order where he recused himself, by stating that "[t]he Order to Show Cause references Local Rule 83-7. … Each section or paragraph of the Order to Show Cause references LR 83-7."[12]

First: **no, it doesn't**. The OSC does not reference Local Rule 83-7. And Judge Mosman is blatantly misrepresenting his own OSC to suggest otherwise. Black's Law Dictionary defines "reference" as, *inter alia*, the "[m]ention or citation of one document or source in another document or source."[13] Nowhere does the OSC **mention or cite** Local Rule 83-7.[14]

The Court may think that I am being too exacting in parsing Judge Mosman's judicial language on this point, where he was just a little careless in his choice of words. In another instance, I may be inclined to give Judge Mosman the benefit of the doubt. But Judge Mosman's order claiming that the OSC "references" LR83-7 caused me to go back several times to re-read the OSC in the context of preparing this Response, wondering how I missed the references to LR 83-7 in Judge Mosman's OSC. And when the Court comes to understand from the discussion presented below how misleading the OSC is – in how it selectively presents snippets from the *Bundy* proceedings and singles me out for discipline – it has to realize that it cannot apply a more charitable standard to Judge Mosman's choice of words than he applies to mine, especially where his words emerged from the deliberative confines of a judge's chambers, a seemingly

---

[12] *Bundy* Matter, Docket No. 2101, at 2-3.

[13] *See* Reference, 3d entry, Black's Law Dictionary (10th ed. 2014).

[14] *See Bundy* matter, Docket No. 2069.

great distance away from what those who participated in the Bundy trial described as the most demanding and complex multi-defendant trial they have ever been a part of.[15] And that is further reason to vacate the OSC for failing to meet the requisite standards of judicial notice.

3. *The OSC Fails To Give Me Notice Of The Judge Brown Rulings It Says I Violated.*

Judge Mosman's OSC accuses me of violating the orders and rulings that Judge Brown issued in the *Bundy* matter. But he does not identify the alleged orders or rulings in question, and, in too many instances, it is not apparent from the excerpted portion of the transcript attached to the OSC what order or ruling Judge Mosman might be referring to, or how my conduct varies impermissibly from that order or ruling.[16] I would note here that Rule 83(b) of the Federal Rules of Civil Procedure provides as follows:

> No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement.

The fact that the OSC fails in too many instances to identify the order or ruling made by Judge Brown that it accuses me of violating is further reason to dismiss it.

4. *The OSC Provides Insufficient Notice And Impermissibly Invites Issues Of Variance.*

Finally, as the Court can see from the discussion that follows, there are many instances where Judge Mosman's OSC has misleadingly excerpted the transcript to give an incomplete or inaccurate presentation regarding the conduct in question. This highlights the unfairness of this proceeding, as I have been forced not only to surmise the legal basis of Judge Mosman's

---

[15] *See, e.g.*, Schindler Decl. (attached as Exhibit F) at ¶¶ 2-5, 8.

[16] *Cf. Russell v. United States*, 369 U.S. 749, 768 (1962) (("condemn[ing]" the government's use of "[a] cryptic form of indictment" which "requires the defendant to go to trial with the chief issue undefined" and "enables his conviction to rest on one point and the affirmance of the conviction to rest on another" because "[i]t gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture").

accusations but also spend an inordinate amount of time to correct the blatantly false factual basis of those accusations. In other words, the OSC does not give me or this Court proper notice of the charges against me, either legally or factually. This not only prejudices me in preparing my defense, but it raises some of the same issues I raised in an earlier motion where I pointed out that, if allowed to proceed, this matter will be determined by a judge who is now two places removed from the conduct in question.[17] In other words, the OSC's lack of proper notice further prejudices me by failing to give the Court appropriate notice of what it has been asked to adjudicate: it is impossible in too many instances for me or the Court to divine with certainty the legal or factual basis underlying the OSC's summary allegations without seeking Judge Mosman's elaboration and/or clarification, which would impermissible. Judge Mosman already conceded as much when he tried to "clarify" the OSC – in a manner that I objected to above as misleading – in the same order where he recused, *sua sponte*, and for the second time.[18] In other words, by failing to specify the applicable rules or rulings that it accuses me of violating, or how I violated them, the OSC fails to meet what, in criminal procedure terms, would be construed as an issue of factual insufficiency,[19] or as impermissible issues of variance.[20] In explaining the

---

[17] *See Bundy* matter, Docket No. 2187 at 5

[18] *See Bundy* matter, Docket No. 2101 at 2.

[19] In the context of a criminal indictment, the Supreme Court has explained that an indictment must contain a statement of factual and legal elements of the charges, which both "sufficiently apprises the defendant of what he must be prepared to meet," and establishes the record for purposes of making determinations regarding double jeopardy. *Russell*, 369 U.S. at 763-64.

[20] The law regarding variances begins with the fundamental rule: "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). In *Stirone*, the Supreme Court held that that the variance "between pleading and proof" in that case "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury," and that allowing a defendant to be prosecuted for conduct not charged by the grand jury impermissibly allowed the government to create circumstances where one could not say for certain whether the defendant "was convicted solely on the charge made in the indictment." *Id.* at 215-18. A variance

standards that should apply to disciplinary proceedings, courts have suggested that they may look to criminal procedure for analogies. *See, e.g., Stringer*, 233 F.2d at 947 (describing the disciplinary proceeding as having been initiated by "information (not strictly a criminal one)" which "charged" the attorney of violating "his obligations as a lawyer" to his client); *In re Los Angeles County Pioneer Soc.*, 217 F.2d 190, 193 (9th Cir. 1954) (noting that while "the rules of practice in a disbarment proceeding are more flexible than those prevailing in criminal cases, and that a formal charge is not indispensable … that is not to say that an attorney can be disbarred without a charge in some form"). Just as a court may not broaden or narrow the scope of an indictment returned by the grand jury, it should not be permitted to broaden or vary the scope of an order to show cause seeking to impose disciplinary sanctions – especially where the proper and intended scope of the OSC cannot be divined. This is one more reason to dismiss the OSC for failing to provide proper notice, and I object and request that the OSC be summarily dismissed on that additional basis.

5. *The OSC Fails To Give Me Notice Of The Procedures That Govern Its Resolution.*

The proceedings initiated by the OSC are further deficient by failing to identify the applicable procedural rules that should apply to this matter. In the *In re Los Angeles County Pioneer* case, the Ninth Circuit reversed a disbarment order for having violated the attorney's rights to due process, and suggested that the District Court for the Southern District of California could avoid the issues that necessitated that reversal by enacting procedural rules for disbarment modeled on the then-current rules of the U.S. District Court for the District of Oregon. *See In re Los Angeles County Pioneer Soc.*, 217 F.2d at 195 n.1. But that was 1954, more than 60 years

---

will usually result in a mistrial because "[d]efendants (and their counsel) [are] at the very least, deprived of adequate notice of the charges against them, and they were therefore limited in their ability to prepare a defense at trial." *United States v. Dellosantos*, 649 F.3d 109, 124-25 (1st Cir. 2011) (reversing conviction for drug conspiracy where "the evidence did not support a finding of a single overarching conspiracy covering all the relevant drug dealing").

ago. Judge Mosman's OSC makes no mention of what, if any, applicable procedural rules govern this matter. And it appears the District has long done away with the procedural rules referenced in *In re Los Angeles County Pioneer*. In preparing this response, I have tried to determine what are the applicable procedural rules, but what I have found is a void.

It is significant in this respect that the Court's Statement of Professionalism asserts, uncategorically, that "[a]ttorney admissions, discipline, and standards of professional conduct are addressed in LR 83," giving special attention to Local Rule 83-6.[21] But Local Rule 83 is limited to potential reciprocal disciplinary proceedings – i.e., the procedure that applies where an attorney has been disciplined by another court – and it says absolutely nothing about the procedures that apply to disciplinary proceedings originating in this Court.[22] In some instances, it appears that counsel for the District Court has tried to take advantage of the void of applicable rules – suggesting that the Court need not give me an actual evidentiary hearing because it can revoke my admission with some form of summary proceeding.[23] I am grateful that the Court has thus far rejected those efforts, but that does not resolve the notable absence of any identifiable procedures governing this matter. Standing alone, I think I can understand why a court might respond to the argument in this subsection to conclude that the lack of established procedures and processes by itself will not invalidate the OSC – as one could argue that the inherent power of a court to discipline attorneys appearing before it necessarily includes a concurrently inherent power to establish the appropriate procedures, so long as those procedures satisfy the demands of due process and other considerations. But the Court cannot address these issues in isolation.

---

[21] See the District Court's Statement of Professionalism and Notice of Rule 83-6, available at https://www.ord.uscourts.gov/index.php/attorneys/statement-of-professionalism.

[22] *See* LR 83-6.

[23] *See Bundy* matter, Docket No. 2187.

When combined with the other deficiencies specified in this Response, the OSC goes too far to require that everyone involved – especially me and the Court – continually engage in assumptions and speculation about not only the legal and factual bases of the OSC but also the procedures that govern how it should be resolved. I raise the issue here as an additional reason to dismiss the OSC for failing to provide me with sufficient notice and an opportunity to be heard.

6. *The OSC Is Tainted By Judge Mosman's Continued Participation Following Recusal.*

I mentioned above that I am grateful the Court has rejected Mr. Weaver's efforts to limit my ability to present evidence in my defense in this matter. Those efforts raise issues regarding his role and involvement in this case in the first place, including how Mr. Weaver came to be appointed and whether he has the necessary authority to act on behalf of the Court. As stated above, once recused, a judge may not take any further action "other than the ministerial act of transferring the case to another judge." *Shell Oil Co.*, 672 F.3d at 1290-91; *Stringer*, 233 F.2d at 948. A "ministerial act" ss one that "does not involve the exercise of discretion or judgment." *O'Keefe*, 128 F.3d at 891.

Here, Judge Mosman recused himself *sua sponte* – for the second time – on May 17, 2017, after admitting that his partiality could reasonably be questioned in this matter.[24] And yet, more than a month later, on June 22, 2017, Judge Mosman reappeared in this matter to appoint Robert Weaver "to prosecute the Order to Show Cause pending against Marcus Mumford."[25] The rest of that order makes reference to the Court so-called "Pro Bono Program," which makes it a little uncomfortable to criticize Mr. Weaver's role here – given that it does not appear that he has any financial interests at stake. But the fact that Judge Mosman appointed Mr. Weaver to serve as the Court's pro bono counsel does not transform his improper ruling into a proper one.

---

[24] *Bundy* matter, Docket No. 2101 at 2-3.

[25] *Bundy* Matter, Docket No. 2145 at 1.

Whenever a judge is disqualified or recused, the subsequent judge assigned must determine whether to vacate the court orders issued *prior to recusal. Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988); *see also Shell Oil Co.*, 672 F.3d at 1290-91; *Mangini*, 314 F.3d at 1161 (vacating judge's prior order); *O'Keefe*, 128 F.3d at 891 (noting that the values underlying the federal recusal statute include "protecting the litigants' constitutional entitlement to an unbiased adjudication and the public's perception of the integrity of the judicial process" (citing *Doddy*, 101 F.3d at 457); *Rohrbach v. AT&T Nassau Metals Corp.*, 915 F. Supp. 712, 718 (M.D. Penn. 1996) (vacating prior actions of disqualifying judge); *Chambers v. Kansas City Comm. College*, 2014 WL 326021, at *3 (D. Kan. 2014) (vacating prior judge's summary judgment order). In making that determination, the Supreme Court has directed courts to "consider the risk of injustice to the parties …, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. The need to vacate Judge Mosman's order appointing Mr. Weaver becomes even more clear when one realizes that Judge Mosman entered the order appointing Mr. Weaver over a month after he issued the OSC. So it does not appear to even fall within the discretionary *Liljeberg* factors. But even it did, those factors should apply here to reconsider the OSC. Courts have vacated a disqualified judge's prior rulings, even where the "initial reason for disqualification is no longer present." *DeFazio*, 2007 WL 926510, at *2-*3 (citing *Stringer*, 233 F.2d at 948)).

Now perhaps Judge Mosman would defend his actions by arguing that the order appointing Mr. Weaver was merely "ministerial." But the act of appointing counsel to represent the Court's interest in this matter clearly "involve[s] the exercise of discretion or judgment." *O'Keefe*, 128 F.3d at 891. Moreover, I understand from Mr. Weaver that he and Judge Mosman

are friends and former colleagues, having worked together several years ago in the United States Attorney's Office. That seems to color the language Judge Mosman used in his order appointing Mr. Weaver to "prosecute" me.[26] And it only makes matters more objectionable to realize that the timing of Judge Mosman's OSC – as it was filed a few weeks after the government dismissed its criminal case against me for some of the conduct now asserted in the OSC.

Further related to this issue, I recall that Mr. Weaver refused my request for discovery regarding the communications with the Court that led to his appointment, including any correspondence with Judge Mosman. Having made an issue of several false allegations that made against me in this matter, I want to be careful that I do not similarly bear false witness against another. Even where Mr. Weaver and I have not been able to reach agreement regarding some matters, I have had no issue with his courtesy and professionalism. But Judge Mosman issued the OSC with the understanding and intent of harming my reputation and livelihood. The fact that he had *ex parte* communications with Mr. Weaver or others related to Mr. Weaver's appointment in the same time period where he admitted his impartiality was in question[27] seems to confirm the impropriety of both the order appointing Mr. Weaver and the OSC itself. Accordingly, I respectfully request that the Court disqualify Mr. Weaver. And I raise this issue and also the *Liljeberg* factors as additional reasons to vacate the OSC and thereby "purge the perception of partiality" in this matter. *Mangini*, 314 F.3d at 1161.

### 7. The OSC Should Be Dismissed As Unduly Vindictive And/Or Selective.

The cumulative effect of the issues raised in this Response leads me to ask a number of "why?" questions regarding Judge Mosman's OSC: First, why did Judge Mosman feel the need to issue an OSC seeking to revoke my admission *pro hac vice* in the first place? My client had

---

[26] *Bundy* Matter, Docket No. 2145 at 1.

[27] *Bundy* matter, Docket No. 2101 at 2-3.

been acquitted on all charges. Among other things, Judge Brown confirmed during the October 27, 2016 proceedings that my client was acquitted and released as far as it concerned any authority that she had over the matter.[28] And after the parties conferred as to the form of the final judgment of acquittal, Judge Brown entered it on November __, 2016, effectively closing the case as to my client.[29] That concluded my involvement in the *Bundy* matter, and I have not had any further appearance in it since.

So what led Judge Mosman to determine that he needed to take the action against me contemplated by the OSC, over five months after the final judgment was filed and almost six months after acquittal? "While it is indeed true that admission *pro hac vice* is a privilege, not a right, revocation of that privilege, once bestowed, sends a strong message which works a lasting hardship on an attorney's reputation." *Mruz v. Caring, Inc.*, 166 F. Supp. 2d 61, 70 (D.N.J. 2001) (citation omitted). In *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109 (9th Cir. 2005), the Ninth Circuit noted that the same disciplinary sanctions contemplated by the OSC in this case "may expose [the attorney in question] to further sanctions by the bar and portends adverse effects upon counsel's careers and public image." *See also In re Bundy*, 840 F.3d 1034, 1045 (9th Cir. 2016) (affirming denial of a *pro hac vice* application based in part on another court's revocation of the attorney's *pro hac vice* admission almost 20 years earlier). Accordingly, courts have held that revocation of an attorney's admission *pro hac vice* is an "'extreme sanction' that should not be imposed lightly." *Raub*, 2017 WL 5172603, at *2 (quoting *Regional Employers' Assur. Leagues v. Castellano*, 2009 WL 1911671, at *2 (E.D. Pa. July 1, 2009)).

And why only me, as the docket does not reflect any similar action taken by Judge Mosman or another judge against any other lawyer in the *Bundy* matter, either for the defense or

---

[28] Exhibit No. 2069-21, at 29:5-7, 30:5-6.

[29] *See Bundy* matter, Docket No. _____.

government. Yet, as the Court will see from the discussion that follows, many of the issues raised in the OSC reflect the practice utilized by other lawyers throughout the case, whether it was the manner in which counsel argued their positions, examined witnesses, or otherwise conducted themselves in the courtroom. "Once admitted, *pro hac vice* counsel cannot be disqualified under standards and procedures any different … than those imposed upon regular members of the district court bar." *United States v. Collins*, 920 F.2d 619, 626 (10th Cir. 1990); *Cooper v. Hutchinson*, 184 F.2d 119, 123 (3d Cir. 1950) ("[T]he rights and duties of an outside lawyer, once so admitted, appear to be the same as those of a local lawyer."). Courts have found error in rulings that appear to assume "that *pro hac vice* counsel may be disqualified more readily than regularly admitted counsel." *Koller By & Through Koller v. Richardson-Merrell Inc.*, 737 F.2d 1038, 1055 (D.C. Cir. 1984), *vacated sub nom. Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985).[30]

I have to ask also why Judge Mosman issued the OSC, without any apparent input from Judge Brown. Courts routinely hold that "[w]hen the offending conduct takes place in open court, ***the district court must make an immediate decision*** whether the attorney's continued participation in the case will jeopardize the integrity of the proceeding," and have approved of disqualification orders in those circumstances because the judge imposing the sanctions had "supervise[d] the conduct of the case." *Collins*, 920 F.2d at 628 (emphasis added). There was only one instance where Judge Brown mentioned that she was considering holding me in contempt – and in that instance, she admitted and addressed the misunderstanding that she

---

[30] The Supreme Court vacated the decision of the Court of Appeals for the District of Columbia on the ground that orders disqualifying counsel in civil cases are not collateral orders subject to appeal as final judgments within the meaning of 28 U.S.C.A. § 1291. *See Richardson-Merrell, Inc.*, 472 U.S. at 424; *see also* Guide to Multistate Litigation, at § 4:6 – Pro hac vice admission (Nov. 2017 Update) (discussing the D.C. Circuit's holding in *Koller*, 737 F.2d at 1055).

sensed we were having and took time to explain what was the objectionable conduct, how she intended to address it in the future by making a finding of contempt and fining me, and what I could do to avoid her threat of disciplinary sanctions.[31] At that time, Judge Brown confirmed that she was not holding me in contempt for anything that had occurred prior to that time. And that was the end of the matter. Other lawyers participating in the trial have noted how me and Judge Brown reached a place of mutual respect for each other.[32] That sentiment is consistent with what I expressed to Judge Brown on October 27, 2016, after the marshals attacked and arrested me, and in my email the following day.[33] Where Judge Mosman's OSC now singles me out for disciplinary sanctions on matters that were either resolved during the *Bundy* trial or left unaddressed, it not only creates problems regarding "notice" as set forth above, but it also creates a problem of comity and judicial efficiency, as it eliminates the possibility for an attorney and judge to resolve differences that arise, *at least with any confidence that those differences will stay resolved*. It also creates potential conflict between different judges on the court, inviting "the prospect of 'the most tyrannical licentiousness'" that sometimes arises in proceedings where the offended judge is "responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *International Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 831-32 (1994). Finally, the fact that Judge Mosman is seeking to address conduct that he did not observe himself runs contrary to the concept of "inherent power," which is limited to what is "necessary to the exercise of all others." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (quoting *Roadway Express, Inc. v. Pipe*r, 447 U.S. 752, 764 (1980)). If Judge Mosman did not preside over the conduct he seeks to now address, how can the Court be certain

---

[31] Exhibit No. 2069-6 at 7:8-12:3.

[32] Ludwig Decl. (Exhibit __), at ¶ __.

[33] See attached Exhibit A

that the sanctions he now seeks to impose on me pursuant to his inherent power are "necessary," or that they are "tailor[ed] … to appropriately address the harm identified," *Raub*, 2017 WL 5172603, at *2 (citing *Republic of the Philippines*., 43 F.3d at 74), as opposed to "tyrannical licentiousness"? *See United Mine Workers*, 512 U.S. at 831.

And I have to ask "why?" questions related to the timing of the OSC. Why did Judge Mosman file the OSC on April 12, 2017, almost six months after Mr. Bundy's acquittal? Why not earlier or later? On October 27, 2016, the U.S. Marshals attacked and tased me in the courtroom following my client's acquittal, and the government cited me for violating provisions of the Code of Federal Regulations for the same alleged misconduct now raised in OSC ¶ 5. The next day, the U.S. Marshals Service issued a press release alleging that I became "upset and aggressive in the courtroom after learning that … [Mr. Bundy] could not be released due to outstanding warrants in Nevada." On October 29, 2016, Judge Mosman wrote to say he was "getting up to speed" on the issues I raised with him the day before.[34]

On January 6, 2017, I appeared to answer the government's allegations against me. In January 2017, the government filed an information, and I appeared to plead not guilty to the following offenses: disorderly conduct that impeded federal employees from the performance of official duties by allegedly "verbally and physically interfering with members of the U.S. Marshals service in their transportation of a person in their custody, in violation of 41 C.F.R. § 102-74.390(c)"; and failing to comply with the lawful directions of a federal police officer, in violation of 41 C.F.R. § 102-74.385, by allegedly refusing to comply with U.S. Marshals' and Federal Protective Service officers' instructions "to stop resisting, stop kicking, and to place his

---

[34] Exhibit A.

hands behind his back."[35] Around that time period, Judge Mosman recused himself in response to requests for materials that would assist my defense. He remained recused presumably until the government's prosecution against me was dismissed. In the late January/early February 2017 time period, my defense team filed a number of motions challenging the government's prosecution. On February 16, 2017, the Court ordered the government to produce certain categories of information to assist in my defense, including any texts sent or received by members of the U.S. Marshals, DHS , or the Federal Protection Services that might "reveal hostility towards [me] or in any way casts doubt on [the Marshals' credibility."[36] But a few weeks later, around the time that I expected to receive the court-ordered discovery, I was notified that the government was going to dismiss, and on March 15, 2017, the Court dismissed the matter without prejudice on the government's motion.[37]

It appears that Judge Mosman had the excerpted transcripts attached to the OSC prepared in two or three waves, the timing of which overlaps with the timing of the government's prosecution of me, the last eight excerpts prepared shortly after the case was dismissed.[38] Within a few weeks after the prosecution was dismissed, Judge Mosman emerged and filed the OSC, seeking to impose serious sanctions against me for some of the same alleged misconduct. He

---

[35] *United States v. Marcus R. Mumford*, Case No. 3:17-cr-0008-JCC (D. Ore.) (hereinafter, "*US v. Mumford*"), at Docket No. 1, at 1-3.

[36] *US v. Mumford*, Docket No. 28, at 2.

[37] *US v. Mumford*, Docket No. 32.

[38] OSC, Exhibit 2069-1 at 24 (1/30/2017), Exhibit 2069-2 at 14 (1/30/2017), Exhibit 2069-3 at 16 (1/30/2017), Exhibit 2069-4 at 35 (1/30/2017), Exhibit 2069-5 at 29 (2/6/2017),  Exhibit 2069-6 at 12 (2/6/2017), Exhibit 2069-7 at 22 (2/6/2017), Exhibit 2069-8 at 15 (2/6/2017), Exhibit 2069-9 at 34 (2/6/2017), Exhibit 2069-10 at 48 (2/6/2017), Exhibit 2069-11  at 23 (2/6/2017), Exhibit 2069-12 at 73 (2/6/2017), Exhibit 2069-13 at 33 (2/6/2017), Exhibit 2069-14 at 16 (2/6/2017), Exhibit 2069-15 at 31 (2/6/2017), Exhibit 2069-16 at 9 (3/29/2017), Exhibit 2069-17 at 8 (3/29/2017), Exhibit 2069-18 at 9 (3/29/2017), Exhibit 2069-19 at 14 (3/29/2017), Exhibit 2069-20 at 23 (3/29/2017), Exhibit 2069-23 at 6 (3/30/2017), Exhibit 2069-24 at 5 (3/30/2017), Exhibit 2069-25 at 5 (3/30/2017).

recuses again a few weeks later but remains involved to the extent he needs in order to issue the order appointing Mr. Weaver to prosecute me. As the Court can see from some of the attached declarations that I have gathered for this response, there is good reason to believe that the U.S. Marshals acted intentionally in their efforts to attack me on October 27, 2016, as some kind of perverse reckoning to settle scores after my work in defending Mr. Bundy proved effective.[39] Why does the filing of the OSC seem to line up with what is essentially a second effort to punish me, and thereby excuse the marshals, for the events of October 27?

There is another aspect of timing that concerns me. In the government's prosecution of the Bundy defendants in Nevada, an issue was raised in 2016 regarding the effort to get Cliven Bundy's attorney admitted pro hac vice. See In re Bundy, 840 F.3d 1034, 1045-46 (9th Cir. 2016). The district court denied the application, in part, based on rulings from 20 years earlier in some cases where courts had revoked that attorney's pro hac vice admission. In a split decision issued on October 28, 2016, the Ninth Circuit affirmed. And in March 2017, less than two weeks before Judge Mosman issued his OSC, the Ninth Circuit shuts the door on the issue by denying the attorney's effort to seek mandamus. 852 F.3d 945 (9th Cir. 2017). I raise the issue here because, as I have sought guidance and feedback from persons who I consider mentors, I have had to conclude that there are vindictive aspects to the OSC, and the timing suggests coordination between the government and the court.

These questions raise further concerns about the validity and/or propriety of the OSC. "[A] prosecution which would not have been initiated but for governmental 'vindictiveness'—a prosecution, that is, which has an 'actual retaliatory motivation'—is constitutionally impermissible." *United States v. Adams,* 870 F.2d 1140, 1145 (6th Cir.1989) (remanding for

---

[39] *See* Mendenhall Decl. at ¶¶ 12-14; Olson Decl. at ¶ 7; Ludwig Decl. at ¶¶ 7-8; Salisbury Decl. at ¶ 7; Schinlder Decl. at ¶ 15; *see also* emails attached as Exhibit 1.

further consideration of whether the bringing of charges for making false tax returns was motivated by a desire to punish defendant for her allegations of gender-discrimination against her government employer) (quoting *Blackledge,* 417 U.S. at 27-28). To establish a claim for vindictive prosecution: "A defendant has the burden of proof and must establish either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons." *United States v. P.H.E., Inc.*, 965 F.2d 848, 860 (10th Cir. 1992) (quoting *United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991)); s*ee also Goodwin*, 457 U.S. at 389 ("In declining to apply a presumption of vindictiveness, we of course do not foreclose the possibility that a defendant in an appropriate case might prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allows him to do."). Coordination evidence by the DOJ complaints against me un other jurisdictions.

8.  *The OSC Fails To Involve Judge Brown.*

Mutual respect developed. But the Court must realize the environment of trial.

Judge Brown has previously said: "No one should ever be acquitted in her courtroom. Such a series of catastrophic errors for someone to get into my courtroom to be acquitted."

American Standoff Aftermath, Episode 3, at 3:02 to 3:15 minutes of (available at https://www.youtube.com/watch?v=WSW7hb5WprA&list=PLYtkcRpMOp8K_i785NBNcBM6f x_Gg9TX0&index=3).

That turns presumption of innocence on its head.

And it ignores things like stuttering – insert discussion.

.

9.  *The OSC Fails To Acknowledge The Standards That Guide The Work Of A Criminal Defense Attorney.*

Insert discussion of standards that apply to the work of criminal defense attorneys, which the OSC fails to take into consideration

### III. The Applicable Legal Standard

To prevail on a motion to disqualify counsel, the movant bears the burden of establishing that a particular sanction is warranted. *Raub*, 2017 WL 5172603, at *3 (citing *Marino v. Usher*, 2014 WL 2116114, at *6 (E.D. Pa. 2014)). In deciding a motion for disqualification, "'the court must consider the client's right to be represented by the counsel of his choice, as well as the opposing party's right to prepare and try its case without prejudice.'" *Raub*, 2017 WL 5172603, at *3 (quoting *University Patents, Inc. v. Kligman*, 737 F. Supp. 325, 329 (E.D. Pa.1990), where the court declined to disqualify plaintiff's counsel because defendant suffered no prejudice)).

I understand that the Court's OSC is considering imposing disciplinary sanctions against me that would include a possible revocation of my *pro hac vice* admission and/or an order permanently barring me from practicing law in the District of Oregon, and that either sanction carries with it potentially career-limiting if not career-ending consequences.[40] It is well

---

[40] In *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109 (9th Cir. 2005), the Ninth Circuit noted that the same disciplinary sanctions contemplated by the OSC in this case "may expose [the attorney in question] to further sanctions by the bar and portends adverse effects upon counsel's careers and public image." *See also In re Bundy*, 840 F.3d 1034, 1045 (9th Cir. 2016) (affirming the denial of a *pro hac vice* application based in part on a revocation of the attorney's *pro hac vice* status in another court almost 20 years earlier).

established that within the federal court system, "each district court is authorized to govern and discipline its own bar," *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1198 (9th Cir. 1999), but the reach of such discipline is limited to "protecting the due and orderly administration of justice" and for "maintaining the authority and dignity of the court." *Cooke v. United States,* 267 U.S. 517, 539 (1925). Regarding attorneys who have been admitted to practice law in any federal district *pro hac vice*, there is no separate legal standard. *See United States v. Collins*, 920 F.2d 619, 626 (10th Cir. 1990) ("Attorneys admitted *pro hac vice* are held to the same professional responsibilities and ethical standards as regular counsel. Once admitted, *pro hac vice* counsel cannot be disqualified under standards and procedures any different … than those imposed upon regular members of the district court bar.").

In the present circumstances, without identifying any specific rule, statue or other legal authority, Judge Mosman's OSC expressly contemplates the revocation of my admission *pro hac vice* and the imposition of an order permanently barring me from being admitted to practice law in the District of Oregon. Thus, it appears that the court is relying upon its own inherent supervisory authority alone. *See, e.g., Ex parte Burr*, 22 U.S. (9 Wheat.) 529 (1824). While the court certainly has this authority, any consideration of disbarment or revocation of the ability to appear before the court is among the highest possible sanctions, and is governed by exceptionally high standards, including the establishment of both "factual and legal prerequisites" before any such exercise of this power is legitimate. *Zambrano v. City of Tustin,* 885 F.2d 1473, 1478 (9th Cir. 1989); *In re L.A. Cnty. Pioneer Soc'y,* 217 F.2d 190, 193–94 (9th Cir. 1954) (collecting cases). The first consideration in determining whether to impose the sanctions contemplated by the OSC is my due process rights to fair and adequate notice – and my corresponding right to be heard *after* being afforded that notice. *Cole v. U.S. Dist. Court*, 366 F.3d 813, 821 (9th Cir.

2004) ("[R]evocation of *pro hac vice* status is a form of sanction that cannot be imposed without notice and an opportunity to be heard."). The second consideration derives from both the Sixth Amendment and Fifth Amendment due process rights of my client, a criminal defendant.[41] *See United States v. Dinitz*, 538 F.2d 1214, 1219 (5th Cir. 1976) ("In this connection, of course, the Sixth Amendment is indisputably relevant, for it helps define the limits of judicial discretion."); *Collins*, 920 F.2d at 627 (10th Cir. 1990) (noting that in a criminal case, considerations of attorney sanctions must balance the "social need for ethical practice" of law, and before imposing disbarment or disqualification, an express finding that this need, under the circumstances then present, "outweighs the party's right to counsel of his choice").

As an initial matter, Judge Mosman's OSC fails to state the authority that it is relying on or the authority to revoke *pro hac vice* status. The OSC did not address the implication of the potential sanction on the defendant in this case, my client Ammon Bundy, and did not explain why the allegedly sanctionable conduct rises to the potential of disbarment. Courts have held that these two shortcomings are so insufficient as to justify, by themselves, immediate termination of these proceedings. *See, e.g., Cole*, 366 F.3d at 822 (holding that an order to show cause regarding the potential revocation of *pro hac vice* status that does not expressly state both "the potential sanctions and the reasons for the sanction" constitutes a violation of the attorney's due process rights); *Johnson v. Trueblood*, 629 F.2d 302, 304 (3d Cir. 1980) (due process in considering revocation of *pro hac vice* status requires, at a minimum, that "the attorney somehow receive notice of the standard that will be applied to his conduct").

---

[41] "The damage in this case includes the petitioners' loss of a lead counsel... And if [the attorney's] knowledge could be gained by another counsel, another attorney still may not gain the same quality of attorney-client relationship and rapport ...Once a new attorney is brought in, the effect of the order is irreversible."). *Cole*, 366 F.3d at 813.

But even if we assume that the OSC has satisfied the Due Process and Sixth Amendment criteria indicated above, the relevant legal standards require that the Court[42] also make specific findings of "willful abuse of the judicial process," *see Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Or. Ltd. Partnership,* 76 F.3d 1003, 1007 (9th Cir. 1996), or "bad faith conduct during litigation," *Western Sys., Inc. v. Ulloa,* 958 F.2d 864, 873 (9th Cir. 1992). These findings have to be express and explicit so that I can be certain that I understand the court's allegations against me. But there is nothing in the OSC that argues, explains, analyzes or specifies any conduct of mine to satisfy this high bar. *See Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) ("Before awarding sanctions under its inherent powers, however, the court must make an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith.'" (citing *Roadway Express,* 447 U.S. at 767); *see also In re Keegan,* 78 F.3d at 436; *United States v. Stoneberger,* 805 F.2d 1391, 1393 (9th Cir. 1986). An attorney demonstrates bad faith by "delaying or disrupting the litigation or hampering enforcement of a court order." *Hutto v. Finney,* 437 U.S. 678, 689 n. 14 (1978). ("The bad faith requirement sets a high threshold."). Strict adherence to these high standards are justified because the sanction of revoking an attorney's ability to practice law "not only may have a severe effect on the individual attorney sanctioned but also may deter future parties from pursuing colorable claims." *Batarse*, 115 F.3d at 650 ("Because the district court's inherent powers are so potent, we require courts levying sanctions to assess an attorney's individual conduct and to make an explicit finding that he or she acted in bad faith."). The rare case where such sanctions have been applied include

---

[42] "A district court abuses its discretion in imposing sanctions when it bases its decision 'on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Mark Indus. Ltd. v. Sea Captain's Choice, Inc.,* 50 F.3d 730, 732 (9th Cir. 1995) (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405 (1990)); *see also Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1198 (9th Cir. 1999).

circumstances where an attorney has previously been disciplined for the same repeated conduct, where that conduct constitutes a clear violation of repeated court warnings and rules, and where the conduct specified is both "purposeful" and reflects "obdurate refusal to comply" with warnings and prior orders seeking to correct the conduct at issue across multiple cases and with multiple judges. *In re Brown*, 408 B.R. 509, 512 (Bankr. D. Idaho 2009) ("There is absolutely nothing in the record to suggest a temporary suspension of Hale's right to practice in the federal courts in this District would result in his post-suspension compliance with this Court's previous sanction order in *Jones* or any other order the Court might enter addressing how he practices law. Hale has made clear for a significant period of time that his intention is not to comply with this Court's rulings and orders.").[43]  As set forth below, none of those considerations are present here.

For more than the past one hundred and fifty years, courtroom conduct that is not itself remedied or sanctioned by the presiding judge, has not been sufficient grounds to separately invoke the Court's disciplinary powers to disbar, after the fact.  *See, e.g., Ex parte Robinson*, 86 U.S. 505, 512-13 (1873) ("[T]he power can only be exercised where there has been such conduct on the part of the parties complained of as shows them to be unfit to be members of the profession… [else] no one would be safe from oppression wherever power may be lodged."); *Collins*, 920 F.2d at 628 ("When the offending conduct takes place in open court, ***the district court must make an immediate decision*** whether the attorney's continued participation in the case will jeopardize the integrity of the proceeding. A disqualification decision rendered under such circumstances" is the appropriate method of sanction because it is that judge, in that court, observing that behavior where the power to "supervise the conduct of the case."). The above

---

[43] In addition, the court's failure to provide full and official transcripts with its order to show cause, falls short of the due process required by Oregon's local rules. *See, e.g., In re Corrinet*, 645 F.3d 1141, 1146-1147 (9th Cir. 2011).

legal standard is required to protect both the attorney and his client from retaliation by an angry judge or a perturbed court. *Cammer v. United States*, 350 U.S. 399, 406-07 (1956) ("Without either an information or an indictment, but merely on a simple rule to show cause, drawn up in any form the judge may think proper, a man is put upon his trial for an infamous offence, involving in its punishment the loss both of liberty and property. He is deprived both of petit jury and grand jury, and is tried by an angry adversary prepared to sacrifice him and his rights on the altar of his own vengeance."). The Supreme Court has observed how the power to impose supervisory sanctions is "'liable to abuse' … [because] [u]nlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct," and because "[c]ontumacy 'often strikes at the most vulnerable and human qualities of a judge's temperament,' and its fusion of legislative, executive, and judicial powers 'summons forth … the prospect of 'the most tyrannical licentiousness.'" *International Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 831-32 (1994). The Court should quash the OSC.

## IV.    Response To OSC ¶ 4

Addressing matters a bit out of sequence, I understand that Paragraph 4 of the OSC (hereinafter, "OSC ¶ 4"), orders that I show cause why I should not be disciplined for having made what the Court characterizes as an intentionally misleading proffer of "Claud R. Koerber" as a potential defense witness during the *Bundy* trial proceedings.

> 4.    Proffering as substantive evidence the fact-testimony of "Claud R. Koerber" without first disclosing to the Court that you associated the same individual under the name "Rick Koerber" as a paralegal in this case who was present in the courtroom throughout the trial as part of your defense team and notwithstanding the Court's repeated orders that witnesses were excluded from the courtroom (*See, e.g.*, Ex. 24, Ex. 25), and without timely disclosing that the same individual was also a client of yours in an unrelated, ongoing criminal proceeding. *See* Ex. 22 at 3-4, Ex. 23 at 4-5; Motion (#1424) to Reconsider Preliminary Rulings Excluding Witnesses at 17-25.

**OSC ¶ 4**

Though OSC ¶ 4 does not identify the particular rule or order is accuses me of violating, besides a passing reference to Judge Brown's generic witness exclusion order, I assume that it raises three issues of potential misconduct:

(1)    Whether I tried to mislead Judge Brown by proffering "Claud R. Koeber" as a potential defense witness without disclosing that he also went by the name "Rick Koerber" and was a member of Ammon Bundy's trial team;

(2)    Whether I violated Judge Brown's prior rulings regarding the exclusion of witnesses by proffering Mr. Koerber as a potential defense witness notwithstanding the fact that he had been in the courtroom at various times throughout trial as part of Mr. Bundy's trial team; and

(3)    Whether I violated an unspecified duty to disclose in the defense's proffer of witnesses that Mr. Koerber was a former client in an unrelated criminal proceeding that had been dismissed with prejudice in 2014 based, in part, on a widespread pattern of prosecutorial misconduct.

In what follows, I provide a detailed response to each of these three issues. But I can summarize my overall response: the allegations made by the Court in OSC ¶ 4 are false and misleading. The full context and record of my communications with Judge Brown regarding Mr. Koerber, both prior to and during trial, contradicts the allegations made in OSC ¶ 4 and shows that there was never an effort by me or other members of the defense team to conceal any issues regarding Mr. Koerber. In fact, I have attached and referenced materials – including essential

evidence not reflected in the official transcript, but plainly available to parties in the *Bundy* matter and most importantly to Judge Brown – to show how the purportedly undisclosed issues raised in OSC ¶ 4 had actually been thoroughly, candidly and repeatedly disclosed to the Court prior to the October 2016 joint proffer of potential defense witnesses, and that the allegations made in OSC ¶ 4 are inconsistent with Judge Brown's request for the joint proffer of potential defense witnesses in the first place.[44] These documents help demonstrate why there are no grounds for discipline arising from the proffer of Mr. Koerber as a potential defense witness in the *Bundy* matter. One would hope that Judge Mosman would have at least asked to review Judge Brown's records before accusing me of violating court orders or otherwise trying to mislead her with respect to the joint defense team's October 12, 2016 proffer of potential defense witnesses.

    1.  *I Did Not Attempt To Mislead Judge Brown In Proffering Mr. Koerber As A Witness.*

As background, I should point out that Mr. Koerber's involvement in the *Bundy* matter preceded mine by several months. I understand that he was initially retained as a paralegal by Ammon Bundy's former counsel, Oregon lawyer Mike Arnold, and he was also separately appointed by Judge Brown as a CJA-authorized paralegal for Defendant Ryan Bundy, under the supervision Ryan Bundy's appointed counsel, Lisa Ludwig, Esq. I raise these facts because both of those events preceded my appearance in this action on behalf of Ammon Bundy, and also because I want this Court to review the letter of recommendation that I wrote in support of Mr. Koerber's CJA application, attached hereto as Exhibit __, and then shove it in Judge Mosman's face.

---

[44] The OSC does not specify, but it appears the proffer at issue in OSC ¶ 4 was made on October 12, 2016, in an email to Judge Brown and government counsel from my co-counsel, J. Morgan Philpot, on behalf of the defense teams representing the seven defendants standing trial at the time. *See* attached Exhibit __.

I wrote that letter recommending Mr. Koerber in late March 2016, with the understanding that it would be submitted to the judicial authority who would consider and approve his CJA Application. The substance of my letter contradicts the substance of the Court's allegations in OSC ¶ 4, and shows how candid I was in presenting for the Court's benefit some of the very information that Judge Mosman accuses me of intentionally withholding from the October 2016 joint proffer of potential defense witnesses. Besides writing the letter of recommendation in favor of Mr. Koerber's CJA appointment, I did not have any further involvement in assembling the information presented by Mr. Koerber's CJA application, and so I do not know who would have actually reviewed the letter or the information contained therein in the context of approving Mr. Koerber as a CJA- appointed paralegal for Ryan Bundy. I have attempted to obtain a copy of Mr. Koerber's CJA application in preparing this response,[45] and I understand that it was submitted to Judge Brown on or about April 14, 2016, by attorney Lisa Ludwig, court-appointed stand-by counsel for Defendant Ryan Bundy. Regarding my letter of recommendation for Mr. Koerber, Mr. Ludwig explained to me that she may have attached it to Mr. Koerber's CJA Application, which was submitted to Judge Brown directly, or that she would have, at a minimum, summarized its contents in the motion that she filed with Judge Brown seeking Mr. Koerber's CJA-appointment as Ryan Bundy's paralegal. I am attaching the following additional materials that I understand would have accompanied Mr. Koerber's CJA Application: (1) the

---

[45] On this point, I would request that this Court provide a copy of the application in its records, as I have been forced to rely on the cooperation of other counsel appearing in this matter, and their staff. These are fine legal professionals, and they have been more than generous with their time and resources. While I have no reason to question the authenticity of the materials they have provided, or the veracity of their factual accounts reported herein, I realize that they are busy professionals with active law practices, and that the requests that I have been forced to make of them in responding to the OSC have been, to be candid, kind of a nuisance. Receiving a copy of what the Court has in its records will help either identify any inconsistencies with the understandings stated in this section and/or eliminate the potential for them.

motion that Ms. Ludwig prepared and signed in support of Mr. Koerber's appointment under the CJA, which was titled: "Motion For Approval Of Extraordinary Expenses – Paralegal"; (2) a Declaration of Stand-By Counsel In Support Of Motion For Approval Of Extraordinary Expenses – Paralegal, signed by Ms. Ludwig; and (3) Mr. Koerber's Curriculum Vitae. See Exhibits 2, 3, and 4. I understand from Ms. Ludwig that Judge Brown approved Mr. Koerber's CJA Application on May 11, 2016, pre-authorizing a CJA voucher to compensate Mr. Koerber for work as a paralegal on behalf of Ryan Bundy. See attached Exhibit 5.

The Koerber CJA Application materials submitted to Judge Brown are significant to the issues presented in OSC ¶ 4 because they show that Judge Brown would have been well-aware, several months prior to my having any involvement in this case, that "Claud R. Koerber" also went by "Rick Koerber," and because those materials disclosed, among other things, the case where Mr. Koerber was a named defendant, and that I represented him in that matter. Ms. Ludwig's motion to appoint Mr. Koerber as a CJA-authorized paralegal, dated April 14, 2016, makes clear that "Claud" and "Rick" Koerber are one and the same in seeking Judge Brown's appointment of "Claud (Rick) Koerber" as Ryan Bundy's CJA-authorized paralegal. Ex. 2 at 1. The declaration that Ms. Ludwig submitted in support of that motion similarly referred to Mr. Koerber as "Claud ('Rick') Koerber." Ex. 3 at ¶ 6. In that declaration, Ms. Ludwig also described the letter of recommendation that I wrote in support of Mr. Koerber's CJA-appointment and his Curriculum Vitae. See Exs. 1, 3 & 4. Mr. Ludwig told me that she may have also attached it to the other CJA Application materials submitted to the Court. Regardless, I would direct the Court to Mr. Koerber's CV, which includes his rickkoerber@[redacted] email address and citations to the case of *United States v. Koerber* pending in Utah federal court, where I represented Mr. Koerber, and where we had obtained a dismissal *with prejudice*, findings by

the Utah court that prosecutors had been engaged in a "widespread and systematic pattern of prosecutorial misconduct" and violations of Mr. Koerber's constitutional Due Process rights just to bring an indictment in the first instance. *See* Ex. 4 (citing *United States v. Koerber*, 966 F. Supp. 2d 1207 (D. Utah 2013), and *United States v. Koerber*, 2014 WL 4060618 (D. Utah Aug. 14, 2014), *rev'd in part and remanded*, 2016 WL 240537 (10th Cir. Jan. 21, 2016)).

I present this information – all of which predated the appearance I made in the *Bundy* matter on behalf of Ammon Bundy in June 2016 – in hopes that the Court will appreciate my candor in disclosing some of the information that Judge Mosman now accuses me falsely of intentionally omitting, long before the joint proffer of potential defense witnesses in October 2016. The Court should realize that, contrary to the import of those allegations asserted in OSC ¶ 4, by the time the joint proffer of potential defense witnesses was made on October 12, 2016, any effort on my part to try and conceal Mr. Koerber's identity, my prior association with him, or his presence in the courtroom during trial, from Judge Brown would have been unreasonable and futile. Given the disclosures that had already been made by that point regarding Mr. Koerber, and Mr. Koerber's interactions with the Court in getting appointed as a CJA-authorized paralegal for Ryan Bundy, I could not have misled the Court regarding the matters alleged in OSC ¶ 4, even if I had wanted to. In fact, in one of the transcript excerpts attached as Exhibit 23 to the OSC, Judge Brown acknowledged that she was familiar with Mr. Koerber's work on the case since at least March or April 2016, when she had "identified and approved" Mr. Koerber "through the CJA funding to work on behalf of Ryan Bundy for a limited period of time, and then I understand, Mr. Mumford, your office engaged him." Doc. 2069-23 at 4:22-25.

I understand that from at least July 2016 Judge Brown took several actions demonstrating her special interest in supervising Mr. Koerber's CJA-appointment, and those actions further

belie the allegations made in OSC ¶ 4. Ms. Ludwig informed me that, at some point in the

summer of 2016 before trial began, Judge Brown contacted Ms. Ludwig's office to inquire into

the status of Mr. Koerber's CJA-appointed work and whether Mr. Koerber was planning to be

compensated through the CJA for the work that he was doing for Ammon as opposed to Ryan

Bundy. I understand that Ms. Ludwig responded to inform Judge Brown that Mr. Koerber had

not submitted any time to her for work on Ryan Bundy's case and, therefore, she had not made

any request for the CJA funds that Judge Brown had pre-approved in granting Mr. Koerber's

CJA Application.[46]

    In the early September 2016 time period, Judge Brown raised similar issues *with me and*

*my co-counsel*. On September 1, 2016, my co-counsel, Morgan Philpot, wrote an email

requesting that Judge Brown allow "our paralegal, and investigator, Mr. Claud R. 'Rick' Koerber

---

[46] Set aside why Judge Brown was making a *sua sponte* inquiry into the issue before Mr. Koerber requested any compensation from the pre-approved CJA voucher – the fact that Judge Brown made such inquiries shows how active she was in supervising Mr. Koerber's involvement in the case, months before trial, and contradicts the allegations made in OSC ¶ 4 that defense counsel somehow misled Judge Brown in the October 12, 2016 joint proffer of potential defense witnesses. In addition to the interaction had with Judge Brown on the issue of Mr. Koerber's status as a CJA-appointed paralegal, I understand that the U.S. marshals and/or county prison officials communicated with Judge Brown – most likely in the August-September 2016 time period – regarding a background check that they performed before granting the request that I made to have Mr. Koerber formally-recognized as a member of Ammon Bundy's trial team, which among other things allowed him to help arrange in-person visits with Mr. Bundy as part of our trial preparation efforts and to sit in the courtroom area designated by Judge Brown for members of the seven defense teams. Given the fact that the background check would have pre-dated the witness proffer at issue in OSC ¶ 4 by several weeks, it seems that any communications that Judge Brown had related to that background check or my trial team request would help contradict the accusations made in OSC ¶ 4. I bring up the issue here to illustrate why the Court's approach to evidentiary matters should reflect the nature of the allegations made in the OSC – and to request the Court's help in obtaining emails or text messages to or from Judge Brown in the March-October 2016 time period related to Mr. Koerber. If the Court is going to suggest that I misled Judge Brown by proferring Mr. Koerber as "Claud R." as opposed to "Rick" Koerber, or somehow concealed Mr. Koerber's status as a member of our trial team present in the courtroom throughout the trial, then I should be able to gather and present all of the evidence, including documents and witnesses, contradicting allegations.

to sit at counsel table" during the upcoming trial. That email is attached as Exhibit 6. The Court can see that Judge Brown personally responded to Mr. Philpot's September 1 email, denying the request for an extra seat at counsel table but inviting us to have "Mr. Koerber … use that common defense team space in the back of the well behind the rows of defense tables if that can be coordinated with the rest of the Defendants." (Ex. 6) These pretrial communications with Judge Brown contradict the allegations made in OSC ¶ 4, showing that, long before the October 12 joint proffer of potential defense witnesses, (i) we clearly identified "Claud R. 'Rick' Koerber" as a member of the defense team, and (ii) we dispelled any possible confusion over whether "Claud R." and "Rick" Koerber were two different individuals. Judge Brown was not misled about whether Mr. Koerber had been "present in the courtroom throughout the trial as part of [Ammon Bundy's] defense team" – as OSC ¶ 4 alleges – she was the one who invited him to be there, several weeks before he appeared on any proffer of defense witnesses.

The Court will also see in the September 1 email that Judge Brown raised similar issues to those that Ms. Ludwig described about whether Mr. Koerber was "being compensated through the CJA for work he is doing … on Ammon Bundy's behalf." (Ex. 6.) I recall addressing this issue with Judge Brown at pretrial hearings held September 6-7, 2016, and I intend to request a final transcript of those proceedings to help establish that fact. As I recall, I responded in those hearings to give Judge Brown my personal assurance that I would make certain that Mr. Koerber did not submit any application for CJA funds for work done on Ammon Bundy's behalf. I can tell the Court that I followed through on the assurances that I made to Judge Brown in that respect. In fact, part of the reason why an issue never developed on that point is because Mr. Koerber never made any application for the CJA funds that Judge Brown pre-authorized, but not because it would not have been proper for him to do so.

Let me pause here to state that I have personal knowledge that Mr. Koerber did an extensive amount of work on Ryan Bundy's behalf, both prior to and during the trial, and that he should have been compensated for his work pursuant to the CJA voucher that Judge Brown pre-authorized. So why did Mr. Koerber not submit a request to be compensated from the pre-approved funds for that work? Because it seemed to us that Judge Brown was overly obsessed with the issue, as Ammon Bundy's team was the only one proceeding to trial without CJA-appointed counsel. To understand why I would say that, the Court needs to understand the many competing demands that we faced in preparing for and defending Mr. Bundy at trial, in particular, how Judge Brown repeatedly ordered or otherwise demanded coordination between the different defense teams, whether that was coordination among the defense teams representing all of the indicted defendants or just those teams representing the seven defendants going to trial in September 2016. The frequency of Judge Brown's demands in that respect only intensified as the trial approached and progressed. Please understand that I do not raise these issues now to complain. I understand why Judge Brown would make those demands on my team and others. But the frequency of her orders to coordinate and pool resources seemed to be inconsistent with the demands that Judge Brown made that we try and distinguish Mr. Koerber's work on behalf of Ammon Bundy from work done on behalf of Ryan Bundy or as part of a joint defense effort. I recall discussing with Mr. Koerber the issues that Judge Brown might raise with any request of his for payment from pre-approved CJA funds, and how difficult it was to predict how Judge Brown might apply the applicable standards to ensure that he complied with the assurances she had demanded of me and my team. For example, would Judge Brown recognize that Mr. Koerber's work on something that she had requested from the joint defense team qualified as

work done on behalf of Ryan Bundy?[47] At that point, Mr. Koerber had performed extensive

paralegal work for Ammon Bundy, extensive investigative and paralegal work for Ryan Bundy,

extensive paralegal work for both defendants, and extensive paralegal work for the joint defense

of all seven defendants standing trial at the time. I recall discussing with Mr. Koerber how issues

or misunderstandings could arise no matter how many precautions he took in preparing his

submission for CJA funds, how much time it might take to resolve any issues that might develop

in that respect, and how the Court might use those issues to place additional restrictions on the

already limited access that we had to Ryan and/or Ammon Bundy, as we frequently met with

both of them in our trial preparation efforts. When combined with some of the other issues that

we faced in representing Ammon Bundy – who had been publicly accused by some government

officials of being a "domestic terrorist" – Mr. Koerber decided to forego any payment from the

pre-authorized CJA funds. And yet he continued to work on our team through the end of the trial.

It was a sacrifice that he was willing to make to avoid an issue that might detract or complicate

our work on Mr. Bundy's behalf. I do not intend to dwell on the issue here but rather to make the

following point about the full context of my interactions with Judge Brown that would contradict

the Court's OSC ¶ 4 allegations: given the fact that Judge Brown was applying such an

extraordinary level of scrutiny to Mr. Koerber's involvement as a member of my client's defense

team, which also included the direct interaction that Mr. Koerber had with Judge Brown and her

staff in months and weeks preceding October 12, 2016, there is simply no basis for Judge

Mosman to have isolated and make unduly selective use of a single communication – such as the

---

[47] The simple fact that the OSC ¶ 4 fails to make any distinction between my actions and the actions of the other defense teams with respect to the October 2016 joint proffer of potential defense witnesses shows that our concerns about how Judge Brown might conflate issues or single out our team were likely justified. In OSC ¶ 4, it appears that the Court assumes that I am solely responsible for the joint proffer of potential defense witnesses, when in fact that proffer reflects the combined and diligent work of individuals from all seven defense teams.

joint proffer – to accuse me of a lack of candor with the Court. And if the Court is not persuaded by this Response to drop the issue entirely, I intend to seek additional discovery regarding these and other issues, and I would hope that this Court would, at a minimum, reject District Court counsel's current efforts to preclude me from obtaining and presenting any of the necessary and relevant evidence I need beyond the transcript to respond to the OSC's allegations of misconduct. For purposes of this response, I would refer the Court to that portion of the hearing held September 6-7, 2016, where I resolved Judge Brown's concerns about making sure Mr. Koerber was not being compensated through the CJA for work on behalf of Ammon Bundy as an example of my candor with the Court regarding Mr. Koerber, further contradicting the accusations stated in OSC ¶ 4.

There are further instances in the record that contradict the Court's allegations in ¶ 4. As another example, the Court can see in the email exchange marked Exhibit __, dated September 19, 2016, between Mr. Philpot, Judge Brown's courtroom deputy, Bonnie Boyer, and Multnomah County Sheriff's Captain Derrick Peterson, that Ms. Boyer confirmed for Captain Peterson that Mr. Koerber (identified in one instance as Claude "Rick" Koerber, and in another instance as Claud "Rick" Franklin),[48] was an official member of Ammon Bundy's defense team. The Court may ask why Mr. Philpot referred to Mr. Koerber alternately as "Claude 'Rick' Koerber" and "Claud 'Rick' Franklin." It is well-known that Mr. Koerber uses both names, and I understand that he has increasingly used his birth name Franklin as he has come to better appreciate and teach his children about their family history.[49] Regardless, the September 19th email shows how Mr. Keorber and the attorneys working with him were open and transparent

---

[48] Mr. Koerber's Wikipedia page, https://en.wikipedia.org/wiki/Rick_Koerber, explains that he was born Franklin.

[49] *See* id.

with the district court, court staff, law enforcement, and others, regarding his name, and the different ways in which he is sometimes addressed. For purposes of responding to the OSC, I would point out that Judge Brown's deputy did not have any confusion about the identity of the person she was referring to. The fact that Judge Brown's chambers confirmed for Captain Peterson that "Claud 'Rick' Koerber" was an official member of Ammon's defense team is further proof contradicting the allegations in OSC ¶ 4. It is against that background of interactions with Judge Brown and her chambers going back several weeks and months before October 12, 2016, that the Court must assess the veracity of allegations that I somehow tried to mislead Judge Brown by proffering "Claud R. Koeber" as a potential defense witness without disclosing that he also went by the name "Rick Koerber," and was a member of Ammon Bundy's defense team.

As indicated above, I understand that the "proffer" referenced in OSC ¶ 4 was the one prepared and circulated by Mr. Philpot to Judge Brown and prosecutors on October 12, 2016. I understand that Mr. Philpot prepared that email, but in truth, it was the collaborative effort of lawyers and staff associated with the defense teams for the seven defendants standing trial at the time. We initiated the joint defense project at the behest of Judge Brown, who had requested that the seven defense teams confer and submit a joint proffer of any potential defense witnesses that they intended to call.

By pointing out how the joint proffer of potential defense witnesses was the collective effort of all seven defense teams, please understand that I am not trying to pass the buck or distance myself from any wrongdoing. To the contrary, there was no wrongdoing. But I am trying to make a point about what Judge Brown directed the parties to prepare and submit to her at the time. My notes reflect that as the prior trial week had wrapped up on Thursday, October 6,

2016, Judge Brown ordered the defendants to give the government a "headline" presentation of the testimony that they anticipated *from any and all remaining potential witnesses* – and this was done, primarily, to address the "cumulative" evidentiary issues that Judge Brown observed at that point in the defendants' cases-in-chief. I recall working with Mr. Philpot and members from the other defense teams on Friday and Saturday, October 7-8, 2016, to compile a list that was as comprehensive as possible of any remaining potential defense witnesses, as Judge Brown had ordered us to do. On October 8, 2016, at approximately 5 p.m., I understand that Mr. Philpot circulated the defendants' initial joint proffer of potential defense witnesses to government counsel. That list is attached as Exhibit __. That is the first mention of Mr. Koerber as a potential defense witness. My notes reflect that Judge Brown requested a shorter and more succinct version of what the defendants circulated on October 8. 10/11 Tr. at 255-60.[50] On October 11, Judge Brown ordered that the defense team circulate a revised joint proffer, and that eventually became the October 12 joint proffer of potential defense witnesses.

The government was also well-aware of Mr. Koerber and his role on the defense team. That is why prosecutors objected to the proffer by raising the issues. Relying on the transcript alone would present an incomplete picture of how the defense interacted with Judge Brown on the issues presented in OSC ¶ 4. I do not recall an extended discussion, but I recall discussing and instructing others to discuss the proffer of Mr. Koerber with government counsel. It is one of the reasons why government counsel raised the issue.

I believe that even if I had been the attorney who had prepared the draft proffer or the

---

[50] It is also worth noting that Mr. Koerber's email address had been included on Pacer notifications, that Mr. Koerber had been present in multiple joint defense meetings, that Mr. Koerber was present in meetings with Judge Jones in chambers on multiple occasions, that Mr. Koerber and his past relationship with me was known among the other defense attorneys, and the possible use he might be as a defense witness was also discussed.

attorney who had presented the proffer to Judge Brown, the result would be the same. In any event, there was clearly no intention of misleading the court, and there is no reasonable chance that even if Mr. Koerber had been called to take the stand, that any party or the court would not have known of Mr. Koerber's role for Mr. Bundy or the defense team generally.

2.  2.      *Proffering Mr. Koerber As A Potential Defense Witness Did Not Violate Judge Brown's Rulings Regarding The Exclusion Of Witnesses.*

Judge Brown's email dated September 1, 2017, shows that she had invited Mr. Koerber to be present in the courtroom throughout the trial as a member of Ammon Bundy's defense team. I do not dispute the witness exclusion orders that the Court cited in its OSC, except to note that Judge Brown had made exceptions to that exclusion order throughout trial, beginning with the witnesses mentioned in the context of the individual witness exclusion orders referenced in the OSC and including, *inter alia*, Sheriff Richard Mack, who was also included on the October 12, 2016, proffer. Thus, proffering Mr. Koerber in advance – is exactly the approach necessary to give both the government and the Court advance notice that we might be asking for a similar exception - based upon the expected testimony of Mr. Koerber.  It is significant in this regard that, notwithstanding the fact that the government objected to our ability to call Sheriff Mack as a witness based on its assertion that he had been present in the courtroom and observed several days of trial proceedings, Judge Brown overruled the government's objection, and he was allowed to testify notwithstanding the fact that he had been in the courtroom at various times during the trial.[51] Clearly, there was nothing in contravention of the Court's rules or orders – in proffering potential witness testimony from Mr. Koerber.

By making an issue of the October 12 proffer in this respect, it appears the Court is

_____

[51] *See also* court order re Matt Deathridge, and another exception granted to allow testimony of a witness who had been in the courtroom, despite the exclusion of witnesses generally.

seeking to impute way too much significance to the particulars of the witness proffer that was made. In particular, I understand that the Court had simply asked the defense team to address in this proffer the anticipated relevance of the witnesses' anticipated substantive testimony. Certainly, the defense team would not have been at liberty to engage in any knowingly deceptive conduct in that respect. But OSC ¶ 4 is making an issue of matters that went beyond the mandate of Judge Brown's assignment regarding the requested defense proffer of witnesses. In truth, the Court can see that the joint defense team addressed, in a further motion, the last issue and also the basis for arguing that Mr. Koerber should be allowed to testify notwithstanding his presence in the courtroom during trial.[52] In that same motion, we addressed the issues raised regarding Sheriff Mack as well.

That Judge Brown granted our motion with respect to Sheriff Mack and other witnesses but denied it with respect to Mr. Koerber, was a judgment call on her part, which is not at issue here. But the fact that other defense lawyers and I addressed the issues raised by the government in an effort to obtain leave of the court to present those witnesses listed in the joint proffer is indicative of our continued good faith regarding how we presented this case on our clients' behalf. To single me out for some kind of career-limiting or career-limiting sanctions without a clear indication of what part of the joint proffer I was responsible for, or how my conduct violated any duty or obligation I was under, would be the epitome of an abuse of discretion.

3. 3.    *The Inclusion Of Mr. Koerber As a Potential Defense Witness Did Not Violate Any Obligation To Disclose His Status As A Former Client In An Unrelated Proceeding.*

In considering the issues raised by OSC ¶ 4, I would ask that the Court briefly consider the role of a criminal defense lawyer in our justice system. It is an honor to represent falsely-

---

[52] Motion (#1424) to Reconsider Preliminary Rulings Excluding Witnesses at 17-25.

accused individuals like Mr. Bundy and Mr. Koerber.[53] But more often than not, and especially in this case, the actions taken against me in the name of the United States of America since the jury pronounced my client not guilty have left me feeling the "business" end of Clarence Darrow's quote: "To be an effective criminal defense counsel, an attorney must be prepared to be demanding, outrageous, irreverent, blasphemous, a rogue, a renegade, and a hated, isolated, and lonely person – few love a spokesman for the despised and the damned." And to pile on with false accusations, as the Court has now done in its OSC, leaves me feeling the sobering reality of former Labor Secretary Raymond J. Donovan's observation, following his own acquittal of politically-motivated corruption charges: "The question is … [where] do I go to to get my reputation back?" Raab, Selwyn, Donovan Cleared of Fraud Charges By Jury In Bronx, New York Times, May 26, 1987, available at http://www.nytimes.com/1987/05/26/nyregion/donovan-cleared-of-fraud-charges-by-jury-in-bronx.html?pagewanted=all (last checked May 4, 2017).

Finally, regarding the proffer of Mr. Koerber's testimony – itself.  Mr. Philpot copied me

---

[53] The timing of the Court's OSC causes one to wonder if it was not triggered by an effort to prevent me from continuing my representation of Mr. Bundy in Nevada. See, e.g, In re: Cliven D. Bundy, 840 F.3d 1034, 1045 (9th Cir. 2016), where Judge Bybee authored the opinion of a divided panel in affirming the Nevada district court's denial of an attorney's application for admission pro hac vice to represent my client's father based, in part, on the fact that two other federal courts had revoked his attorney's admission pro hac vice over 18 and 22 years prior, in unrelated cases. Of note is Judge Gould's dissent from the panel's ruling, observing how:

In providing a full and fair defense to every criminal defendant, there will by necessity be occasions when the difficult nature of the case evokes sharply confrontational lawyering. In tough cases with skilled prosecutors, aggressive positions by defense lawyers are sometimes an unavoidable part of strong advocacy, and contribute to making the proceeding an ultimately fair one for the defendant.

Id. at 1056 (Gould, J., dissenting). Judge Gould concluded that "concerns over [the attorney's] aggressive style must yield to a superordinate concern: that Bundy have the counsel of his choice to receive a fair shake at this most critical trial." Id at. 953-54

and the other defense lawyers representing Mr. Bundy's co-defendants on the version of the document sent to the government and to the court. I do not recall who was responsible for adding Mr. Koerber to the list of proffered witnesses, but I recall the strategy. Because we could not anticipate how Judge Brown would rule on our ability to put on additional evidence with the other witnesses named, and because of how Judge Brown had instructed us to make the proffer, Mr. Koerber's name was added in the interest of candor and to create a place and notification for legitimate argument on that point.  The possibility of Mr. Koerber having relevant fact testimony, including testimony pertaining to a potential defense exhibit, was discussed with several different attorneys for the other defendants, before including his name and proffered testimony on the list provided to the government and to Judge Brown. After the defense notice, the issue came up, in the scheduled court hearing, outside the presence of the jury, Judge Brown inquired briefly of Mr. Koerber, made a ruling disallowing Mr. Koerber from testifying, and there was no incident or further argument on the matter.

## V.      Response to OSC ¶ 1

Paragraph 1 of the OSC (or "OSC ¶ 1") orders me to show cause why I should not be disciplined for having made what the Court characterizes as "[r]epeated failures or refusals to observe court rulings" at trial in the *Bundy* matter.

> 1.      Repeated failures or refusals to observe Court rulings.  See, e.g., Ex. 1 at 5-11, 15-16, 20-21; Ex. 3 at 4-6, 10; Ex. 4 at 4-9, 18-22, 28-31; Ex. 5 at 17-23; Ex. 7 at 4-9, 16, 17-21; Ex. 8 at 4-8; Ex. 9 at 8-9, 16, 18-19, 21-25, 29-31; Ex. 10 at 15-16, 31; Ex. 11 at 5-6, 20-21; Ex. 12 at 25-27, 51-52, 65-66; Ex. 13 at 4-5, 17-20, 30-31; Ex. 14 at 8-11; Ex. 15 at 5-7; Ex. 16 at 4-6; Ex. 17 at 5-6; Ex. 19 at 5-7; Ex. 21 at 27-33.

**OSC ¶ 1**

OSC ¶ 1 does not identify an applicable rule or order violated, but alleges in conclusory fashion that I repeatedly failed or refused to observe Court rulings during the *Bundy* trial. It is impossible to know exactly what court order or ruling Judge Mosman was referring to in each instance – in the laundry list of citations provided – or what basis he had to accuse me of failing or refusing to observe court rulings. As a general matter, it is essential to start with the observation set forth in the advisory committee notes to Rule 611 of the Federal Rules of Evidence: "Spelling out detailed rules to govern the mode and order of interrogating witnesses presenting evidence is neither desirable nor feasible."[54] That is why Rule 611 "sets forth the objectives which [a judge] should seek to attain," but puts "[t]he ultimate responsibility for the effective working of the adversary system … with the judge."[55]

That is why it is significant that Judge Brown never sanctioned me and never made any findings that I violated any rule or order, let alone that I willfully failed or refused to comply with court rulings. This is significant, because the trial judge is best positioned, in the course of the proceedings, to address any circumstance where an attorney is litigating outside the rules or orders of the court. *See Collins*, 920 F.2d at 628 ("When the offending conduct takes place in open court, ***the district court must make an immediate decision*** whether the attorney's continued participation in the case will jeopardize the integrity of the proceeding."). I do not claim that I was without error in my advocacy, but I never willfully – let alone repeatedly – failed to observe, or refused to observe court orders or instructions.  Perfection is not the standard. *See United States v. Cronic*, 466 U.S. 648, 656–57 (1984) ("The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been

---

[54] Fed. R. Evid. 611, Adv. Comm. Notes on subdivision (a).

[55] Id.

conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."). Courts recognize that responsible advocacy often requires that a lawyer raise certain issues or explore specific topics that may elicit objections, *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996) (finding that "precise issue[s]" not explored or raised at trial, are not preserved for appeal), and where a multifaceted fact or legal issue is pursued – even though a court sustains objections – it is the duty of an attorney to make sure those issues are decided with "explicit and definitive" rulings, meaning that an attorney cannot simply avoid lines of questioning that might evoke objections from the opposing party. *United States v. Archdale*, 229 F.3d 861, 865 (9th Cir. 2000) ("We do not review an issue not raised or objected to below except to prevent a manifest injustice.").

For these reasons, a non-descript laundry list of citations to partial transcripts does not provide notice sufficient to comply with the due process standard outlined above. Further, when the OSC does not offer any explanation or argument as to why any one of the 200+ exchanges with the Court – cited in these references – constitutes a "failure" or "refusal" of mine to obey some unspecified court ruling – the issue is not presented fairly. In the vast majority of instances cited, the record shows persistence, diligence and attentive advocacy on my part. A year later, after an acquittal, and without any further explanation, there is simply no basis upon which I can respond – nor should it be required under these conditions.  Nevertheless, out of respect for the Court – and its processes – I will do my best to address each specific citation – none of which amounts to sanctionable conduct.

4. *1. OPC ¶ 1, **Record Cite ("RC") #1*** – *(Exhibit 1 at 5:1-17)*[56]

The Court's first record citation in OSC ¶ 1 includes several different exchanges and interactions. The first possible issue being raised is on page 5, lines 1 thru 17 of the exhibit. This involves a brief interaction between myself and Judge Brown that seems to disprove the entire thrust of the OSC: that my conduct warrants the extreme measures of attorney discipline such as disbarment. The matter that Judge Brown and I discussed on September 15, 2016, concerned a substantive motion for mistrial that I had researched and drafted overnight (at approximately 2 am) following the close of the Wednesday trial day at approximately 5 pm, and that I had filed earlier that morning before the new trial day commenced. (The filing is identified as Doc. 1280). In the motion, I had mistakenly quoted from a rough transcript of trial proceedings. When Judge Brown pointed out how that was contrary to her prior order limiting how the parties could cite rough transcripts, I immediately acknowledged the error and apologized. Additionally, Judge Brown had reviewed the matter over the lunch break and had ordered the filing sealed, consistent with the purpose of her prior order.  In announcing her decision there was no discussion of sanction, no suggestion of bad faith, or anything similar.  In fact, Judge Brown stated that she "appreciated the – the nature" of the circumstances, and what I had done as an advocate for my client, overnight and proactively suggested accommodations to assist me in advocating on that issue.  She re-iterated the prior order and simply said, "So, please do not do that again."  Again, I immediately apologized.  Together Judge Brown and I agreed – in a brief, productive exchange –

---

[56] The OSC includes, as its first citation, following the conclusory allegation "Repeated failures or refusals to observe Court rulings" Ex. 1 at 5-11.  Exhibit 1 is a selection of excerpts from the Bundy trial on September 15, 2016.  It is unclear why the citation is to pages five (5) through eleven (11) because there does not to be a relationship of any articulatable complaint.  This is part of the problem of the deficient notice, I am left to guess and surmise – and so is the Court.  Nevertheless, I will address each potential issue for each citation. I will use page and line number denotations to be specific, and will break out the different possible references in each citation.

to resolve the matter by placing the entire motion under seal, where it remained. Judge Brown further instructed, and I agreed, to not quote from the rough transcript when arguing the motion. There was no other issue raised in that respect, and that was the end of the issue. Judge Brown confirmed as much, stating "That's fine with me."

Contrary to the import of the OSC as a whole, this example helps demonstrate why Judge Mosman's OSC is unwarranted. It also illustrates why conclusory and general allegations, followed by a string of citations is plainly insufficient notice under the local rule and Due Process standards cited above.  Nevertheless, the record shows that when confronted with my error regarding the citation to a rough transcript in the motion for mistrial, I immediately acknowledged it and sincerely apologized, and I acted to remedy the circumstancse by designating the motion as being under seal. The transcript shows that there was never anything more to this occurrence, nothing was raised further – no other concerns or findings addressed or made, etc. This was an isolated occurrence, incident to the high pressure of trial practice. I did not then deny that I had made an error, and I don't deny it now.  But, it was an error far outside the range of the allegations and tenor of this proceeding, and clearly the kind of good faith mistake that happens in courtrooms and trials, and is resolved without issue by the court and the attorney – as part of diligent advocacy. *See Cronic*, 466 U.S. at 656–57. There was no reason for Judge Mosman to dredge up this incident in the context of the OSC as an example of my alleged "[r]epeated failures or refusals to observe court rulings" when they were not repeated nor refusals in this respect.

*5.    2. OPC ¶ 1, __RC #2__ (Exhibit 1 at 5:25-11:22)*[57]

Within its initial citation to pages 5 thru 11 of the first exhibit is another separate and discrete interaction, Ex. 1 at 5:25-11:22, included as a separate excerpt taken from a portion of my cross-examination of Malheur National Wildlife Refuge Manager Chad Karges, where the government made, and Judge Brown sustained, nine evidentiary objections to questions related to the federal government's ownership of Refuge related property. As background, the Court must realize that federal ownership of the Refuge was both a factual and legal element of some of the allegations brought against the defendants, and directly related to my client's "adverse possession" state-of-mind defense, challenging the federal government's ownership of the Refuge. (*See* Doc. 1248)

In response to these issues, the government requested, first in its trial brief (Doc. 958), and subsequently in a motion (Doc. 1229) filed on the eve of trial, September 9, 2016, that the Court take judicial notice that the Refuge was "federal property located on federally-owned land." The Court's Order Re: Final Pretrial Conference (Doc. 1171), filed September 1, 2016, noted that issue *had not been decided at the final pretrial conference*, but would be addressed at the pretrial hearing on September 6, 2016. My client opposed the government's motion for judicial notice, and Judge Brown did not grant that motion, in part, until September 22, 2016, with its Order Taking Judicial Notice Of Federal Ownership Of The Malheur National Wildlife Refuge (#1229); Order Denying Ammon Bundy's Motion (#1248) To Enjoin Prosecution (Doc. 1327). Prior to that, I understand that the Court gave the parties some guidance on the issue,

---

[57]  Within the same range of the first listed citation (pages 5-11) is another possible issue being raised, and I point this out because the court has provided a second excerpt in the cited exhibit, without explanation, and as part of the same prior reference – though there is nothing similar in this excerpt to the prior issue I just addressed above.  Nevertheless, I am addressing it – the second excerpt - here, though the OSC does not make clear what is being pointed out or whether this is or is not part of a new allegation of purported misconduct.

including instruction regarding how this topic could be relevant to state of mind or other motives of the defendants. But the questions at issue here were raised on cross-examination, in response to the government's direct examination of Mr. Karges – and regarding evidentiary exhibits related to this issue that the government had introduced and the court accepted.

Simply, to the extent the Court had previously put issues regarding federal ownership of the Refuge headquarters off-limits as questions of law – they were not off limits with regard to intent, basis for intent, or questions of fact related to the defendants' intent. Further, while Judge Brown and I clearly had a different view of why these questions were relevant and significant (e.g. questions referring to the government's Exhibit 2 at page 2 and page 3), the Judge was not requiring the government to even explain the basis of the objection – so I was not informed whether it was the form of the question, the relevance of the question, or any other evidentiary rule. I respectfully attempted to clarify and re-raise relevant questions, e.g. simply trying to understand the relevance and meaning of the government's exhibit (see Ex. 1 at 7:11-25). The government introduced an exhibit, and elicited testimony regarding the ownership of particular land parcels associated with the Refuge, and Mr. Karges had testified that he "knew" these things – and vouched for data in the exhibit at issue, but I was not allowed to probe his knowledge or the basis of this knowledge at all. This was important, in part, because my client had made public statements about the land ownership, and questioning the very data presented by the government, and we anticipated that the government was going to use those statements as part of its case based upon the government's prior filings. Or, more simply, the government had opened the door with how it asked Mr. Karges to explain, on direct examination, how the Refuge was purportedly set aside by President Teddy Roosevelt in 1908, and how it expanded its boundaries in the 1930s and 1940s with two large acquisitions of property: 1) the purchase of the Blitzen

Valley in the 1930s from the Eastern Oregon Land and Livestock Company, and 2) the purchase

of the "00" Unit in the 1940s from the "00" Ranch. (Sept. 15 Rough at 74-77) In particular, the

Court sustained a foundation objection that I had raised during the government's direct exam,

which the government resolved by asking Mr. Karges if he reviewed the property records for the

Refuge headquarters and by having Mr. Karges testify that the federal government currently held

the deed to that property. (Rough at 77)[58]

The government's questioning to try and prove federal ownership of the Refuge

headquarters through Mr. Karges, when my client had filed with the Court information and

materials calling into question that very fact, opened the door to questions regarding whether the

State of Oregon had approved the acquisitions making up the Refuge, (Ex. 1 at 5:25-6:4), where

or how the Eastern Oregon Land & Livestock Company obtained legal title (Id. at 7:9-12),

whether Mr. Karges' search of records included a chain-of-title search (Id. at 7:23-8:2), when

and where Mr. Karges reviewed the deed that he had described on direct examination (Id. at 8:7-

20), whether he knew about government's deed prior to discussing his testimony with

prosecutors (9:8-12), and details related to government's acquisition of the "00" Unit, including

the cost of the transaction and whether Mr. Karges reviewed that deed as well (10:10-17). Those

questions are not duplicative of each other, so the Court cannot accuse me of repeatedly failing

to obey court orders. And any one of those questions could yield relevant evidence calling into

question the testimony elicited from Mr. Karges by the government. The answers also address

the believability of the motive of my client regarding his adverse possession defense.

On the point of calling into question Mr. Karges testimony, courts have routinely held

that "[a] reasonably full cross-examination of a witness upon the subjects of his examination in

---

[58] It is also worth noting, that other attorneys had the same type of approach on this topic. *See e.g.* Rough at 200.

chief is the right, not the mere privilege, of the party against whom he is called, and as a rule, a

denial of this right is a prejudicial error." *United States v. Jorgenson*, 451 F.2d 516, 520 (10th

Cir. 1971); *see also United States v. Lum*, 466 F. Supp. 328, 334 (D. Del. 1979) ("The doctrine

of opening the door allows a party to explore otherwise inadmissible evidence on cross-exam

when the opposing party has made unfair prejudicial use of related evidence on direct

examination."). That the government never stated the basis for its repeated objections

complicates the issue. A party waives any objection it might have to responsive evidence once it

opens the door. The New Wigmore: A Treatise on Evidence § 2.4. "[A] witness who has 'opened

the door' to discussion of a particular matter cannot bar his opponent from entering that same

door for purposes of impeachment." *Id*. Courts routinely recognize that a party opens the door to

rebuttal evidence when it tells only "half the story" or creates a false impression. *United States v.

Tenorio*, 809 F.3d 1126, 1131-1132 (10th Cir. 2015); *see also Henderson v. George Washington

Univ.*, 449 F.3d 127, 140-141 (D.C. Cir. 2006)

Finally, the government had Mr. Karges testify regarding the Refuge's extensive water

infrastructure as needing to be managed and maintained by the Refuge's various employees in

order to effectuate the purpose of the Refuge. (Rough at 85, 95). It was not unreasonable to probe

that issue on cross-examination by asking questions related to when that infrastructure was

constructed and why. (Ex. 1 at 11:3-11) Indeed, other defense attorneys were permitted to ask

those types of questions. (Rough at 208-09 - Schindler)[59] In singling me out on this issue, Judge

Mosman's OSC has perhaps inadvertently demonstrated its own prejudices and biases,

impermissibly holding me to a different or higher standard than regularly-admitted attorneys in

---

[59] The Court encouraged the defendants to avoid duplication on cross-exam, but I intended that
my questions about water infrastructure construction would develop, as opposed to duplicate,
any issues raised by other defense counsel. Here, it is significant that the Court blocked my
questioning on this issue based on the government's relevance objections. (Ex. 1 at 11:3-11)

the District of Oregon. *See Collins*, 920 F.2d at 626.

Finally, in pursuing the lines of questioning cited, I had the obligation to demonstrate through questioning that the district court's exclusion of testimony was not harmless error for the purpose of protecting my client's potential appellate rights. *See, e.g., Neder v. United States*, 527 U.S. 1, 38 (1999). To the extent that it was possible for an appellate court to hold my client accountable for not having demonstrated the materiality and significance of the excluded testimony by questioning extensively related to excluded testimony, I had an obligation to do so for the purpose of showing prejudice in the event of an appeal – and to the extent that the trial court found nothing sanctionable in my conduct at the time, made no findings that I had violated or refused to obey its orders, that should be both demonstrative and determinative.  To the contrary of the OSC, Judge Brown was clearly setting limits on the issue, and explained that if I did not adjust my questioning I would "lose the right to cross" examine the witness. The issue did not go further, Judge Brown did not make a detrimental finding, allowed my continued cross-examination, and trial continued.  The OSC seeks to revisit issues that the District Court managed – setting limits, and forewarning consequences of those limits were transcended.  The best indication that no limits were crossed – approaching anything like misconduct alleged in the instant proceeding – when the trial judge observing this issue never had to enact a single consequence (that she had spelled out).  The fact that the Court and a defense attorney had some tension on good faith legal issues and the approach here, should not be an issue of disciplinary concern.  I advocated zealously, the Court placed limits, I respected the Court's conduct and not one single time – on this issue or any other – did the judge see fit to make a finding that I had crossed her limits or that there was justification to impose any degree of sanction or consequence. Now, the OSC, with vague and unarticulated reference puts me in the position of

proving a defense to an allegation that has not been specified or articulated – but an allegation that nonetheless goes further than the Court did at the time, and asks me, a year later, to defend against a re-opening of these kinds of deep context issues.  Finally, I adjusted my courtroom conduct as part of regular communication and exchange with Judge Brown.  To essentially bring a Monday morning quarterback approach to this issue, in this manner, essentially presumes that my behavior would not have been different – had Judge Brown even once said, "Okay, you've crossed the line – here is the consequence."  While I did become professionally frustrated with Judge Brown's rulings on some of these issues – including sustaining undescribed, and sometimes unspoken objections – the Court and I worked through those issues professionally and diligently – without incident.

6.  *3. OSC ¶ 1 – **RC #3** – (Exhibit 1 at 15:21-16:8)*

OSC ¶ 1 cites, as its second reference to alleged "failures or refusals to observe Court rulings", pages 15 and 16 of Exhibit 1.  Like all other citations, there is no explanation or description of the alleged misconduct. The exchange cited is from a separate excerpt that starts at page 13 and is labeled "Third Excerpt." The relevant portion appears to be Ex. 1 at 15:21-16:8, which is another portion of my cross-examination of Mr. Karges on September 15, 2016.  In this excerpt, the government made, and Judge Brown sustained, two objections to questions that I asked about Government Exhibit 110 on grounds that other defense counsel had already asked about the exhibit. In fact, Exhibit 110 was one of the most misleading exhibits offered and introduced into evidence by the government at trial. It is a picture of a ragged, scary-looking individual, who was not identified as a defendant or co-conspirator in the case, holding an assault-style rifle, which the government (claiming it did not even know who the individual was) introduced to prejudice the defendants by suggesting that they had intimated government employees and that the defendants had caused this man. (Rough at 17-18)

It turned out that, in the defendants' case-in-chief, we were able to introduce video of the press conference where the individual appearing in Exhibit 110 came to the Refuge for the duration of that press conference only, as part of an armed detail protecting the individuals putting on the press conference, who were not associated with the occupiers, indeed, they opposed defendants' occupation of the Refuge at the time. On the video that defendants introduced, one can see that Exhibit 110 was a photo staged at the request of news reporters.

**[INSERT EXHIBIT ## - I**

On September 15, 2016, the government defended its use of the photo as circumstantial evidence of how the public responded to Mr. Bundy's call for members of the public to join his protest at the Refuge and bring their arms. (Rough at 17-21) The Court can see that one of the questions I asked - regarding timing – was first raised by Judge Brown in evaluating the government's proffer for Exhibit 110, (Rough at 17), and the other was for purposes of showing that there was no basis to support the use that the government intended to make of the photo after introducing it through Mr. Karges. (Rough at 18-19) In particular, Judge Brown specifically confirmed that I would be able to challenge the witness on these points in my cross-examination. (Rough at 21)

The government objected to my questions – asking Mr. Karges *when* the man in the photo came to the Refuge, and *why he brought the gun* – on grounds that they were duplicative of questions asked by other defense counsel. *But the record shows otherwise.* Attorney Matt Schindler, counsel for Kenneth Medenbach, had Mr. Karges confirm that he did not know the individual in Exhibit 110 and that the man was not one of the defendants standing trial. (Rough at 201-02) Attorney Lisa Maxfield, representing defendant Neil Wampler, used Mr. Karges' inability to identify the man in Exhibit 110 to make a point about how Mr. Karges could not

identify her client, and one of the videos where her client appeared was not one of the reasons

Mr. Karges instructed employees to stay home during the occupation of the Refuge. (Rough at

224-25) But otherwise, the questions I asked, which the OSC now characterizes as "repeated

failures" or "refusals" on my part to observe Court rulings, had not been asked prior to my

asking them on cross-examination. Finally, there was no blanket ruling effecting my line of

questioning, and unlike other examples in the OSC, there was an explanation for the

government's objection (5:23-24) and it wasn't a rule or order – it was oddly, "This exhibit has

been asked about by other counsel.") Not understanding how that was a basis for an objection, I

simply sought to be more clear and specific in my follow-up to telegraph relevance and the

probative nature of the question.  Once the government's objection was sustained again – I

moved on to a different topic. Far from evidencing misconduct on my part, I would argue that a

review of the direct exam and cross-examination of other defense counsel demonstrate how

Judge Brown erred in sustaining the government's objections on this point, especially when one

considers my earlier discussion where Judge Brown seemed to confirm that I would be able to

raise those matters on cross-examination. (Rough at 17-21)

7. *4. OSC ¶ 1 – __RC #4__ – (Exhibit 1 at 20-21)*

OSC ¶ 1 next cites to page 20 and 21 of Exhibit 1 (this is a different portion of the "Third

Excerpt" covered in the exhibit.) The transcript here is from September 15, 2016 and deals with

an exchange where I am asking government witness Chad Karges (Refuge Manager), on cross-

examination, about video excerpts that had been introduced by the government. I asked the

witness if he was familiar with a statement my client had repeatedly stated in public broadcasts –

and recording excerpts – that he wanted to see "loggers get back to logging, miners get back to

mining" etc.  (23:6-9). This is important because it relates to several earlier exchanges about the

government's use of photos and videos to create an impression – of my client.  *See e.g.* Rough at

56

18, where AUSA Gabriel proffered the relevance of certain evidence by characterizing video

clips of my client – and his motivations for asking people to come and support the protest and to

come to the Refuge. The Court even acknowledged that evidence was being offered for

"circumstantial evidence of responsive conduct by members of the public" as a "call to arms"

(Rough 19) and as "evidence of intent" for my client.  (Rough 22).   It also relates specifically to

video of my client's statements, that the government introduced and had Mr. Karges comment

on.  (Rough 105-111).  Finally, other attorneys were permitted to ask about the historical use of

the Refuge property – including logging (Rough 199) – but I was not. (Rough 282). The point

here is simply that there was no order that had been made that I was failing or refusing to follow.

    *8.   5. OSC ¶ 1 – __RC #5__ – (Exhibit 3 at 4-6)*

      OSC ¶ 1 next cites to a separate exhibit, Exhibit 3 (pages 4-6) which is a portion of trial

proceedings from September 19, 2016, where I am cross-examining government witnesses FBI

Agent Richard Baltzersen. During the government's examination of Agent Baltzersen he was

asked and testified that, among other things, he was involved in the investigation of these

defendants (Rough at 22), he was familiar with the facts of the case (id.), he reviewed a number

of exhibits, including video exhibits associated with the investigation (id.), he had been to the

Refuge (id.), and he was familiar with other parties and alleged co-conspirators (id.).  During

direct examination, the government reviewed Government Exhibit 663 (YouTube video with my

client speaking), and Agent Baltzersen volunteered in description of the video that my client had

identified the name of the group occupying the Refuge, and described part of the motivation for

occupying the Refuge as being related to the Hammond Family ranch issues and conflict with the

Federal Government.  Through this witness, the government played an excerpt of the video.

(Rough at 24).  Similar treatment was made of Government Exhibit 654 (YouTube video)

(Rough at 25), and Government Exhibits 45 and 49 (Camera videos). (Rough at 27-28).

The excerpt of this testimony picks up after the direct examination, and includes some of my cross-examination of Agent Baltzersen. It is unclear what allegation of misconduct is being advanced here by the Court, but there are two instances where the government raised "beyond the scope" objections which Judge Brown sustained.  In the first instance, I asked FBI Agent Baltzersen "did you do any investigation into the issues that were raised at the press conference" recorded and played in Government Exhibit 663. Ex. 3 at 5:4-5. This question was about a video that included my client's statements, that had been admitted and played, and that Agent Baltzersen said he had watched, said he was familiar with, and in the context – was part of the investigation that he had been a part of, related to the conspiracy charges against my client.  My question was open and simple – it only required a yes or no answer.  FBI Agent Balzersen however responded by asking, "Are you asking if I investigated the Hammond issue?"  *Id*. at 5:5-7.  I stated, "Yes" and Agent Baltzersen then answered, "I have not."  *Id*. 5:7-8. My next question was a follow-up.  Initially I had asked a broad question – "did you do any investigation into the issues" – and Agent Baltzersen had now answered regarding one of the issues.  I wanted to find out if his investigation related activities included "the issue raised concerning the – the unconstitutional ownership of federal land in Harney [County]" that my client had spoken about in the clip. *Id*. 5:9-11.  This was important because Agent Baltzersen had already testified that he was involved in the investigation, that he reviewed the videos, that he had been to the Refuge, and that he was familiar with the alleged co-conspirators.  In his direct testimony, he characterized the press conference video with specific, selective references, that included his statement that the Hammond Family's conflict with the Federal Government over land issues was related to my client's stated motivation for being at the Refuge – as discussed in this press conference.  If he had investigated that issue – that is potentially probative and relevant

58

information regarding one of the elements of the conspiracy offense at issue. Nevertheless, the government objected to the question as "outside the scope" of direct examination. Ex. 3 at 5:12-13. Judge Brown sustained the objection. I abandoned the question, but went directly to the content of the video Agent Baltzersen had characterized and asked, "You understood that those – those statements were – were offered as statement of the conspiracy?" *Id.* at 5:16-17. Judge Brown responded by stating, in the presence of the jury, "the witness was – is here to authenticate the manner in which those statements were made. He has indicated he didn't investigate. It's beyond the scope of direct. It's also not relevant. Please move on to cross of what he did say." *Id.* 5:18-22. I responded, "Okay." *Id.* 5:23.

Agent Baltzersen had not stated he did not do any investigation – he had simply stated he didn't investigate the Hammond issue. I was not allowed to probe further into what he investigated. And, Agent Baltzersen had in-fact characterized statements of my client, regarding his stated intentions and state of mind regarding why he was participating at the Refuge – as recorded in the press conference. (Rough at 23). In any event, there is no order at issue – there is no evidence of any effort or willfulness on my part to fail to comply with any order or to refuse to follow any order.

9. 6. OSC ¶ 1 – **RC #6** – (Exhibit 3 at 10)

OSC ¶ 1 next cites to a separate excerpt in Exhibit 3 (page 10), which is a portion of my cross-examination of government witness Carla Denise Burnside (also from trial proceedings on September 19, 2016. Ms. Burnside testified on direct that she had worked at the Refuge for 26 years (Rough at 122), and that she worked as both an archaeologist and as information technology support for the Refuge. (Rough at 122-124.)

Another defense attorney, Tiffany Harris who represented defendant Shawna Cox, was the first to cross-examine Ms. Burnside. In that examination, Ms. Burnside also admitted that in

her office there was a box that contained all the previous files that the Refuge staff had collected relating to the Hammond Family.  (Rough at 144.)  Ms. Burnside testified that she had gathered and kept these files as a special assigned project from Refuge manager Chad Karges. (Rough 145.)  As part of this testimony Ms. Burnside characterized statements on Facebook that had been published by third parties, as inaccurate and part of the motivation for Mr. Karges giving her the assignment was to create a chronology and respond to information being posted on Facebook regarding the conflict with the Hammond Family.  (Rough 145).  During this cross-examination, the government objected to Ms. Harris's continued questioning on this topic – when she inquired as to whether Ms. Burnside was involved in preparing a "rebuttal" to the Facebook allegations as "well beyond the scope of direct."  Judge Brown sustained the objection. (Rough at 146).  This all took place immediately before the excerpted section of proceedings provided in the OSC beginning at Ex. 3 p. 8. The OSC references p. 10 in relation to alleged sanctionable conduct by me.  This page is the beginning of my cross-examination of Ms. Burnside.

My first question was a follow-up did not go back to the issue of preparing "rebuttal" material, but to the line of questioning that had been allowed regarding the file being kept by Ms. Burnside, under special assignment from Mr. Karges, regarding the long-running dispute with the Hammonds, which Ms. Burnside had already testified was at least partially in response to social media communications.  That line of questioning had been allowed.  So, my first question was, "You talked about your review of the Hammonds' file, Ms. Burnside.  Was it your intent to make – make your work public?"  Ex. 3 at 10:2-4. The government objected as outside the scope of direct.  Judge Brown sustained the objection and I moved on to a different line of questioning. There was no issue, no further discussion, etc.  And, quite frankly, the "scope" of the direct was

only part of the issue, because the Court and the government – allowed Ms. Harris to introduce

the topic without objection, and allowed Ms. Burnside to address the Hammond file she kept, the

assignment she'd been given by Mr. Karges, and the motivation in doing this.  This topic and

Ms. Burnside's testimony on this issue was potentially probative, and relevant to the elements of

the offenses alleged, because it confirmed for the jury that there was in fact a longstanding

dispute between the Refuge and the Hammonds, and that social media had played a role, and that

Refuge director Karges was aware of the issue and directed Ms. Burnside to take on a project of

gather, compiling and maintaining that information – including a chronology. Besides the fact

that it was within the scope of direct examination, the relevance of those facts cannot be

overstated because of how significant it was for my client and other defendants to rebut the

government's charges with a counter-theory: they did not occupy the Refuge in furtherance of a

conspiracy to impair and impede federal officials from the exercise of their official duties

through threat, force or intimidation but, rather, to engage in a protest that would bring to light

issues concerning governmental overreach on the part of the executive branch in its prosecution

of the Hammonds and other issues regarding its management of so-called public lands, which

had the consequence of destroying the economy of Harney County and the rest of rural America.

My question was simply to identify whether that "chronology" was intended to be made public.

Based upon the explanation provided here – and the clear content of the government's

allegations - there are several reasons why this was potentially relevant information – and there

was a good faith basis to ask the question.  When the court ruled that it was beyond the scope of

direct I moved on – there is nothing in the record to show I failed or refused to follow a court

order – and my courtroom conduct was no different than the fully admitted members of the bar,

like Ms. Harris.

10. 7. OSC ¶ 1 – **__RC #7__** – *(Exhibit 4 at 4-9)*

OSC ¶ 1 next cites to Exhibit 4 (pages 4-9), which is a portion of my cross-examination of government witness and Refuge employee, ecologist Jess Wenick on September 20, 2016. Prior to the portion of the testimony included in this excerpt, Mr. Wenick testified extensively about his background. (Rough 68).  Mr. Wenick also testified extensively about a portion of fence that had been removed. (Rough 73).  Over my objection, Mr. Wenick was allowed to testify that a video (Gov. Ex. 76) showed individuals involved in the occupation of the Refuge removing a fence that Mr. Wenick testified, belonged to the Refuge.  (Rough 74).  Mr. Wenick, at the government's questioning, testified that the place where the video showed people standing, they were standing on Refuge property. (Rough 75). In response to government questioning he also testified as to who owned the adjacent land.  *Id*.  He was asked if anyone employed with the U.S. Fish and Wildlife Service had given permission to cut the fence down – with the implication that such permission was required.

During my cross-examination, Mr. Wenick testified regarding the adjacent landowners – the Puckett family (Rough 91) and I asked him, when the Puckett's purchased the land adjacent to Refuge property, whether they had access to run their cows on both sides of the fence at issue. (Rough 91).  He denied that the Puckett's had such access.  *Id*.  I questioned him further and was able to get him to admit that the Puckett's had in fact run their cattle on both properties, prior to the fence being restored and put back up. *Id*.  When I asked him if he was trying to make a distinction based upon whether they should or should not have had access – Mr. Wenick answered by reference to the fluctuation of Malheur lake.  This is where the excerpted portion of Exhibit 3 for the OSC picks up. I asked Mr. Wenick again, if the Pucketts – who were the adjacent property owners related to the fence at issue – "had access to…that land when they purchased…their property." Ex. 4 at 4:15-19.  Although Mr. Wenick had previously admitted

this was the case, he answered "Not under the law." *Id*. I hadn't asked Mr. Wenick about the law, I had asked him about the fence, about the adjacent property ownership, and about access – before and after the fence had been restored. His non-responsive answer introduced the legal topic of whether the "access" was according to the "law" or not. This answer was prejudicial to my client – implying that the taking down of the fence had legal significance beyond what his direct testimony had established. So, I asked what law he was referring to. *Id*. at 4:20-22. There was no objection to scope or relevance or any other rule. Mr. Wenick answered "open range." That is a term that I was concerned the jury may not understand, and it was a term that clearly had specific meaning to Mr. Wenick since he is the one who answered – regarding the distinction between "access" and "legal" rights. I followed up to clarify what he meant by "open range" as applied to my prior question. I was closing down the topic – that the witness had opened with a non-responsive answer. There was no objection to my question. Mr. Wenick answered "Open range does not go – apply to the federal government."

The summary of the situation was this. Mr. Wenick had said that the Pucketts – the adjacent land owners – had at one point had access to the land in question. Then the fence at issue was restored, repaired or built – and that separated the properties with a fence. We had been discussing this issue. I had asked him to clarify the distinctions he was making – and he introduced the legal topic – and said, in substance, that even before the fence was in place, although the Puckett's may have had physical access for their cows to graze on the Refuge property, they did not have "access" according to "open range" law, and then said, that "open range" law does not apply to property of the federal government. The objection at issue came when I attempted to clarify what he was basing his non-responsive distinction upon. Before I could even finish the question – the government objected, without explanation or reference to a

rule.  Judge Brown sustained the objection – even without hearing the rest of my question,

stating that "The fact that the Puckett family may have used the land has been established" and

that the fact that a fence was afterward "installed" was established.  Judge Brown then instructed

"now we need to go to the substance of the direct examination."  Ex. 4 at 5:6-9.  But, that was

the point.  The substance of the direct examination is that a video was introduced showing

occupiers on both sides of the fence, on both properties, removing a very small section of fence,

and Mr. Wenick had been questioned by the government regarding whether or not he (Mr.

Wenick) or any other Refuge employee had given "permission" for that action.  I was trying to

explore whether they needed permission based upon historical use or general expectations, or

whether the Pucketts could have given permission – because we had a good faith basis to believe

that the Puckett family had given permission and planned to raise that testimony later.  The

"substance" of the issue was whether the "permission" testimony established an element of the

relevant offenses.  But, Judge Brown instructed "No more on the battle of whether they did or

did not have lawful access.  That's not for this jury."  *Id.* at 5:10-11.  Since I was not allowed to

continue that line of questioning – I moved back to the timeline to rebut the implication of the

government's direct examination.  I asked about "when" the fence had been erected – Mr.

Wenick answered, "in the fall of 2015."  I followed up to ask about a time prior to the Fall of

2015 when the same Refuge property was previously fenced off.  The witness answered, "in

2003." *Id.* at 5:25. I then established that after 2003 the fence had fallen into disrepair.  Finally,

having established this timeline I attempted to ask whether other cattle ranchers – besides the

Pucketts had access to the land during the time – from 2003 to 2015 – because that information

could be relevant to what happened in the video – why the fence was being taken down, and who

might have had the right to give permission for that action.  The government objected, Judge

Brown sustained the objection, and I was not permitted to go further regarding "access".

So, at this point – I was not allowed to ask about ownership of the land.  I was not allowed to ask about access to the land.  But I had been allowed to ask about the fence, its timeline, and who had been responsible for the fence.  So, I proceeded to ask a different question – regarding "what authority does the federal government have to keep and maintain that fence?"  It was a different question – and was not on the prohibited subjects.  Nevertheless, the government offered a non-specific objection, the Court sustained the objection.  I moved on.  There was no order that I failed or refused to observe.

11. 8. OSC ¶ 1 – __*RC #8*__ – *(Exhibit 4 at 18-22)*

OSC ¶ 1 next cites to Exhibit 4 (pages 18-22), which is a continuation of my cross-examination of Refuge employee, ecologist Jess Wenick on September 20, 2016. On page 18 of the transcript excerpt (Ex. 4), I asked was in the process of asking Mr. Wenick about whether, in the course of his employment, he had ever seen or experienced firearms at the Refuge.  On direct examination of Mr. Wenich the government had elicited testimony regarding the presence of firearms in photos of occupiers at the Refuge.  (Rough 79-80).  The government had already explained, the day before, that it was introducing testimony through witnesses such as Mr. Wenick to show that firearms were used by the occupiers at the Refuge for force, threats and intimidation and not simply in conjunction with the exercise of a legal right. (September 19, 2016 Rough 5).

On page 18 of Exhibit 4, I ask Mr. Wenick, "Besides the photos you have been shown today, have you ever personally witnessed a person at the Refuge with a firearm?"  He answered, "Not that I recollect."  Ex. 4 at 18:8. That answered didn't seem plausible considering other testimony already received, so I probed the issue, asking "Now, there are guns at the Refuge that you and others use, though right?" *Id.* at 18:9-10. Mr. Wenick's answer was non-responsive,

stating "I am trained, but I don't carry a rifle with me." *Id*. at 18:11. But, I hadn't asked Mr.

Wenick about either his training or about him carrying "a rifle" at the Refuge.  So, I asked

"Okay. Do you have it to use if you need it, though?"  Mr. Wenick answered, "Actually, no.  It's

– that has expired." *Id*. at 18:13. His answer was again non-responsive, I hadn't asked him about

his training certification, which he followed up explaining that's what he meant, his certification

to use a firearm had expired. *Id*. at 18:13-16. Attempting to steer Mr. Wenick back to the actual

question and line of questioning that I had begun earlier – I asked, "Okay.  Well, regardless of

whether you have a training – there's a firearm that you have access to, though, right?" *Id*. at

18:17-20. This met a government objection, for a question that was allegedly "outside the

scope." *Id*. As illustrated above, I had previously asked Mr. Wenick about whether he had

previously "witnessed a person at the Refuge with a firearm" and whether there were "guns at

the Refuge" that he and others use that you and others. *Id*. at 18:9-10. Those questions did not

elicit objections, and were directly related to questions Mr. Wenick had been asked on direct

examination regarding the presence of firearms in photos of the occupiers at the Refuge.

Nevertheless, Mr. Wenick's answers were repeatedly non-responsive.  It remains unclear to me

how my last question about his access to firearms at the Refuge was impermissible the second

time I asked it, but not the first – or why I was not permitted to get an answer to the initial

question after Mr. Wenick's repeated resistance to simply answer my questions. Nevertheless,

there was no court order that I failed to observe or refused to observe.  When Judge Brown

sustained the objection, I moved on to a different line of questioning regarding the files in Mr.

Wenick's office.  *Id*. at 19.

　　　　By also referencing my cross-examination of Mr. Wenick on pages 19-22, the OSC is

drawing attention to additional objections by the government that were sustained by Judge

Brown.  The first instance is a question I asked about the evidence he observed about particular

files having been access, and some removed from his office.  The government had asked Mr.

Wenick on direct examination about files and folders and binders (Rough at 82-83).  The

government had asked what types of documents had been gone through by the occupiers of the

Refuge.  (Rough 83).  The government had also probed Mr. Wenick's answers to these questions

to elicit that files regarding other rancher / permittee records had been gone through.  (Rough

83). In addition, the government asked Mr. Wenick about adjoining offices, that he described as

having been left in disarray by occupiers, and that it appeared that the occupiers had operated a

technological sweat shop because there were computer parts, printer parts and scanner parts all

over.  (Rough 84). Finally, the government questioned Mr. Wenick about post-occupation photos

that showed files by the scanning and printing equipment that had been brought there from other

locations, and asked him to identify what types of documents had been singled out – and elicited

his answer that they were historical land records related to the Refuge.  (Rough 84-85).  This was

significant to the defense, because it was circumstantial evidence of intent behind the occupation.

The fact that occupiers had brought in outside scanning and printing equipment, and had gone

through specific files related to the historical use of Refuge property, the history of permits and

use of land rights, and property ownership records, according to the defense theory, showed that

the occupation was aimed at purposes other than those alleged as constituting the conspiracy

(e.g. contesting land ownership, exercising adverse possession, addressing and petitioning for

redress, etc.)  All this was the context, omitted in the excerpts constituting Exhibit 4 in the OSC,

explaining my questioning about files in Mr. Wenick's office.  Specifically, I asked "These files

that you – that you observed were moved or in Ms. Healy's office, would you agree with me that

that indicates that the people occupying the Refuge were interested in the historical documents

there?" *Id*. at 19:1-7. This is directly responsive to the questioning by the government and his

prior answer that the files he observed as being out of place were "historical."  Yet, the

government objected – without explaining the basis of the objection, and Judge Brown sustained

the objection – again without referencing the grounds upon which the objection was made or

sustained. So, I followed up with a clarifying question: "You identified those documents as

historical. Isn't that right?" *Id*. at 19:9-10. Mr. Wenick admitted that was the case.  I probed his

observations on this topic further, establishing more foundation for my earlier question, and then

re-asked the question, "Okay. And having one through those documents that you can find, you

would agree with me that it indicates that the people that gather[ed] those files were interested in

the historical documents, then?" *Id*. at 19:22-25.  The government objected – claiming that the

question called for speculation.  The court asked me to rephrase the question if I wanted to

pursue it.  I probed Mr. Wenick further, he continued to resist my questioning, but he ultimately

admitted that "all of them" meaning all of the documents he observed as having been removed

from his office or others and place in proximity to the scanner and printers by the occupiers,

were "historical documents regarding the Refuge".  *Id*. at 21:6-8. Thus, I had established by this

point, through Mr. Wenick, that the documents first discussed during the government's direct

examination were not random documents, but had been specific documents culled out of many

documents in many locations – and all of selected documents were historical documents –

pertaining Refuge property.  So, I rephrased the question previously objected to and asked,

"Okay, and would you say that those are the documents that you would go to if you were

interested in a dispute over the legitimacy of the federal government's presence there?" *Id*. at

21:9-11.  The government objected based upon the question being supposedly "outside the

scope" and as being "irrelevant."  *Id*. at 21:12-17.  Judge Brown sustained the objection and

instructed me to move on.  I asked the court to clarify what ground had been the basis for

sustaining the objection, and Judge Brown answered, "both grounds."  *Id.* at 21:20. I thanked the

court for the guidance, and moved on.[60]  There was no order that I had failed to observe, nor is

there any order that I refused to observe.

### 12. 9. OSC ¶ 1 – **RC #9** – *(Exhibit 4 at 28-31)*

OSC ¶ 1 next cites to Ex. 4 at 28-31, which is a separate excerpt of testimony (see Ex. 4

at 26:22) from September 20, 2016. This section deals with my cross-examination of government

witness FBI Agent Benjamin Andrew Jones.  Agent Jones testified on direct examination that,

following my client's arrest on January 26, 2016, a local sheriff deputy had given him my

client's iPhone. (Rough 178). Among other things, the government admitted a "note" from that

iPhone as Government Exhibit 32. That note, it was established, by Agent Jones came from the

iPhone after the FBI had obtained search warrant to "seize" the digital contents of the iPhone.

On page 29 of the excerpt, I am asking Agent Jones regarding the chain of events that led

up to the government identifying the iPhone as belonging to my client, the government obtaining

a search warrant, and the government locating and identifying the note on the phone.  In that line

of questioning I asked, "And was there an arrest warrant issued at the time of his [Ammon

Bundy's] arrest?"  Ex. 4 at 28:21-25.  The government objected to the question as being beyond

the scope of direct. Judge Brown sustained the objection.  I asked a new question, "Agent Jones,

do you know what Ammon Bundy was arrested for?" *Id.* at 29:3-4. That question was objected to

by the government without explanation of any grounds.  Judge Brown sustained the objection. I

asked a new question, "He was in custody[?]" The government again objected, without stating

---

[60] The transcript excerpt goes on to include additional questions of mine on pages 23 thru 26 of
my cross-examination of Mr. Wenick, that were objected to as beyond the scope or irrelevant –
and that Judge Brown sustained.  However, those page numbers are not cited in the OSC, and
still do not show any order that I failed to observe or refused to observe.

any grounds.  Judge Brown responded, "He was in custody." *Id*. at 29:10. The government than

stated its objection was to the "form" of the question.  Judge Brown instructed me to rephrase the

question.  I complied and asked, "At the time of these events, he was in custody. Right?" *Id*. at

29:15. The government objected stating, "I don't know what events he's referring to."  Judge

Brown asked me to be specific.  I asked, "At the Sage Hen" rest area, was he in custody. Agent

Jones then answered, "Rest area, yes sir."  I followed up to be clear, "Rest area.  He was in

custody?"  Agent Jones answered, "Yes." *Id*. at 29:20-23. Following up on these questions, I

asked "And he was in your custody?" *Id*. at 29:24. Agent Jones answered "yes" with some

explanation.  Finally, I asked "And did you have an arrest warrant for Mr. Bundy at the time he

was in your custody." *Id*. at 30:2-3. The government objected, without stating grounds – and

Judge Brown sustained the objection. *Id*. at 30:5. I asked a different question, "What was he in

your custody for?"  The government objected without stating grounds, and Judge Brown

sustained the objection. Judge Brown asked me to "move on" and I did.  *Id*. at 30:9.  My next

question of Agent Jones was, "You were involved in the investigation in this matter?" *Id*. at

30:11.  The government objected, stating my question was "beyond the scope."  Judge Brown

responded in part, "The question is not beyond the scope. He was involved.  He testified to

involvement.  The objection is overruled." *Id*. at 30:16-18. I then asked Agent Jones how long he

had worked on the case. He answered.  Finally, I asked "how would you describe your role in the

investigation?" *Id*. at 30:23-24. The government objected – without stating grounds, and Judge

Brown sustained the objection. I followed up by asking Agent Jones if he had training as an FBI

officer.  I acknowledged that he did.  I then asked, "Is part of that training that you don't take

someone into custody without probable cause?" *Id*. at 31:6-7. The government objected, without

stating grounds, Judge Brown sustained the objection.  I was then instructed "Mr. Mumford,

move to another subject." *Id*. at 31:9-10.  In response I abandoned the questions about the nature and cause of the arrest – and went back to the iPhone that Agent Jones had testified about.  I asked, "Is part of that training sir, that you don't take somebody's property without ---" and the government objected, without stating grounds.  The court sustained the objection.  I moved on to questions about Government Exhibit 216. There is nothing in this exchange showing an order of the court that I failed or refused to observe.[61]

   *13. 10. OSC ¶ 1 – __RC #10__ – (Exhibit 5 at 17-23)*

   OSC ¶ 1 next cites to Exhibit 5 (pages 17-23) which is an excerpt of a series of exchanges with the Court on September 21, 2016, and a portion of my questioning of Government Witnesses Jeremiah Beckert from the Oregon State Police.  The government had questioned Mr. Beckert regarding the incidents of January 26, 2016 surrounding the stop and arrest of several of the defendants, including my client, and the shooting death of LaVoy Finicum. On cross-examination, without objection, I had asked Mr. Beckert if "it was true" that there "was no violation of state law, at the time" of the stop, arrest and shooting. (Rough 78) In fact, the court interposed its own clarification in allowing my question, clarifying that meant for the purpose of a stop (Rough 78). I agreed, and thanked the court for the clarification.  In response, Mr. Beckert answered that he was not told about any state charges, but that those involved had been told about federal charges. (*Id*.)  There were several exchanges with the court and the witness on this related topic, including instances where the court expressly allowed me to probe the topic as relevant.  *See* e.g. Rough at 81. Following an extensive colloquy involving essentially all of the defense attorneys during a break in the testimony – as the witness was re-taking the stand, but

---

[61] There is a third excerpt of a portion of my cross-examination of Agent Jones (see Ex. 4 at 32:15) that constitutes pages 32 through 35 but these pages are not cited in the OSC. There is, in this section, an exchange between Judge Brown and I, where I comply with an order she gives – demonstrating that I did not fail or refuse to follow any orders of the Court.

outside the presence of the jury I asked for and obtained leave from the court to explore an

inconsistent statement of Mr. Beckert regarding his knowledge of federal charges existing before

the stop, arrest and shooting – as this contradicted prior testimony this witness gave in a prior

proceeding.  Ex. 5 at 20:2-9.  When testimony resumed I asked the witness to turn to "page 21"

of his prior testimony, and proceeded to ask him about his prior statement.  My questioning was

repeatedly objected to, and the objections sustained, because my questioning was not in a "form"

that the Court allowed.  I tried to rephrase my question several times – but failed in offering the

"form" of the question in a manner that the Court would allow.  My effort was earnest and

diligent. *Id*. 5 at 21:17 thru 23:17. There was no order that I failed or refused to follow, I simply

did not ever find a way to ask the question in a form that was permissible.

### 14. 11. OSC ¶ 1 – __*RC #11*__ – *(Exhibit 7 at 4-9)*

OSC ¶ 1 next cites to Ex. 7 at 4-9, which is an excerpt of my cross-examination of

Government Witnesses, FBA Agent Sarah Louise Bibbs on September 26, 2016.  Prior to the

excerpted portion of the record, in direct examination the government established that Ms. Bibbs

was a member of the FBI's evidence response team.  (Rough at 67). Ms. Bibbs also testified that

she assisted in processing evidence, for approximately two weeks, at the scene of the Malheur

National Wildlife Refuge after the occupation of the Refuge had ended.  (Rough 67). During

direct examination, the government introduced several photographs as evidentiary exhibits and

had Ms. Bibbs testify regarding the exhibits.

It is unclear what order or ruling the OSC is alleging that I failed or refused to obey, but

there are several government objections during my cross-examination that were sustained by

Judge Brown.  However, significantly, the excerpt omits the fact that during the government's

introduction of the photographic exhibits through Ms. Bibbs I had repeatedly objected, based

upon a lack of foundation and lack of relevance.  Judge Brown overruled my objections.

During my cross-examination of Ms. Bibbs, the first objection included in the excerpt, is the government's objection to my question regarding when she completed the search of Mr. Ehmer's truck and trailer, from which a majority of the pictures introduced as exhibits were taken. This was a foundation related question that had not been covered in the direct examination.  Ms. Bibbs had said, in response to my prior question, that the search was before February 12th but she didn't remember the date.  She then said, "It was before the initial Refuge search was initiated. Before the Refuge was completely searched." Ex. 7 at 4:8-9. I followed up and asked, "When was Mr. Ehmert's truck seized from the Refuge?" Ms. Bibb's answered that she didn't have that specific information.  So, I asked her if it was before February 12, 2016 – testing her prior answer that the search of the vehicle and trailer took place before February 12, 2016.  The government objected – stating that the witness had already "answered this question twice" and that she didn't "have a basis of knowledge for the question."  *Id*. at 22:13-15.  Judge Brown sustained the objection.  However, the witness had previously testified (not included in the excerpt) but cited in the rough transcript above, that the search had taken place before February 12, 2016 – without objection.  So, the government's objection was essentially protecting the witness from probing examination, testing whether her statements were prior statements were reliable.  Nevertheless, after Judge Brown sustained the objection I moved on.

The next objection came when I asked Ms. Bibbs if she understood that Mr. Ehmer had been riding the horse – who she had previously identified (Rough at 69) – during the occupation.  The purpose of the question was to explore whether the trailer and truck (which the government had used to introduce evidence of rusted shotgun shell casings, and other exhibits) were relevant to the Refuge, and to what extent.  The government objected stating that this was "well outside the scope" of the direct.  But, it was not.  The government elicited testimony, during direct

examination, that Mr. Ehmer had been transporting a horse named "Hell Boy" (Rough at 69). In fact, Ms. Bibbs stated that the vehicle in question was known to have been driving by Mr. Ehmer and that the trailer previously contained a horse…named Hell Boy. (Rought 69). While Judge Brown had overruled my prior objections to foundation during direct, I believed in good faith I was certainly entitled to probe and asset the relevance of the evidence that had been introduced by seeing what, if any, connection the evidence had to the Refuge occupation, and whether – for example – the shotgun shells and rifle found in the truck/trailer had anything to do with how Mr. Ehmer had acted during the occupation. By these objections, the government succeeded – in my view unfairly – in shielding its witness and evidence from even the most basic probing and examination. Nevertheless, as before, because Judge Brown had sustained the objection, I moved to a different question – without incident.

Next, there were a series of objections sustained when I was asking the witness questions about financial cards that she reported to have found in the truck, all contained with a maroon pouch. On direct examination, she had been asked if she recognized the exhibits. On cross-examination, I wanted to know whether she had discovered, along with cards, any evidence that the cards had been used – e.g. receipts. So, I asked, regarding the Chevron gas card, "Was there any evidence that had ever been used?" Ex. 7 at 5:15-19. The witness testified that she did not "know that." Id. In other words, she did not answer whether there was other evidence or not – just that she did not know – if there was such evidence. I wanted to clarify, to make sure she was not saying that she knew there was none. The government did not object, Mr. Knight simply spoke up and said, "The witness has already - " and without more Judge Brown said, "She said she does not know. The objection is sustained." Id. at 5:22-23. I moved on and asked about the other cards. During that questioning, with each card I asked about whether or not there was any

evidence showing that the card(s) in question had been used.  In each instance – Ms. Bibbs

answered that she did not know.  So, wanting to the scope of the witnesses lack of knowledge – I

began asking if she had done any investigation of that question.  My purpose was to find out if

her lack of knowledge was simply because no evidence was apparent at the time she found the

cards, or because even after investigation she had found none.  After asking about a Mastercard

(Ex. 7 at 6:11-25) I asked, And you didn't do any investigation into that either then?"  *Id*. at

6:20-22. The government objected, stating "This question had been answered eight times."  *Id*.

But, it hadn't been. I was asking the same questions regarding separate discrete pieces of

evidence.  Nevertheless, Judge Brown sustained the objection and advised me to not "repeat

what's already established by your own cross, sir."  *Id*. at 6:23-25.  My last question about the

cards, was "What would be the point of taking cards and not using them?" Without any objection

being raised, Judge Brown stated "The objection is sustained."  *Id*. at 7:2-5. While my question

may not have been worded in the most elegant manner, the point I was trying to get at was

foundation and relevance.  In other words, the government had introduced this evidence to

suggest that something akin to theft had occurred, during the occupation.  But, there was no

evidence that I heard from the witness suggesting that the pouch was stolen or that the cards had

been used, and I had a good faith belief, based upon discovery, that the reason the pouch had

been placed in the truck was actually to protect – or secure the contents, including the cards.  I

wanted to probe, to see if the witness had any knowledge, as a member of the FBI evidence

response team, after being involved for more than two weeks in the investigation – that would

support the inference being raised by the government during Ms. Bibb's direct examination.

Nevertheless, Judge Brown sustained the objections – as I've pointed out here – and I moved on.

Finally, I was questioning Ms. Bibbs about the fact that she had found a rifle in the

trailer, and she had found corroded shotgun shells, but there did not appear to be any relation between the two and there did not appear to be any evidence indicating that either the rifle (buried in hay) or the corroded shotgun shells were relevant to any activity that took place during the occupation.  I asked Ms. Bibbs, "Do you know any reason why these shotgun shells would be relevant to this case, at all?"  Mr. Knight stood up – but before even raising an objection, or specifying the grounds of such an objection, Judge Brown stated "The objection is sustained" and further stated that I was "arguing with the witness." *Id*. at 8-6-12. I didn't mean to be arguing with the witness, upon reading the transcript I don't think there is anything that suggests I was arguing with the witness.  I didn't know the basis of the objection that had not been raised but that had been sustained.  So, I attempted to clarify my question.  I aske, "Other than the fact that you found these shells and the others in the truck, do you know why they would be relevant to this case?" *Id*. at 8:13-15.  This witness was involved for two-weeks, had investigated both vehicles, and several other locations at the Refuge.  It was not unreasonable to ask whether evidence of the shotgun shells or any other shells she found in the truck, had also been found at the Refuge, or any other relevant connection.  Nevertheless, the government objected, stating that the question had been ruled upon, that it was outside the scope, and that it was irrelevant.  As pointed out above, it was not clear what ground the court had used to sustain the objection to the prior version of the question.  I was acting in good faith to refine the question and clarify it, and to make it clear I was not "arguing" with the witness.  The question clearly was not outside the scope, because the government had introduced testimony from Ms. Bibbs about how and where she found the shells at issue, and had introduced photographs of the same.  It was relevant, because the government was attempting to have an inference, from the evidence admitted, that the rifle and shells had something to do with the occupation.  When Judge Brown sustained the

objection and asked me not to repeat a question following her sustaining a prior object, I

attempted to explain myself.  Judge Brown disagreed with my clarification and instructed me to

"ask another question."  *Id*. at 9:1-6.  I respectfully said, "I understand. Okay." I moved on.  The

court instructed Mr. Knight to take a seat, and I proceeded to question on a different topic.  In

fact, the excerpt ends, but the rough transcript shows that I was able to get the witness to admit

that there were no spent shells found associated with the Rifle (Rough at 86) and no ammunition

for the rifle in the truck. *Id*.

In all the above exchanges, the record is clear that when the court disagreed with me, and

issued rulings that I disagreed with – I nevertheless was respectful and followed the court's

instructions.  There is no indication of a single time where I failed to follow or refused to follow

an order or ruling.  The closest instance is when I tried to clarify a question when a prior

objection had not actually been made – but my question prohibited on grounds that I was arguing

with a witness.  In good faith I rephrased the question to make it more clear and to ensure I was

not arguing – so as to comply with the court and show the court respect and deference.

### *15. 12. OSC ¶ 1 – __RC #12__ – (Exhibit 7 at 16)*

OSC ¶ 1 next cites to Ex. 7 at page 16, which is an excerpt of my cross-examination of

Government Witnesses, FBI Agent Ryan Phillips on September 26, 2016.  Mr. Phillips was also

part of the evidence response team.  (Rough 223).  During his direct examination the government

introduced into evidence Government Exhibit 391.  This is a photo of a canister of 420 rounds of

ammunition. *Id*. Mr. Phillips testified that he found the canister on the driver seat of a pickup

owned by defendant Ryan Bundy.  (Rough 225)  Following cross-examination I asked for and

obtained leave from the court (Ex. 7 at 15:21-23), to re-cross-examine the witness on one point

related to Government Ex. 391. The exhibit is a photograph, and I was concerned that size and

scope of the evidence actually found was not appreciated – since only a photograph had been

exhibited,  So, I confirmed with the witness that the box of ammunition was actually in the seat where the driver would sit – so as to confirm that it was likely placed there by someone after the vehicle was parked, whether occupier or government investigator.  I asked, based upon the physical evidence found, "fair to conclude someone put it there after someone had drive it last. Right?"  The government objected arguing that my question called for speculation.  *Id*. at 16:14-18. Judge Brown sustained the objection.  I had not meant to ask the witness to speculate, I had meant to put the physical evidence that he had found, where he had found it, in context – based upon his own observation.  So, sought to avoid asking the witness to speculate about "when" the evidence had been put there – or by whom, and just sought to elicit testimony about the physical facts. I rephrased the question and asked, "So someone couldn't drive the truck, without moving that out of the way.  Is that fair?" *Id*. at 16:20-21.  Without objection, Judge Brown made a record that "the placement of the evidence is established" and instructed me that based upon having already established that, she would allow me to argue to the jury "reasonable inferences to the jury" but instructed that I should not "ask the witness" to draw an inference.  *Id*.  I respectfully responded, "Thank you" and moved on.  There was no issue here.  There was no order or ruling that I failed to or refused to observe.

   *16. 13. OSC ¶ 1 – __RC #13__ – (Exhibit 7 at 17-21).*

       OSC ¶ 1 next cites to Ex. 7 at pages 17-21 with is the fourth excerpt from September 26, 2016.  This portion of the record involves my cross-examination of Government Witness, FBI Special Agent Steve Daniels. On direct examination, Mr. Daniels had testified that he was the senior team leader for the evidence response team at the Refuge.  (Rough at 276).

       During my cross-examination, I established that while Mr. Daniels had "found" ammunition at the Refuge, he didn't know who it had belonged to.  This was a pattern of the investigation, that had been previously established by myself and other attorneys and other

witnesses.  But, Mr. Daniels was the senior team leader.  So, I asked him, *if he knew of anyone* who did any analysis to determine when the ammunition was brought to the Refuge? (Rough at 309).  The excerpt beings in the middle of these questions. Importantly, Mr. Daniels answered, that he did not know of anyone.  That was potentially significant, in that it further revealed that the senior team leader did not know of any investigation that had been undertaking to connect the ammunition found at the scene to any occupier or any defendant or any timeframe.  I followed up and asked, "Do you know why they wouldn't have?"  Ex. 7 at 17:17-25.  The government objected to my question, based on the line of question being "cumulative" and that it was "inappropriate" to ask a witness why something didn't happen.  *Id*.  This was a senior team leader.  I asked him about what he know and if he know – why no such investigation had been conducted.  I can't think of a legal or factual reason why that question is "inappropriate." And, its unclear to me why the "line of questioning" is cumulative. The question was designed to elicit, from an important government witness, probative evidence as to the quality and credibility of his testimony, and of the investigation being conducted that resulted in the exhibits that had been admitted into evidence, by the government.  Nevertheless, Judge Brown sustained the objection on both "form" and cumulative grounds.  She asked that I move on – and I did.

I next questioned Mr. Daniels regarding Government Exhibit 326, which is a photograph involving room "n" previously described by Mr. Daniels. I asked if he knew whose "sleeping quarters" room "n" had been assigned, during the occupation.  The government objected that tis question had been "asked and answered."  Ex. 7 at 18:5-11.   The government had asked Mr. Daniels on direct, about Exhibit 326 and he had volunteered, that Exhibit 326 was found in room N, and that this room was sleeping quarters.  He identified eight shotgun shells, a Winchester 12 gauge shotgun, and seven buck shot shotgun shells and one shotgun slug.  (Rough 289). I do not

remember, and the rough transcript does not reflect, any other attorney asking this question about room N.  I had been asking him about each room, if it had been established which occupier, if any, had slept in the room, to connect the evidence introduced by the government to any person, occupier, or defendant.  The question was therefore both relevant and probative.  Nevertheless, because Judge Brown sustained the objection, I moved on.  Significantly, when I asked about the next room (as had been the case with previous rooms) this leader of the investigation admitted that there was some evidence that was connected in the room to a particular person – but that he didn't recall who and didn't have the report specifying who.  *See* e.g. Ex. 7 at 18:14-4. Again, this line of question was designed to cross-examine on the quality and reliability of the investigation, and to elicit evidence that could be used to counter the inferences suggested the jury based upon the government's introduction of this evidence. Nevertheless, the government continued to object to similar, but unique questions, along these same lines, *see e.g.* Ex. 7 at 19:7-14.  While Judge Brown sustained these objections, I had a duty to ask.  There is not one instance where an order or ruling was made – where I willfully failed to follow or refused to follow the Court's order or instruction.

Finally, in the last section of this excerpt, I was questioning Mr. Daniels on a "tactical" backpack he had found, and I wanted to know if the FBI used these – because it related to the fact that the backpack could have belonged to someone besides an occupier, and it also related to why he was referring to a backpack as a "tactical backpack."  *See e.g.* Ex. 7 at 20:1-12.  The government objected to this questioning on relevance grounds, and Judge Brown sustained the objection.  I moved on.  Yet, this same pattern took place when I questioned Mr. Daniels about a high capacity ammunition magazine, that had the initials "DEP" on it.  I asked who concluded it was a "high capacity" magazine, and whether "DEP" was ever identified.  The government

80

objected, the Court sustained the objections and I moved on.   Again, while Judge Brown

sustained these objections, I had a duty to ask.  There is not one instance where an order or ruling

was made – where I willfully failed to follow or refused to follow the Court's order or

instruction.

   *17. 14. OSC ¶ 1 – __RC #14__ – (Exhibit 8 at 4-8)*

   OSC ¶ 1 next cites to Ex. 8 at pages 4 through 8, and relate to a portion of the record

from September 27, 2016 and my cross-examination of Government Witness, FBI Special Agent

Nick Vanicelli.  On direct examination Mr. Vanicelli was identified as the Senior Team Leader

for the evidence response team.  (Rough 29).  During my cross-examination of Mr. Vanicelli

several objections were made and sustained without incident, but the OSC appears to be drawing

attention to an exchange involving my questions regarding cash found at the Refuge by

investigators.  After Judge Brown had sustained objections on cumulative grounds (due to

questions asked by other attorneys for the defense) I asked for and obtained leave to ask whether

there was anything unusual about the cash the witness had found.  *See* Ex. 8 at 5:17 to 6:3.  The

witness was giving responsive answers, and had explained that he had found "an envelope

containing cash" and that "there were other smaller amounts of cash located in various locations

throughout the encampment." *Id*. at 6:6-14. This was important, and potentially probative of

issues raised by the government, e.g. because my client had been arrested with a certain amount

of cash – and there was evidence introduced previously in the trial to suggest a connection

between the alleged conspiracy and the money used for stalking the Refuge with food, paying for

services, etc.  But, the government objected.  Judge Brown sustained the objection stating that

the witness "has testified repeatedly cash was not his focus or his seizure."  *Id*. at 6:18-19. I

didn't understand the basis for the exclusion of further testimony from this witness, given that he

was giving responsive and relevant answers – on a line of questioning that derived directly from

testimony and exhibits introduced during direct examination. I attempted to briefly explain why the questions were relevant and probative, and to proffer a reason for the questioning, but Judge Brown stated "you're going to forfeit your right to continue if you don't move on now." *Id*. at 7:1-2. I politely acknowledged the direction from Judge Brown, and stated, "You don't need to do that." Before proceeding, I was careful, and clarified what I was being allowed to ask, and not being allowed to ask. When it was clear that I would not be allowed to ask anything further about the money issue – I moved on. *See* Ex. 8 at 7:8-19. Contrary to the allegation of the OSC, this record shows that I was prohibited from asking relevant and probative questions, based upon objections and grounds that were not consistent with the record, but that I nevertheless followed the Court's guidance, and when unclear – I proceeded respectfully and cautiously to obtain direction from the Court. When there appeared to be frustration from Judge Brown – and an indication that I could forfeit further questioning – I became exceptionally deliberate, in a respectful manner, and moved on without incident, and there was never an instance where Judge Brown forfeited my questioning or made any findings that I had failed or refused to follow her orders or rulings.

   *18. 15.* OSC ¶ 1 – **_RC #15_** – *(Exhibit 9 at 8-9)*

   OSC ¶ 1 next cites to Ex. 9 at pages 8 through 9. This is an excerpt from September 28, 2016 and relates to the testimony of defense witness Sheila Marie Warren, who was initially called as a witness by Defendant Ryan Bundy. The OSC is fundamentally misleading on this reference. The issue raised in this section of the transcript has to do with what happened after I finished examining Ms. Warren. See Ex. 9 at 7:11-12. Following my examination, AUSA Knight conducted a brief cross-examination of Ms. Warren. Mr. Knight asked the witness, "Isn't it also true that the FBI tried to contact you and ask you about wat you saw at the Refuge, and you refused to speak to them?" *Id*. at 8:1-3. Ms. Warren answered, "Yes" indicating that was a

82

true statement.  Mr. Knight followed up by asking, "But you were willing to speak with Mr.

Ryan Bundy for 45 minutes?" *Id*. at 8:4-6.  Ms. Warrant against answered, "Yes."  At this point

Mr. Knight ended his cross-examination and the Court asked if there was any redirect.  *Id*. at 8:9.

At this point, the witness, without any question pending, volunteered a clarifying statement,

stating spontaneously, "I didn't trust the FBI ---" *Id*. at 8:13.  Judge Brown responded by saying,

"Ma'am, will you please stop speaking out of turn." *Id*. at 8:14-15.  The witness responded,

"Okay" and the court turned to me and asked, "Any redirect, Mr. Mumford?" *Id*. at 8:17.  I

asked, "Why did you refuse to speak to the FBI?" *Id*. at 8:20.  There was no objection to the

question, and the witness began to answer, "Because I heard that five of them were under

investigation for --" at which point the court intervened and Judge Brown stated, "Stop. Stop.

Stop.  Jurors, disregard this, and do not go further on that line." *Id*. at 8:23-25.  Another short

exchange occurred with the court where I suggested that the issue had been opened upon cross-

examination by Mr. Knight, and Judge Brown responded, "You know full well the rulings I've

made about the other subject." *Id*. at 9:4-5.  The excerpt goes on to reflect that the judge took a

break, dismissed the jury for a short period of time, and entertained an offer of proof from me on

a different line of questioning from me.  But, by ending the excerpt here, the cited record is

fundamentally misleading because it creates to false impressions.  First, it creates the impression

that I had intentionally elicited information from the witness in contravention of prior court

orders.  Second, it creates the impression that the excerpted section of the record is complete –

and in an very significant way, it is not.

      First, during my proffer (outside the presence of the jury, in the continuation of the same

portion of the proceeding cut off in the OSC excerpt) I asked about Ms. Warren's answer –

regarding not trusting the FBI.  *See* Rough at 83.  During that proceeding the court expressly

allowed Ms. Warren to explain herself on this point.  (Rough 83-87).  Following that exchange,

Judge Brown made a record of what had transpired, and the substance of the offer of proof.  In

examining the issue Judge Brown made a specific finding that Ms. Warren's statement that she

did not trust the FBI – was a voluntary response.  Judge Brown also made exceptionally clear

(*see* Rough at 88) that the court would have permitted the answer, if a proper question regarding

why she didn't trust the FBI had been pending, noting that the witness is entitled to an

explanation.  Further, Judge Brown also made clear that if Mr. Bundy or I had asked that

question, and that was her response, the court would have let the answer stand.  (Rough 88).

Following these findings, several defendants asked to address the record.  Ryan Bundy spoke

first and explained why further explanation from the witness should be allowed.  (Rough 89).  I

also addressed the record on the same point.  (Rough 90).  Ms. Harris (attorney for Shawna Cox)

spoke after me, and also addressed the record on this point. (Rough 91-93).  All of these

exchanges took place – specifically addressing the court's prior orders on the topic, and the

witnesses volunteered testimony.  The court then gave the government a chance to address the

issue.  The court then recessed for about 5 minutes, and upon return, Ms. Harris against asked for

the benefit of the record in this point.  (Rough 100-101).  Ms. Harris was then allowed to put the

witness back on the stand and make a further offer of proof.  (Rough 102-103)  Judge Brown

then asked the government to address the topic.  (Rough 103). After hearing from the

government, Judge Brown made a ruling, that not only would she allow the witnesses prior

statement to stand, but that she would allow Ms. Harris to proceed in front of the jury, based

upon the offer of proof presented.  The record shows that Ms. Warren was allowed to testify

about why she did not trust the FBI, that she felt threatened, that she felt intimidated by FBI

Agent Ronnie Walker, etc.  (Rough 104 to 106).

Thus, not only was there no instance in which I failed to follow or refused to follow a ruling of the court – the record shows that the reference in the OSC is misleading, nothing improper was done by me or anyone else in the cited exchange, and in fact, after thoroughly considering the matter, and in light of the court's prior rulings cited in the excerpt – the court expressly decided to allow the witness to give further testimony on this point.  Once again, the record shows that I, and in this instance my colleagues, were careful and followed the court's guidance as it was given, even as we had to navigate difficult evidentiary issues.  The fact that the OSC included this as an example of alleged misconduct further call into question the issues raised above, including insufficient notice, unfairness and a lack of credibility and good faith throughout the OSC.

### 19. 16. OSC ¶ 1 – __RC #16__ – (Exhibit 9 at 16)

OSC ¶ 1 next cites to Ex. 9 at page 16.  This reference is from a second excerpt taken from the trial proceedings on September 28, 2016 and covers a portion of my examination of FBI Agent Christ Luh.  The page cited appears to take issue with an exchange where I asked Mr. Luh about a recorded telephone call he had with my client during the occupation of the Refuge.  During the call, Mr. Luh had referenced that my client had been receiving national attention regarding the Refuge occupation.  I was attempting to inquire about Mr. Luh's statement on the recording in this regard.  I asked regarding the notes and reports Mr. Luh had made from the call and followed up by questioning, "None of the information was passed up to congressional leaders or other federal authorities?"  Ex. 9 at 16:11-12.  The government objected on grounds of relevance, and the question being argumentative.  *Id*. at 16:13.  The objection was sustained, but it was unclear on what ground.  So, I attempted to re-phrase the question to make sure it was not argumentative, and I asked, "Was any of the information passed up to congressional--" which was interrupted with another objection. It is unclear what the objection was – the objection was

simply that I had asked the "same question." The court sustained the objection.  I left that

question, and explored the topic from a different angel.  I asked, "You mentioned that Mr. Bundy

had national attention, in this call. To your knowledge, did Mr. Bundy have national attention to

these issues prior to January 2nd?"  *Id*. at 16:21-24.  There was no objection.  The witness

answered, and I ended my examination.  There is simply no ruling or order that I willfully failed

to observe or refused to follow.

   *20. 17. OSC ¶ 1 – __RC #17__ – (Exhibit 9 at 18-19)*

       OSC ¶ 1 next cites to Ex. 9 at page 18 thru 19, and is another excerpt from the September

28, 2016 trial proceedings, covering a portion of my questioning of FBI Agent Lapp.  The

citation here is surprising, and it is unclear what behavior is being referred to by the OSC.  It

appears that the purpose of the reference is to point out an instance where I asked Agent Lapp,

"Was there any discussion in this time period about bringing a different kind of action?  To get a

court order or get a formal notice served on Mr. Bundy to leave?" Ex. 9 at 18:15-17.  The

government objected based upon relevance and the form of the question.  Judge Brown sustained

the objection and remarked, "And the Court's previous rulings. The objection is sustained."  *Id*.

at 18:21-22. So, apparently, the OSC is pointing out that Judge Brown referenced her prior

"rulings" when sustaining an objection.  It is unclear to me now, and based upon a review of the

record what prior ruling(s) may have been at issue.  Nevertheless, the reference in the OSC,

suggesting misconduct on my part, is belied by what happened next.  It appears that by pointing

out her prior rulings, Judge Brown was making sure I steered clear of internal deliberations of

state lawmakers or local law enforcement regarding what laws particular law enforcement

officials may have believed or understood were involved prior to the arrest of my client.  But that

wasn't the purpose of my question – and Judge Brown's reference was helpful, and as seen by

following the record forward, and hardly a rebuke.  I simply rephrased the question, and asked

"[P]rior to January 26th, did the federal government make any demand of Mr. Bundy that he leave the refuge?" *Id*. at 18:24-25. If my prior question had been anything close to misconduct, one would expect to see Judge Brown address it at this point. But, the opposite happens. AUSA Knight re-raises his objection on relevance grounds and Judge Brown over-rules the objection and allowed the witness to answer. *Id*. at 19:2-8. I did follow-up to ask if there was any specific "service of process" and the Judge stated "do not go there" and instructed the jury to disregard my question. Judge Brown did say that she had "already sustained the objection before." Id. at 19:14-15. But, there was no misconduct or anything like it, Judge Brown simply instructed me, "Don't go back. Move on now." *Id*. That is exactly what I did. There was no ruling or order that I willfully failed to follow or refused to follow. In fact, this exchange shows how sometimes Judge Brown and I were each performing our assigned roles and duties, and when I clarified a question – I was able to get at the answer I needed, and she was carefully limiting how I did that. Thus, contrary to the allegation of misconduct in the OSC, this was simply complex and diligent litigation – with Judge Brown fully in control of the presentation of evidence, and as with all of the examples cited, me doing my best to advance the interests of my client, and follow the directions given by Judge Brown on sometimes nuanced, detailed and complicated fact circumstances that were being explored.

21. *18. OSC ¶ 1 – __RC #18__ – (Exhibit 9 at 21-25)*

OSC ¶ 1 next cites to Ex. 9 at 21-25, and is another excerpt from the September 28, 2016 trial proceedings, here covering a portion of my questioning of FBI Agent Jason Curry. This portion of questioning relates to my attempt to question Mr. Curry regarding whether or not my client, was the sole source of activity, concern, and government alert at the time of the Hammond related protests in January 2, 2016. While Judge Brown repeatedly sustained objections, based upon scope and relevance, the OSC appears to be raising this issue to demonstrate that I was

unwilling to follow prior rulings regarding the relevance of the Hammond conflict with the

BLM.  The context of the questions shows clearly, I was not attempting to elicit testimony

regarding the Hammond conflict with the BLM, except as it related to activity for which my

client had been alleged responsible – regarding the protests in and around Burns, OR in the

January 2, 2016 time period.  I tried multiple times to address the topic – respecting the Court's

prior orders.  The fact that I was ultimately not successful at finding to do so is not evidence that

I was willfully not following prior orders or rulings – the opposite is true.  The record shows I

was attempting to question a witness, and my questioning was not allowed by the Court after it

sustained objections to multiple various of the questions I was asking.  There is nothing more to

this exchange – certainly nothing show willful disregard or refusal to follow rulings.

### 22. 19. OSC ¶ 1 – **_RC #19_** – (Exhibit 9 at 29-31)

OSC ¶ 1 next cites to Ex. 9 at pages 29 through 31, and relates to September 28, 2016

proceedings, and particularly my questioning of Refuge manager Chad Karges during the

defendants' case-in-chief.  Mr. Karges had testified for the government, on September 15, 2016.

During his testimony the government asked Mr. Karges to explain the history of the Refuge,

including the land ownership of the Refuge property.  *See* e.g. (September 15, 2016 Rough at 75-

76) (discussing acquisition of Blitzen Valley property from Eastern Oregon Land and Livestock

Company). This was no summary or brief reference, prosecutors elicited specific delineations,

for example, asking whether land was purchased from one or more parties, dates involved, how

many acres, etc. *Id*.  The government further elicited details, regarding which land parcels were

purchased for the property where the Refuge headquarters buildings sit.  (9/15/16 Rough at 77).

In fact, I objected because Mr. Karges explanation of the land parcels and ownership was being

introduced without adequate foundation – and my objection was sustained.  When re-

approaching the topic, following my sustained objection – the government asked specifically if

Mr. Karges had reviewed the property records for the Refuge headquarters (9/15/16 Rough at 77), and it was reference to these property records that my objection was later over-ruled.

This is significant for several reasons.  Part of the theory of the defense was that my client had a good faith belief that he was exercising a lawful adverse possession under federal and common law, based upon a good faith belief that the land records at issue did not establish, *inter alia*, that the federal government legally owned the land, but that the State of Oregon did. Whether my client's position was legally correct was not the issue, it was the basis of his good faith belief and the reasonability of his belief.  Here, the government was allowed to elicit testimony on the title issue, particularly regarding the occupied property, and to reference specific land parcel records and parcel history with reference to the deeds, but without actually producing them or related documents. Nevertheless, on cross-examination several defense attorneys, e.g. Mr. Olsen (9/16/2016 Rough at 186); myself (9/16/2016 Rough at 229-233), were limited and not allowed to challenge Mr. Karges history – under relevance and Rule 403 grounds.  Thus, even though the court had repeatedly explained that we could present a state-of-mind defense in our case-in-chief, Ex. 9:29-31 is an excerpt of me trying to establish a basic set of facts for that defense, and being denied the opportunity to do so. Yet, there is no instance of me failing or refusing to follow court rulings, only trying to comply with the ground rules that had been set, and navigate complex evidentiary issues amidst wat appeared to be inconsistently applied evidentiary standards.

*23.*     *20. OSC ¶ 1 –* **RC #20** *– (Exhibit 10 at 15-16)*

OSC ¶ 1 next cites to Ex. 10 from pages 15-16, which is an excerpt from proceedings on October 3, 2016 and my examination of Sherriff Ward during the defense's case-in-chief.  It is unclear here what is being alleged as misconduct by the OSC.  There are a series of questions where I am trying to get the witness to explain to me how, in line with his prior testimony,

statements made by my client were perceived by him as a threat – and the government continues to object based upon the argument that I was repeating the same question. Ex. 10 at 15:8 through 16:11. But, there is no reference to a ruling or order that I failed to follow or refused to follow.

24.     21. OSC ¶ 1 – **RC #21** – *(Exhibit 10 at 31)*

OSC ¶ 1 next cites to Ex. 10 at page 31, which is another except from October 3, 2016 and relates to my questioning of defense witness Travis Haines Williams.  Mr. Williams was a member of the Harney County Committee of Safety, and in this line of questioning I was asking Mr. Williams about a document produced by the committee.  The committee was central related to the activities just prior to and during the Refuge occupation, as it had been instigated by my client, and several of the members of that committee had taken actions related to my client's statements, and had visited the Refuge etc.  The citation here appears to make an issue of the fact that I sought to introduce a report from the committee that was not allowed based upon a relevance objection, but there is no instance of me not following a ruling or refusing to follow one.

25.     22. OSC ¶ 1 – **RC #22** – *(Exhibit 11 at 5-6)*

OSC ¶ 1 next cites to Ex. 11 at pages 5-6.  This exhibit is from trial proceedings on October 4, 2016, and this record citation refers to a portion of my examination of Mr. Witzel, a French Glenn resident.  The portion cited here has to do with me attempting to ask questions of Mr. Witzel to clarify what was depicted in a video that he had taken.  Several objections were made on relevance grounds, and sustained.  Nothing in this exchange shows that I was not following the rulings of the court or refusing to do so.  Instead, I was trying to introduce relevant and probative evidence related to the video that had been shown.  Judge Brown ruled that my questions were irrelevant.  After trying a few different ways to elicit relevant testimony that Judge Brown would allow, I was unsuccessful.  However, at no point to I fail or refuse to comply

with the court's rulings or orders.  But, like the prior examples, these were complex efforts on the part of all parties to navigate the evidentiary landscape.  And, with regard to these issues, even Judge Brown acknowledged that it was difficult to determine what was relevant to the case and what was unnecessary repetition.  (Rough at 95).

26.     23. OSC ¶ 1 – **_RC #23_** – (Exhibit 11 at 20-21)

OSC ¶ 1 next cites to Ex. 11 at pages 20-21.  This exhibit is from trial proceedings on October 4, 2016, and this record citation refers to a portion of my examination of my client, Defendant Ammon Bundy.  The pages cited here have to do with my client's statement explaining his state of mind – being objected to, on hearsay grounds.  However, as the record makes clear, none of this portion of his statement was being admitted to establish the truth of the matter asserted, it was to explain why he acted the way he acted, and what had been said in that context.  When confronted with the objection I attempted to explain this. Judge Brown apparently took issue with the form of the question.  However, there is no instance where a ruling or order was not being followed or refused.  I was striving diligently to follow the court's guidance.  On this issue, I simply transitioned to a video, and a new line of questioning.

27. 24. OSC ¶ 1 – **_RC #24_** – (Exhibit 12 at 25-27)

OSC ¶ 1 next cites to Ex. 12 at pages 25-27, which is from trial proceedings on October 5, 2016 and my examination of my client Ammon Bundy.  During the exchange at this portion of the record, I was asking my client about why he had taken certain actions with regard to posting a video.  He was explaining that, and his state of mind.  The government had objected based upon hearsay. Judge Brown was making a distinction I frankly did not understand.  Her ruling was that he could testify as to his state of mind but not his reason for having that state of mind. Ex. 12 at 26:12-13.  I was attempting to comply with her ruling.  There was a colloquy regarding the fact that my client had said he preferred not to answer the question unless he could explain

the reason.  Judge Brown stated to me, "I am making rulings here. You don't get to debate them

now I the jury's presence.  Ask another question.  We will take this up at the recess.  Move past

it now, please." *Id*. at 26:20-25. I was attempting to clarify how to proceed.  Jude Brown

followed up with the following instruction.  "Mr. Mumford, I've made a ruling now.  You need

to follow the ruling.  You may ask a question around which there won't be an objection. Let's

use the jury's time valuably please."  *Id*. at 27:5-9.  I followed her instruction, and the record

shows that the questioning then proceeded without incident.  Thus, contrary to the allegations in

the OSC, this shows that Judge Brown made clear what her ruling was, and asked me to move on

– and I complied without incident. Its also worth noting that Judge Brown later re-considered this

issue and ruled that my client should be allowed to explain the fear.  *See e.g.* (10/5/106 Rough at

93)

   *28. 25. OSC ¶ 1 – __RC #25__ – (Exhibit 12 at 51-52)*

      OSC ¶ 1 next cites to Ex. 12 at 51-52, which is another selection of my examination of

my client, Ammon Bundy, on October 5, 12016, regarding his state of mind and motivations in

taking the actions that he did, and framing his actions in defense of the Constitution of the United

States.  I was questioning Mr. Bundy about his personal religious convictions to establish the

basis for his state of mind, and the legitimacy of his claimed motivation.  In particular, I was

directing him to a section of scripture.  The Court ruled that he could not read the scripture out

loud, but allowed him to review it prior to my questioning.  The government objected even

without me asking a question – just to him reading scripture in anticipation of my question.

Judge Brown instructed me to ask him a question, again making clear that she would not allow

him to read the scripture to the jury.  However, I did just what Judge Brown instructed, I asked

him a series of questions – all of which then came in without objection, and he testified as to his

personal convictions regarding his faith and standing up for the Constitution of the United States.

It is unclear what portion of this exchange the OSC is alleging constitutes misconduct but there is no instance of an order or ruling that was not followed – in fact, the record shows the opposite.

29. 26. *OSC ¶ 1 – __RC #26__ – (Exhibit 12 at 65-66)*

OSC ¶ 1 next cites to Ex. 12 at pages 65-66, which is another selection (seventh excerpt) of my examination on October 5, 12016, this time of defense witness, Nevada Assemblywoman Michele Fiore.  There is a reference in this citation to a statement by Judge Brown regarding a prior ruling or order.  Specifically, Judge Brown stated, "This is a line of questioning I've told you not to pursue.  Please get to the relevant matters so that the witness can make her flight, as you requested."  Ex. 12 at 66:7-10.  However, the OSC omits the context – including the portion of the record Judge Brown is referring to.  Specifically, the government had objected to Ms. Fiore's proffered testimony only on "cumulative" grounds.  *See* Rough at 149. Judge Brown made a preliminary ruling on the admissibility of Ms. Fiore's testimony and ruled that Ms. Fiore could testify, as to the perspective of a member from the COWs organization, and that this was not cumulative. Rough at 149. At my request Judge Brown also ruled preliminarily that she could testify as to a brief background and how she came to work with Mr. Bundy and came to know him.  That too was allowed.  There is nothing else in the record limiting my questioning of Ms. Fiore.  Further, the excerpt omits the first section of Ms. Fiore's testimony, where unsolicited, she offered her opinion on whether the law was being broken by the occupation.  *See e.g.* Rough at 227. The government objected.  Judge Brown allowed Ms. Fiore's answer, but explained to the jury that it was allowed only for explaining her purpose and motivation as a member of the COWS ("Coalition of Western States) organization, in coming to visit Mr. Bundy in Oregon.  *See* e.g. Rough at 227-228.

30. 27. *OSC ¶ 1 – __RC #27__ – (Exhibit 13 at 4-5)*

OSC ¶ 1 next cites to Ex. 13 at pages 4-5 which is from trial proceedings on October 6,

2016 and my examination of my client, Ammon Bundy. The citation at issue has to do with my client answering the following question: "Do you have an understanding or have you wondered why not?" The predicate was whether he had ever received any form notice, or any formal demand from any law enforcement officer to leave the Refuge. Mr. Bundy had answered that he had not. Ex. 13 at 4:18-21. I asked him if he had an understanding or wondered why not. The government objected to the "form" of the question without further explanation. The court sustained the objection and instructed "rephrase the question to call for an admissible answer, please." I asked, "Do you have an understanding as to why not?" The government objected again without stating a basis for the objection. The court sustained the objection, and clarified "The witness can testify about what he thought but not why other people didn't do what he thought he'd asked them to do." *Id*. at 5:6-8. I was attempting to elicit state of mind and intent testimony – and did not understand the distinction the court was making, and without a basis for the objection raised by the government, was at a loss. I explained that I was asking a yes or no question – but the "form" of the question was still impermissible for Judge Brown. *Id*. at 5:12-13. As it was evident I did not understand, the court instructed, "You need to follow the Court's rulings. I'm trying to give you guidance here on a proper question. Either listen or move on to something else. You may ask Mr. Bundy what – whether he had any responses. He's already said no. You may ask him his reaction to that. But he may not offer opinion about why other people are not responding as he requested." *Id*. at 5:18-22.

I listened to the court's instruction carefully. I tried to explain there was a presumption built in to the court's guidance, as to what the answer would be. Judge Brown gave further instruction and said, "It's the form of the question that's the problem." *Id*. at 6:3-4. Following the court's ruling and guidance I asked, "How did – what was your response to that?" *Id*. at 6:6

94

and the questioning proceeded without incident.  Contrary to the allegation in the OSC, this record shows that when I did not understand the court's ruling, I listened to the guidance given, and despite any confusion or disagreement – I did exactly as the court had instructed and moved on.  Judge Brown and I, again – as demonstrated here – were each performing our duties navigating sometimes complex evidentiary issues, and there is no indication of any ruling or order that I willfully did not follow or refused to follow as alleged summarily in the OSC.

*31. 28. OSC ¶ 1 – __RC #28__ – (Exhibit 13 at 17-20)*

OSC ¶ 1 next cites to Ex. 13 at 17-20 , which is the fourth selected excerpt presented from trial proceedings on October 6, 2016 and my examination of my client, Ammon Bundy. The citation at issue has to do with my question of Mr. Bundy regarding how a statement by Senator Harry Reid calling him and his family domestic terrorists had effected him.  He answered that it didn't – but that it effected the FBI. That was his state of mind, and that was his view of things.  The objection itself was only to "the remainder of the answer."  Ex. 17 at 18-19. However, Judge Brown struck the whole answer as lacking foundation.  *Id*. at 17:21-23 and 18:6-7.  I sought leave to "keep going on this" because "he was trying to say something else."  The court clarified that the objection was sustained on lack of foundation – which I interpreted as an invitation to try and re-lay foundation for state-of-mind evidence, consistent with Judge Brown's statement, "Please proceed" after my question seeking leave to "just keep going on this."  So, I asked what he meant – to lay the foundation for his state of mind.  The government objected, and the court sustained the objection as "effectively the same question and answer."  I moved on.

The other exchange highlighted here was a question I asked, "Is it still worth it" referencing the price my client and many others – including his friend Mr. Finicum - had paid to take the political stand at the Refuge.  My client was not allowed to answer – based upon a government objection that the question was "argumentative."  I did not understand the basis of

the government's objection.  The court agreed it was argumentative and "This point has been made multiple times, Mr. Mumford."  I did not understand at the time that the objection had been sustained – meaning I could not ask a clearer or more specific version of the question.  Further, Judge Brown stated, "please continue."  So, I did.  I asked, "Is it still worth it?"  My client answered "Absolutely."  The court then advised me, "Mr. Mumford I just sustained the objection…you can't keep asking questions after the objection has been sustained."  Judge Brown then asked, "are you finished now or do you have more questions?"  I explained I was finished.  While admittedly, after the fact, reading the transcript it appears that Judge Brown had said my initial question was "argumentative" with my own client – it was not clear at the time that the objection had been sustained until after the exchange I just recited.  I was no willfully disregarding her ruling, I had heard her say "please proceed" and though I was within my appropriate purview to ask the question.

32. 29. OSC ¶ 1 – **_RC #29_** – *(Exhibit 13 at 30-31)*

OSC ¶ 1 next cites to Ex. 13 at 30-31, which is a portion of my re-direct of my client Ammon Bundy.  I had asked to mark the pocket constitution that had become ubiquitously associated with my client and other occupiers during the Refuge incident.  The judge denied my request.  I asked if I could publish it – without introducing it as evidence – and Judge Brown denied it.  She said, "I've made a ruling.  Ask another question on redirect.  If you want to pursue the SBA business, you may.  But don't ask him to read form the Constitution."  Like the numerous examples above, I followed the judge's ruling, and I moved on.

33. 30. OSC ¶ 1 – **_RC #30_** – *(Exhibit 14 at 8-11)*

OSC ¶ 1 next cites to Ex. 14 at pages 8-11, from proceedings on October 11, 2016 related to my questioning of defendant Ken Medenbach.  This selections starts off with a government objection being overruled regarding Mr. Medenbach's prior experience trying to exercise adverse

possession claims against the federal government.   Then there follows a series of exchanges where the government, the court and I attempt to carefully navigate what is, and what is not admissible regarding state-of-mind testimony from the defendant.  He did not recognize the Otley case I asked him about, and Judge Brown ruled that he could not testify about what "was not" cited by the prior judge in a different case – but did indicate leave to ask another witness if their state of mind was informed by the case.  Judge Brown instructed, "So move off of Otley, now to something else please, Mr. Mumford." Ex. 14 at 10:18-19.  I said, "Okay" and stopped asking about Otley.  I moved on to the Color of Title statute.  The court sustained the government's objection on that reference.  I, again, said "okay." *Id*. at 11:10.  There is no instance here where I willfully did not follow or refused to follow Judge Brown's rulings.

   *34. 31. OSC ¶ 1 – __RC #31__ – (Exhibit 15 at 5-7)*

   OSC ¶ 1 next cites to Ex. 15 at 5-7, which is from October 11, 2016 and my questioning of Defendant David Fry.  The main reference is to a question I asked Mr. Fry, "Was one of those details you learned that Mr. Finicum was shot while his hands were in the air." Ex. 15 at 5:24-25.  This question was in context and it was state of mind, Mr. Fry had heard that – whether it was true or not – and it effected his decisions.  The In Limine ruling was regarding evidence regarding the truth of what happened to Mr. Finicum, and I thought that this state of mind testimony, in context, was essential and appropriate.  Judge Brown disagreed and stated, "You're violating the Court's rulings in limine."  While I disagreed, I clearly understood that Judge Brown viewed the matter differently – and I dropped the issue.  I attempted a more general question and an objection was sustained on cumulative grounds.  Judge Brown then drew the line, stating "you're forfeiting any more examination if you press this point any further in the jurors' presence."  I explained what I had been trying to do – Judge Brown listened and responded, and instructed me to move on.  As with the many prior examples cited above – I

again moved on.  Its worth noting, that this was how Judge Brown chose to manage the evidence at trial.  When she felt like a line had been approached – she would put me and other attorneys on notice.  There is not one instance where I was put on notice of a line or boundary and intentionally stepped across it.  Like this record shows, instead I followed the direction of the court.

35. 32. *OSC ¶ 1 – **RC #32** – (Exhibit 16 at 4-6)*

OSC ¶ 1 next cites to Ex. 16 at 4-6 from October 13, 2016 and my examination of Sherriff Mack.  I can see nothing at issue here that remotely relates to an allegation of misconduct.  It is true that a few objections were sustained, but the objections were largely to the witnesses answers – not to my questioning.  In any event, as the record shows, I accepted the guidance of the court, I ask for leave to ask one more question on the topic, and there was no incident, certainly no finding or record statement of me not following or refusing to follow a court ruling.

36. 33. *OSC ¶ 1 – **RC #33** – (Exhibit 17 at 5-6)*

OSC ¶ 1 next cites to Ex. 17 at 5-6 from October 13, 2016 and my questioning of defendant Shawna Cox.  The government objected to my question regarding whether law enforcement showed Ms. Cox an arrest warrant.  The objection was sustained as not relevant because of the "legality" of the arrest not being at issue.  I rephrased to ask more generally if anyone had told Ms. Cox why the vehicle she had been riding in, was stopped. Nevertheless, the government objected, and Judge Brown sustained the objection.  I tried to rephrase the question – but another objection was sustained.  I moved on.  There was no willful intention not to follow an order or ruling, I was trying to elicit relevant and probative evidence regarding the delay at issue raised by the government – relevant to the context of the stop, why it had happened and what effect that had on how the events unfolded.  I was not allowed to do so, at least I couldn't

structure a question to get the information without objection – so after a few tries, I simplyl
moved on without incident.

37.      34. OSC ¶ 1 – **_RC #34_** – (Exhibit 19 at 5-7)

OSC ¶ 1 next cites to Ex. 19 at 5-7 from October 17, 2016 and my questioning of Agent
Jones.  The cited record begins with a government objection being overruled.  Ex. 19 at 5:6-14.
A later question was objected to, and the objection sustained because it was "argumentative."
Ex. 19 at 6:11-12.  I asked a follow-up question that I structured so as not to be argumentative,
but another objection was sustained, despite my explanation.  I tried one more time, an objection
was sustained, but Judge Brown saw fit to give some guidance.  *See* Ex. 19 at 7:10-14.  This
pattern continued, with me not understanding why the "argumentative" objection was being
sustained, Judge Brown giving guidance, and in each instance I changed the form of the question
to follow Judge Brown's guidance, and the questioning progressed without incident.

38.      35. OSC ¶ 1 – **_RC #35_** – (Exhibit 21 at 27-33)

OSC ¶ 1 next cites to Ex. 21 at 27-33 from October 27, 2016.

39. 1. OPC ¶ 1, **_Record Cite ("RC") #1_** – (Exhibit 1 at 5:1-17)

The Court's first record citation in OSC ¶ 1 involves a brief interaction between myself
and Judge Brown that seems to disprove the entire thrust of the OSC: that my conduct warrants
the extreme measures of attorney discipline such as disbarment. The matter that Judge Brown
and I discussed on September 15, 2016, concerned a substantive motion for mistrial that I had
filed earlier that morning. In the motion, I had mistakenly quoted from a rough transcript of trial
proceedings. When Judge Brown pointed out how that was contrary to her prior order limiting
how the parties could cite rough transcripts, I immediately acknowledged the error and
apologized. Judge Brown and I agreed – in a brief, productive exchange – to resolve the matter
by placing the entire motion under seal, where it remained. Judge Brown further instructed, and I

agreed, to not quote from the rough transcript when arguing the motion. There was no other issue

raised in that respect, and that was the end of the issue.

Contrary to the import of the OSC as a whole, this example helps demonstrate why Judge

Mosman's OSC is unwarranted. When confronted with my error regarding the motion for

mistrial, I immediately acknowledged it and apologized, and I took action to remedy it by

designating the motion as being under seal. And there was never any further issue raised related

to my inappropriately quoting from rough transcripts in motions filed with the Court. And there

was no reason for Judge Mosman to dredge up this incident in the context of the OSC as an

example of my alleged "[r]epeated failures or refusals to observe court rulings" when they were

not repeated nor refusals in this respect – rather it was an error that I admitted and corrected as

soon as the Court pointed it out.

### 40. 2. OPC ¶ 1, <u>RC #2</u> (Exhibit 1 at 5:25-11:22)

The Court cites to Ex. 1 at 5:25-11:22, which is an excerpt from my cross-examination of

Malheur National Wildlife Refuge Manager Chad Karges, where the government made, and

Judge Brown sustained, nine evidentiary objections to questions related to the federal

government's ownership of the Refuge. As background, the Court must realize that federal

ownership of the Refuge was both a factual and legal element of some of the allegations brought

against the defendants, and directly related to my client's "adverse possession" state-of-mind

defense, challenging the federal government's ownership of the Refuge. (*See* Doc. 1248)

In response to these issues, the government requested, first in its trial brief (Doc. 958),

and subsequently in a motion (Doc. 1229) filed on the eve of trial, September 9, 2016, that the

Court take judicial notice that the Refuge was "federal property located on federally-owned

land." The Court's Order Re: Final Pretrial Conference (Doc. 1171), filed September 1, 2016,

noted that issue *had not been decided at the final pretrial conference*, but would be addressed at

the pretrial hearing on September 6, 2016. My client opposed the government's motion for

judicial notice, and Judge Brown did not grant that motion, in part, until September 22, 2016,

with its Order Taking Judicial Notice Of Federal Ownership Of The Malheur National Wildlife

Refuge (#1229); Order Denying Ammon Bundy's Motion (#1248) To Enjoin Prosecution (Doc.

1327). Prior to that, I understand that the Court gave the parties some guidance on the issue,

including instruction regarding how this topic could be relevant to state of mind or other motives

of the defendants. But the questions at issue here were raised on cross-examination, in response

to the government's direct examination of Mr. Karges.

Simply, to the extent the Court had previously put issues regarding federal ownership of

the Refuge headquarters off-limits as questions of law – they were not off limits with regard to

intent, basis for intent, or questions of fact related to the defendants' intent.  Further, the

government opened the door with how it asked Mr. Karges to explain, on direct examination,

how the Refuge was purportedly set aside by President Teddy Roosevelt in 1908, and how it

expanded its boundaries in the 1930s and 1940s with two large acquisitions of property: 1) the

purchase of the Blitzen Valley in the 1930s from the Eastern Oregon Land and Livestock

Company, and 2) the purchase of the "00" Unit in the 1940s from the "00" Ranch. (Sept. 15

Rough at 74-77) In particular, the Court sustained a foundation objection that I had raised during

the government's direct exam, which the government resolved by asking Mr. Karges if he

reviewed the property records for the Refuge headquarters and by having Mr. Karges testify that

the federal government currently held the deed to that property. (Rough at 77)

The government's questioning to try and prove federal ownership of the Refuge

headquarters through Mr. Karges, when my client had filed with the Court information and

materials calling into question that very fact, opened the door to questions regarding whether the

State of Oregon had approved the acquisitions making up the Refuge, (Ex. 1 at 5:25-6:4), where

or how the Eastern Oregon Land & Livestock Company obtained legal title (Id. at 7:9-12),

whether Mr. Karges' search of records included a chain-of-title search (Id. at 7:23-8:2), when

and where Mr. Karges reviewed the deed that he had described on direct examination (Id. at 8:7-

20), whether he knew about government's deed prior to discussing his testimony with

prosecutors (9:8-12), and details related to government's acquisition of the "00" Unit, including

the cost of the transaction and whether Mr. Karges reviewed that deed as well (10:10-17). Those

questions are not duplicative of each other, so the Court cannot accuse me of repeatedly failing

to obey court orders. And any one of those questions could yield relevant evidence calling into

question the testimony elicited from Mr. Karges by the government. The answers also address

the believability of the motive of my client regarding his adverse possession defense.

On the point of calling into question Mr. Karges testimony, courts have routinely held

that "[a] reasonably full cross-examination of a witness upon the subjects of his examination in

chief is the right, not the mere privilege, of the party against whom he is called, and as a rule, a

denial of this right is a prejudicial error." *United States v. Jorgenson*, 451 F.2d 516, 520 (10th

Cir. 1971); *see also United States v. Lum*, 466 F. Supp. 328, 334 (D. Del. 1979) ("The doctrine

of opening the door allows a party to explore otherwise inadmissible evidence on cross-exam

when the opposing party has made unfair prejudicial use of related evidence on direct

examination."). That the government never stated the basis for its repeated objections

complicates the issue. A party waives any objection it might have to responsive evidence once it

opens the door. The New Wigmore: A Treatise on Evidence § 2.4. "[A] witness who has 'opened

the door' to discussion of a particular matter cannot bar his opponent from entering that same

door for purposes of impeachment." *Id*. Courts routinely recognize that a party opens the door to

rebuttal evidence when it tells only "half the story" or creates a false impression. *United States v. Tenorio*, 809 F.3d 1126, 1131-1132 (10th Cir. 2015); *see also Henderson v. George Washington Univ.*, 449 F.3d 127, 140-141 (D.C. Cir. 2006)

Finally, the government had Mr. Karges testify regarding the Refuge's extensive water infrastructure as needing to be managed and maintained by the Refuge's various employees in order to effectuate the purpose of the Refuge. (Rough at 85, 95). It was not unreasonable to probe that issue on cross-examination by asking questions related to when that infrastructure was constructed and why. (Ex. 1 at 11:3-11) Indeed, other defense attorneys were permitted to ask those types of questions. (Rough at 208-09 - Schindler)[62] In singling me out on this issue, Judge Mosman's OSC has perhaps inadvertently demonstrated its own prejudices and biases, impermissibly holding me to a different or higher standard than regularly-admitted attorneys in the District of Oregon. *See Collins*, 920 F.2d at 626.

Finally, in pursuing the lines of questioning cited, I had the obligation to demonstrate through questioning that the district court's exclusion of testimony was not harmless error for the purpose of protecting my client's potential appellate rights. *See, e.g., Neder v. United States*, 527 U.S. 1, 38 (1999). To the extent that it was possible for an appellate court to hold my client accountable for not having demonstrated the materiality and significance of the excluded testimony by questioning extensively related to excluded testimony, I had an obligation to do so for the purpose of showing prejudice in the event of an appeal – and to the extent that the trial court found nothing sanctionable in my conduct at the time, made no findings that I had violated or refused to obey its orders, that should be both demonstrative and determinative.

---

[62] The Court encouraged the defendants to avoid duplication on cross-exam, but I intended that my questions about water infrastructure construction would develop, as opposed to duplicate, any issues raised by other defense counsel. Here, it is significant that the Court blocked my questioning on this issue based on the government's relevance objections. (Ex. 1 at 11:3-11)

*41. 3. OSC ¶ 1 – __RC #3__ – (Exhibit 1 at 15:21-16:8)*

OSC ¶ 1 cites to Ex. 1 at 15:21-16:8, which is another excerpt from my cross-examination of Mr. Karges on September 15, 2016, where the government made, and Judge Brown sustained, two objections to questions that I asked about Government Exhibit 110 on grounds that other defense counsel asked about the exhibit. In fact, Exhibit 110 was one of the most misleading exhibits offered and introduced into evidence by the government. It is a picture of a ragged, scary-looking individual, who was not identified as a defendant or co-conspirator in the case, holding an assault-style rifle, which the government introduced to prejudice the defendants by suggesting that they had intimated government employees. (Rough at 17-18)

It turned out that, in the defendants' case-in-chief, we were able to introduce video of the press conference where the individual appearing in Exhibit 110 came to the Refuge for the duration of that press conference only, as part of an armed detail protecting the individuals putting on the press conference, who were not associated with the occupiers, indeed, they opposed defendants' occupation of the Refuge at the time. On the video that defendants introduced, one can see that Exhibit 110 was a photo staged at the request of news reporters. [

On September 15, 2016, the government defended its use of the photo as circumstantial evidence of how the public responded to Mr. Bundy's call for members of the public to join his protest at the Refuge and bring their arms. (Rough at 17-21) The Court can see that one of the questions I asked - regarding timing – was first raised by Judge Brown in evaluating the government's proffer for Exhibit 110, (Rough at 17), and the other was for purposes of showing that there was no basis to support the use that the government intended to make of the photo after introducing it through Mr. Karges. (Rough at 18-19) In particular, Judge Brown specifically confirmed that I would be able to challenge the witness on these points in my cross-examination. (Rough at 21)

The government objected to my questions – asking Mr. Karges *when* the man in the photo came to the Refuge, and *why he brought the gun* – on grounds that they were duplicative of questions asked by other defense counsel. But the record shows otherwise. Attorney Matt Schindler, counsel for Kenneth Medenbach, had Mr. Karges confirm that he did not know the individual in Exhibit 110 and that the man was not one of the defendants standing trial. (Rough at 201-02) Attorney Lisa Maxfield, representing defendant Neil Wampler, used Mr. Karges' inability to identify the man in Exhibit 110 to make a point about how Mr. Karges could not identify her client, and one of the videos where her client appeared was not one of the reasons Mr. Karges instructed employees to stay home during the occupation of the Refuge. (Rough at 224-25) But otherwise, the questions I asked, which the OSC now characterizes as "repeated failures" or "refusals" on my part to observe Court rulings, had not been asked prior to my asking them on cross-examination. Far from evidencing misconduct on my part, I would argue that a review of the direct exam and cross-examination of other defense counsel demonstrate how Judge Brown erred in sustaining the government's objections on this point, especially when one considers my earlier discussion where Judge Brown seemed to confirm that I would be able to raise those matters on cross-exam. (Rough at 17-21)

42.     *4. OSC ¶ 1 –* **_RC #4_** *– (Exhibit 1 at 20-21)*

        OSC ¶ 1 cites to Ex. 1 at 20-21

43.     *5. OSC ¶ 1 –* **_RC #5_** *– (Exhibit 3 at 4-6)*

        OSC ¶ 1 cites to Ex. 1 at 15:21-16:8

44.     *6. OSC ¶ 1 –* **_RC #6_** *– (Exhibit 3 at 10)*

        OSC ¶ 1 cites to Ex. 3 at 10


FINISH

## VI. Response To OSC ¶ 2 – "Repeated Instances Of Improperly Arguing With The Court."

45.    1. OSC ¶ 2 – **RC #__** – *(Exhibit 2 at 5:21-6:8)*

The first record cite in OSC ¶ 2 – purporting to state "repeated instances of improperly arguing with the Court, including at times in the presence of the jury and/or with a raised voice or refusals to observe court rulings" – cites to Exhibit 2069-2 at 5:21-6:8 and involves a brief interaction with Judge Brown where I asked for the right to re-cross BLM District Manager Jeff Rose after I felt like the government opened up new matters in its redirect examination. In its direct examination, the government elicited testimony about how seeing Ammon Bundy in Burns in the November-December 2015 time period, and hearing what Mr. Bundy said to encourage people to come to Burns, contributed to Mr. Rose's decision to close the BLM district office in early January 2016. (Rough Transcript at 28-29) On cross-examination, I asked Mr. Rose to confirm that he was never threatened by any of Mr. Bundy's words or advocacy regarding the limits of governmental power. (Rough Transcript at 49-50) On redirect, the government was allowed to expand its prior line of questioning and have Mr. Rose describe how Mr. Bundy encouraged people to come to Burns in order to remove the federal agencies from the area, and how those people brought with them what Mr. Rose described as the most guns he had ever seen. (Rough at 60-63) In response to this last line of questioning, other defense lawyers and I objected to the relevance and scope of the government's redirect examination as going beyond matters raised in cross-examination and also violating one of Judge Brown's pretrial orders, which had placed the issue off-limits. (Rough 62-63) Judge Brown overruled our objections on grounds that my cross-examination, which she admitted was narrow, nevertheless opened the door so that the government was entitled to explore the larger topic on redirect. (Rough at 62-63) At that point, based especially on Mr. Rose's testimony about how people associated with the occupation of the Refuge brought so many guns to Burns, I requested and was denied by Judge Brown the

opportunity to recross Mr. Rose. (Rough at 64-65)

As an initial matter, OPC ¶ 2, RC #__ fails to raise an issue of misconduct involving "repeated instances of improperly arguing with the Court." I attempted to argue more substantively that the government had opened an evidentiary door on redirect, but Judge Brown cut me off and said that was the end of argument, and I complied with her instructions in that respect. (Ex. 2069-2 at 5:21-6:8; 9/16/2016 Rough Tr. at 63-64)

Courts have routinely held that denying a defendant's right to re-cross examination violates his confrontation rights, especially where new matter is brought out on redirect examination. *United States v. Jones*, 982 F.2d 380, 384 (9th Cir. 1992), *as amended* (Apr. 6, 1993); *see also United States v. Riggi*, 951 F.2d 1368, 1375 (3d Cir. 1991); *United States v. Caudle*, 606 F.2d 451, 458-59 (4th Cir. 1979). In *Jones*, the Ninth Circuit noted that the rule applies with particular force where the testimony elicited on redirect examination was especially prejudicial. *Jones*, 982 F.2d at 384-85. Here, Judge Brown previously recognized the prejudicial nature of testimony from government witnesses regarding their subjective perceptions and fears. Even if this Court is inclined to agree with Judge Brown's ruling that my admittedly narrow cross-examination of Mr. Rose opened the door to those new matters raised by the government on redirect, it was hardly beyond the pale of professional conduct to request an opportunity to conduct re-cross on those new matters, and to try to explain the basis for my request when it appeared that Judge Brown might be applying the kind of "blanket ban" on re-cross examination that the *Jones* court criticized. *See Jones*, 982 F.2d at 384-85.

Finally, it was error for Judge Brown to deny my request to conduct re-cross examination on the fact that the defendants did not object to those new matters opened up by the government on redirect. (Exhibit 2069-2 at 6:5-6) One side's evidentiary presentation will operate to "open

the door," allowing the other side to introduce evidence to rebut the "'false impression that may have resulted from the opposing party's evidence,'" *Henderson*, 449 F.3d at 140-41; *see also Tenorio*, 809 F.3d at 1131-1132, regardless of whether other side objected to that evidentiary presentation in the first instance. *Lum*, 466 F. Supp. at 334; The New Wigmore: A Treatise on Evidence § 2.4.

    *46.    2. OSC ¶ 2 – __RC #__ – (Exhibit 4 at 32:18-34:16)*

    OSC ¶ 2, RC #__ cites to Doc. 2069-4 at 32:18-34:16, where the government made a late objection to a question that I asked FBI Agent Ben Jones about whether Mr. Bundy possessed a gun at the time of his arrest. In response to my question, Agent Jones stated his belief that Mr. Bundy did possess a gun at the time of his arrest, but he could not say for sure. (Rough Transcript Sept. 20 at 191) Judge Brown admonished the government, among other things, for not stating the basis for its objection. (Rough at 191-92) But instead of simply overruling the government's objection, Judge Brown informed the jury that Agent Jones had been unable to say for certain whether Mr. Bundy possessed a gun at the time of his arrest, and she instructed the jury to disregard the rest of Agent Jones' response to questions that I asked a few moments earlier. (Rough at 192) In an effort to understand Judge Brown's ruling, I asked her to restate for me the question that led to Agent Jones' answer. In response, Judge Brown accused me in front of the jury of having asked Agent Jones to guess or speculate about whether Mr. Bundy was arrested with a gun or not. (Rough at 192) But I never asked Agent Jones to guess or speculate regarding such matters. (Id.) And it was improper for Judge Brown to accuse me in front of the jury of asking a government witness to guess about whether my client was arrested with a gun. After Judge Brown instructed me to "move on," I tried to clarify with Agent Jones that I was not asking him to guess. Finally, in response to Judge Brown's threat to forfeit my cross-examination rights, I confirmed that I did not wish to forfeit any rights and continued my cross-examination.

Far from any misconduct on my part, the exchange demonstrates Judge Brown's hostility and bias against me when she accuses me of asking Agent Jones to speculate when I clearly did not do. *See United States v. Onyeabor*, 649 Fed. Appx. 442, 444 (9th Cir. Apr. 27, 2016) (reversing fraud conviction where the court's remarks collectively "devastated the defense, projected an appearance of hostility …, and went far beyond the court's supervisory role"); *see also Maslenjak v. United States*, -- U.S. --, 2017 WL 2674154, at *5 (June 22, 2017) (construing a federal statute "using English as you ordinarily would").

47.    *3. OSC ¶ 2 – __RC #___ – (Exhibit 2069-6 at 7:8-12:3)*

OSC ¶ 2, RC #__ cites to Doc. 2069-6 at 7:8-12:3, where Judge Brown acknowledged prior miscommunications, so that she felt the need to be very clear in warning that she was going to hold me in contempt and fine me $1,000 in the event that I asked any more questions going into the propriety of Lavoy Finicum's shooting on January 26, 2016. (Doc. 2069-6 at 7:8-12:3) But while this exchange with Judge Brown was uncomfortable, as she and I attempted to bridge our misunderstandings, it was civil and respectful. The OSC's current attempt to classify the episode as an instance of improper argument with the Court is misguided. The exchange did not take place in front of the jury. Judge Brown confirmed that she was not holding me in contempt for anything that had occurred prior to the time of our interaction. In fact, I recall taking the guidance that Judge Brown offered that day to heart, as I do not recall any subsequent instance where the issue arose with the same intensity or frustration.

Judge Brown acknowledged that the government had raised the issue of Mr. Finicum's shooting during its direct examination of Andy Dunbar earlier that day, using the shooting of Lavoy to confirm the timing and dates of other events that Mr. Dunbar testified to. (9/22/2016 Rough Tr. at 72) The issue also arose the day before, September 21, 2016, when prosecutors elicited testimony from state and local law enforcement witnesses who testified that Mr. Finicum

109

had been shot and killed by law enforcement. (9/21/2016 Rough Tr. at 71, 75-76) In my cross examination of Mr. Dunbar, Judge Brown allowed questions regarding the fact that law enforcement shot Mr. Finicum, (9/22/2016 Rough Tr. at 87) But Judge Brown objected sua sponte to my questions into whether Mr. Dunbar recalled learning who shot Mr. Finicum. (Id. at 87-88) During our September 22 exchange, Judge Brown indicated that it would be appropriate to inquire into the fact of Mr. Finicum's shooting but not the other circumstances surrounding it, and I assured her that I would comply with her order. (Exhibit 2069-6 at 8:11-20, 12:2)

48.      *4. OSC ¶ 2 – __RC #__ – (Exhibit 9 at 4:20-7:12)*

OSC ¶ 2, RC #__ cites to Doc. 2069-9 at 4:20-7:12, where I questioned Sheila Warren regarding her experience in visiting the Refuge in the January 2016 time period. In the course of that examination, Judge Brown overruled the government's nonresponsive objection, but then sustained its scope and relevance objections, pointing out how she had approved the limited scope of Ms. Warren's testimony with counsel in advance. (2069-9 at 5:25-6:11) Finally, near the end of the clip marked Doc. 2069-9 at 7:3-5, I confirmed that Judge Brown's prior orders precluded any examination of matters beyond Ms. Warren's observations at the Refuge, except that we could establish other potentially relevant lines of inquiry by way of a proffer to be made outside the jury's presence.

49.      *5. OSC ¶ 2 – __RC #__ – (Exhibit 9 at 28:6-16)*

50.      *6. OSC ¶ 2 – __RC #__ – (Exhibit 10 at 23:7-24:13)*

OSC ¶ 2, RC #__ cites to Doc. 2069-10 at 23:7-24:13, where I sought to get Harney County Sheriff David Ward to acknowledge and adopt a statement that he made during a November 2015 meeting with Ammon Bundy and others. My brief exchange with Judge Brown on this issue arose from a misunderstanding about what was already in the record. (10/3/2016

110

Rough Tr. at 95) The excerpt begins with a two-and-a-half minute audio clip from the November 2015, marked as Defendants' Exhibit 1305, where Ammon Bundy refers, in part, to a comment that Sheriff Ward made earlier in the meeting, describing how, beginning in the 1980s, Sheriff Ward had witnessed first-hand how the federal government's oppressive regulatory scheme destroyed the Harney County timber industry.

The primary purpose of confronting Sheriff Ward with the audio recording of the November 2015 meeting was to impeach his prior testimony during the government's case-in-chief that Ammon Bundy and others made threats and/or ultimatums against him. The audio contradicted that version of events, which was significant in that the principal charges Mr. Bundy was facing included allegations that he had interfered with the official duties of federal employees by way of force, threat or intimidation. In this respect, I paused the excerpted recording to point out how Mr. Bundy was seeking to establish common cause with Sheriff Ward, by referencing Sheriff Ward's prior statements. (10/3/2016 Rough Tr. at 94-95) First, after Judge Brown sustained the government's argumentative objection, I tried to ask Sheriff Ward about his prior statement directly. (Id. at 95) At that point, Judge Brown stated a different position about how the comment was already in the record. (Id.) In response, I point out that Sheriff Ward's statement was not in the record, as the clip that we had just introduced as Exhibit 1305 was Mr. Bundy's reference to Sheriff Ward's statement. After I corrected Judge Brown's misunderstanding on that point, she changed her position one more time to argue that the issue had been covered during Sheriff Ward's initial testimony in the government's case-in-chief, and that the statement about the destruction of the Harney County timber industry was merely a passing remark. (Id.) I do not believe that Judge Brown was correct with regard to that last point, but the Court can see how I moved forward anyway. But it was not misconduct on my part to try

and correct Judge Brown's misunderstandings on the issue until it became apparent that it was

not worth the time and energy that it would take to correct them. At that point, I moved on.

51.    *7. OSC ¶ 2 – __RC #__ – (Exhibit 10 at 37:15-25)*

OSC ¶ 2, RC #__ cites to Doc. 2069-10 at 37:15-25, where I asked one question on

redirect – whether a community organization, like the Harney County Committee of Safety,

needed federal recognition to be legitimate – after prosecutors asked the witness confirm on

cross-examination that the Harney County Committee of Safety did not have any formal

governmental recognition. (10/3/2016 Rough Tr. at 286-87) Given the substance of the

government's cross-examination, Judge Brown should not have sustained its objection,

especially where the government did not state the specific grounds for the objection. See Fed. R.

Evid. 103(a). But as soon as Judge Brown instructed me to accept the Court's rulings and take up

issues outside of the presence of the jury, I acknowledged that I had no more questions and

thanked the witness, Travis Williams, for his help in the matter. (10/3/2016 Rough Tr. at 287)

52.    *8. OSC ¶ 2 – __RC #__ – (Exhibit 12 at 5:19-6:21, 12:16-14:23)*

OSC ¶ 2, RC #__ cites to Doc. 2069-12 at 5:19-6:21 and 12:16-14:23, which were two

brief exchanges between me and Judge Brown on evidentiary issues. As an initial matter, I

would point out that – contrary to OSC ¶ 2 – both exchanges took place the morning of October

5, 2016, outside the presence of the jury.

The first exchange came in the context of an objection raised by the government – on

cumulative grounds – to a video that my client posted to social media one day before the

occupation of the Refuge, explaining his state of mind and actions. (10/5/2016 Rough Tr. at 2-9)

I argued that my client should be allowed to introduce the video to bolster his testimony where

he denied having the intent to impede federal officers by way of force, threat, or intimidation. To

that, Judge Brown observed that some people could wonder why there was so much consistency

112

between the statements my client made on the video and his testimony at trial. (Id. at 6) I misinterpreted those statements to be unfairly critical of my client's credibility and asked for leave to respond. (Id. at 8) But as soon as I started to speak, Judge Brown realized that I had misinterpreted her comments, cautioned me not to raise my voice, and explained her ruling further. (Id. at 8) That was the end of our exchange on the issue, and there is no indication that I continued speaking with a raised voice as we moved on to discuss other evidentiary issues

The second exchange came later in the same discussion – Judge Brown was moving rapidly through rulings regarding the admissibility of several exhibits that we wanted to introduce during my client's anticipated direct testimony that day. (10/5/2016 Rough Tr. at 2-30) At one point, Judge Brown tells me to calm down and refers to the gestures I was making as theatrics. (Id. at 15-16) I disputed her characterization of my gestures as theatrics. (Id. at 16) For present purposes, I would argue that the record is at best insufficient for this Court to try and resolve that dispute. At the same time, the fact that I asked for and obtained Judge Brown's permission before making my arguments is evidence of my respect for the Court. (Id. at 15) The Court can see from the nature of the back-and-forth how hurried our exchange was, and, as our discussion continued, Judge Brown clarified that her rulings excluding some of the videos should not be interpreted as precluding Mr. Bundy from covering the issues raised in those videos in his direct examination. (Id. at 16-17) That by itself addressed some of the points that I was trying to make in my arguments with the court  – and to be clear, this was time that the court set aside for argument on these matters. Finally, when Judge Brown told me to move on, I complied and went directly into a discussion of the next exhibit to be considered that morning. (Id. at 17)

*53.        9. OSC ¶ 2 – **RC # __**  – (Exhibit 12 at 25:12-27:10, 25:12-27:10, 35:6-40:1, 46:15-47:17, and 54:19-56:20)*

OSC ¶ 2, RC #__ cites to Doc. 2069-12 at 25:12-27:10, 35:6-40:1, 46:15-47:17, and

54:19-56:20, where

25:12-27:10, where I asked Mr. Bundy why he felt the need to post a video that the Court had

found admissible, for his own safety. The government objected based on hearsay, purporting to

state that the testimony Mr. Bundy was going to offer had already "been ruled inadmissible."

(25:17-18) After I pointed out that my question, which asked why Mr. Bundy felt the need to

post the video, sought to get into state of mind, Judge Brown ruled that Mr. Bundy could "state

his stated of mind," but "[w]ithout stating the reasons" or the "basis for his state of mind."

(25:21-22) She provided the following guidance:

> So you may ask a question about his state of mind, not what other people told
> him, not what other things contributed to it. But he may make testimony about his
> state of mind.

(Ex 2069-12 at 25:23-26:1)

Her testimony was admissible not to prove "the fact remembered or believed" but the "mental

feeling" of Vogel. As our dissenting colleague points out, the limiting language of Rule 803(3)

bars " 'statements as to why [the declarant] held the particular state of mind, or what he might

have believed that would have induced the state of mind.' " United States v. Emmert, 829 F.2d

805, 810 (9th Cir.1987) (quoting *1053 United States v. Cohen, 631 F.2d 1223, 1225 (5th

Cir.1980)). The bar applies only when the statements are offered to prove the truth of the fact

underlying the memory or belief. In Emmert, for example, the defendant sought to introduce his

out-of-court statement that "he was scared because of the threats made by the agents." 829 F.2d

at 810.

Here, Vogel's statements to his sister were offered to establish his state of mind, not that he was

raped or that he went through the dress-out procedure. The statements were offered to show his

state of mind at the time of the conversation, thus satisfying any contemporaneity requirement.

114

See United States v. Ponticelli, 622 F.2d 985, 991 (9th Cir.1980), overruled on other grounds by United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc). That Vogel was subjected to the dress-out was established by the testimony of the defendants' employees. The jury could infer the connection between the dress-out and Vogel's mental state. Exclusion of this evidence was erroneous.

The defense argument that Wagner lacked personal knowledge is mistaken. She had personal knowledge of how Vogel had been impacted by the incident. She testified as a percipient of what she had observed.

Wagner v. County of Maricopa, 747 F.3d 1048, 1052–53 (C.A.9 (Ariz.),2013)


In United States v Leake (1981, CA4 NC) 642 F2d 715, 7 Fed Rules Evid Serv 1275, a prosecution of two officials of a corporation to provide counseling and rehabilitation to black alcoholics for conspiring to misappropriate federal funds and misappropriation of federal funds, the court held that the district court had erred in excluding a portion of one defendant's testimony regarding a conversation he had with the chairman of the board of the corporation as to the use of money illegally paid to a doctor and returned by the doctor for the purpose of holding a country music show to benefit the corporation in that, although the testimony recounted the out-of-state court statement of another, it was not hearsay because the statement was not offered to prove the truth of the matter asserted—that is, that because the chairman of the board's statement to the defendant was not offered to prove that the money the doctor returned was used to finance the benefit concert, it was not hearsay. However, continued the court, even if the district court interpreted the statement as constituting hearsay, it erred in finding that the defendant's testimony was not admissible under the "state of mind" exception to the hearsay rule in Rule 803(3). The

115

court pointed out that the defendant was therefore competent to testify as to what went on in his mind; the defendant's testimony regarding his conversation with the chairman of the board would be meaningless unless both sides of the conversation were recounted to the jury, and therefore the chairman of the board's statements to the defendant were admissible as necessary to provide the context in which the defendant made the statements revealing his state of mind.

And

Defendant's communications that reflected lack of predisposition to commit crime charged were relevant to show defendant's then-existing state of mind, in trial for attempted use of weapon of mass destruction in United States. Fed. R. Evid. 803(3). United States v. Mohamud, 666 Fed. Appx. 591 (9th Cir. 2016).

54.    *10. OSC ¶ 2 – **RC #___** – (Exhibit 12 at 54:19-56:20)*

OSC ¶ 2, RC #__ cites to Doc. 2069-4 at 54:19-56:20 – Ammon testifies about what was completely legal.

55.    *11. OSC ¶ 2 – **RC #___** – (Exhibit 13 at 4:24-6:4)*

OSC ¶ 2, RC #__ cites to Exhibit 2069-13 at 4:24-6:4, which involved the government's objection to the form of a question I asked my client on direct examination. I admit that my original question in this instance was poorly worded and compound – paraphrasing here: I asked whether my client had an understanding or wondered why the government never served him with formal notice to leave the Refuge in the January 2016 time period. (10/6/2016 Rough Tr. at 30-31) But after Judge Brown sustained the government's objection, I rephrased my question to

116

address the compound objection. But the government objected again, this time without stating a

basis for the objection, and Judge Brown sustained. In an effort to be helpful, Judge Brown

explained that I could ask my client what he thought, but not why other people did not do what

he asked them to do. (31) That led me to believe that Judge Brown had misunderstood the nature

of my question, as I was asking whether my client had an understanding in the January 2016 time

period as to why the government did not serve him with formal notice to leave the Refuge. (31)

In a brief back and forth, I tried to explain to Judge Brown that my question called for a yes or no

answer, and that she was improperly assuming to know what his answer would be and that any

testimony he might provide on the topic would not be admissible. (31-32) But each time I tried to

explain that leap in logic to Judge Brown, she cut me off with an admonition, suggesting that I

was not listening to her or not following the applicable rules or court rulings. (31-32)

     Reviewing this exchange with Judge Brown is frustrating as it reveals a misunderstanding

that I was not able to resolve. I must accept responsibility for my part in asking an objectionable,

poorly worded question. But this is an instance where the government exacerbated the problem

by having failed to specify the grounds for its subsequent objection after I corrected the form of

the original question. And it appears Judge Brown was misled to conclude that my question

remained objectionable as to form, when in fact I was asking a proper question to establish the

necessary foundation and basis for my client to testify to the issue. After Judge Brown cut me off

three times, I moved on to another question. In retrospect, there are many things that I should

have done differently, and that others should have done differently. But to suggest that this

exchange with Judge Brown warrants the imposition of disciplinary sanctions against me is

improper.

56.    12. *OSC ¶ 2 – __RC #___ – (Exhibit 13 at 26:12-27:14)*

OSC ¶ 2, RC #__ cites to Exhibit 2069-13 at 26:12-27:14, which is an objection, based on relevance and scope, that I raised to a question the government asked my client on cross-examination. In a cheap attempt to challenge the bona fides of my client's views about the limits of federal power, the prosecutor asked my client to confirm that his fleet business he had run for 20 years was financed in part with a SBA loan. (10/6/2016 Rough Tr. at 169) The particulars of my client's business and that loan had absolutely nothing to do with the government's case against my client. I objected based on relevance and scope, and Judge Brown asked the government for a proffer to establish relevance. (Id. at 169) Based on that proffer, I understood that Judge Brown overruled my relevance objection, which led me to reassert the scope objection, pointing out how the Court had sustained the repeated scope objections asserted by the government during the defense's cross-examination of their witnesses. (Id. at 169-70) At one point in the exchange, the Court even asked me to be more clear in explaining my continued scope objection. (Id. at 170) When Judge Brown overruled the objection with an explanation about how the government was entitled to explore issues of bias by showing how Mr. Bundy may have relied on federal government programs, I thought she may still be confused about the basis for my scope objection, which is why I started to point out how strict the court had been in sustaining the government's scope objections. (Id.) When Judge Brown cut me off and asked me to take a seat, I complied.

As the Court case see from some of the discussion above, the government was extremely strict in asserting scope objections during its case in chief, and Judge Brown sustained most of those objections. Here, I was arguing for the same standard to apply in the defendant's case. And Judge Brown entertained a limited discussion of the issues raised by my objections from both sides, in front of the jury. The argument that I presented was limited, and perhaps unduly limited,

as Judge Brown indicated that she did not know what I meant by asserting scope as an objection. I made a limited effort to explain it further, until Judge Brown cut me off. It is significant that the OSC failed to specify how my conduct in this instance rises to the level of sanctionable conduct. And our justice system is adversarial. Under the circumstances, it would be unwarranted to impose some kind of disciplinary sanctions based on this exchange.

57.     *13. OSC ¶ 2 – __**RC #**__   – (Exhibit 18 at 5:18-6:24)*

OSC ¶ 2, RC #__ cites to Exhibit 2069-18 at 5:18-6:24. Here, out of the presence of the jury and seeking to make use of time that Judge Brown made available to consider evidentiary matters, I moved to admit a photo referenced a few days earlier during the testimony of a witness who had appeared via video-conferencing. (10/17/2016 Rough Tr. at 79; see also 10/14/2016 Rough Tr. at 248-49) The government raised what I considered to be two potentially inconsistent objections: that the photo was cumulative of the witness' testimony about his encounter with my client but did not depict the fence that they discussed during the encounter. (10/17/2016 Rough Tr. at 79) Judge Brown sustained the government's objection without giving me an opportunity to respond and subsequently declined my request to clarify the basis for her ruling. In response, I made a brief argument that Judge Brown was applying a standard that was inconsistent from the one she applied in admitting several photos that were also cumulative of testimony presented during the government's case in chief. (80) Judge Brown noted my argument and indicated that her ruling was unchanged. (80) And that was the end of the exchange. My argument was not made in the presence of the jury, and Judge Brown did not give any indication that she considered my argument improper at the time. There is no reason for the Court to now revisit the matter.

58.     *14. OSC ¶ 2 – __**RC #**__   – (Exhibit 19 at 5:6-15 and 6:6-7:13)*

OSC ¶ 2, RC #__ cites to Exhibit 2069-19 at 5:6-15 and 6:6-7:13, where I was cross-

119

examining FBI Agent Ben Jones about his encounter a few weeks earlier with a Harney County rancher, Duane Schrock, who appeared on October 14, 2016, to testify on behalf of the defense. Among other things, Mr. Schrock testified that Agent Jones had approached him several days earlier (while the trial was ongoing) in an attempt to harass, intimidate and tell Mr. Schrock what his testimony at trial should be. (10/14/2016 Rough Tr. at 204-06, 237-38) Mr. Schrock testified that Agent Jones tried to get him to admit that there were more guns at the Refuge during the occupation than what Mr. Schrock actually saw, and that Mr. Schrock needed to point his finger at Mr. Bundy as the leader of the occupation. (Id. at 205-06) Mr. Schrock testified that he came to understand there would be repercussions if he did not go along, and that he already experienced repercussions in his cattle business, which he attributed to his refusal to say what Agent Jones wanted him to say. (Id. at 205-06, 237-38)

In the excerpt specified in OSC ¶ 2, the government re-called Agent Jones to rebut Mr. Schrock's testimony about witness intimidation. (10/17/2016 Rough Tr. at 120) But Agent Jones admitted that, pursuant to his FBI training, he had pressed Mr. Schrock to say there were more guns on the Refuge than Mr. Schrock had originally identified. (Id.) Even though Agent Jones had never visited the Refuge himself during the occupation. (Id. at 127-28) On cross-examination on that point, I asked Agent Jones to confirm that he pressured Mr. Schrock into increasing the number of guns that he could say that he saw on the Refuge during the occupation. (Id. at 128-30) The excerpt begins with the government objecting to my question asking Agent Jones to admit that he told Mr. Schrock how many guns he should have seen on the Refuge. (128) Judge Brown overruled the government's objection that my question misstated Agent Jones' prior testimony. (128) Agent Jones tried to defend his actions on grounds that Mr. Schrock eventually increased the number of guns that he saw at the Refuge by one. (128)

At that point, I asked Agent Jones to explain what basis he had to pressure Mr. Schrock on the number of guns he would have observed at the Refuge, especially in light of the fact that he never visited there during the occupation. (129-30) My first attempt was argumentative, and Judge Brown sustained the government's objection on that basis. (Id.) In the second question, I eliminated the argumentative nature of original question, asking Agent Jones more directly to explain how many guns Mr. Schrock should have identified at the Refuge during the occupation. (129) To that, Judge Brown objected sua sponte, characterizing my examination as if I had asked the same question. (129) But Agent Jones previously testified that he understood that somebody who was on the Refuge as frequently as Mr. Schrock would have likely seen more guns, and the government had not objected to some of my earlier questions where Agent Jones' answers seemed to indicate that he thought there was a right number, so that I was trying to get Agent Jones to tell me what that number was and what basis he had to pressure Mr. Schrock until he gave him that number. (128-129) When I changed the question further and the government objected because it was too similar, Judge Brown indicated that I could ask about how many guns Agent Jones knew or heard about being at the Refuge during the occupation. (129) Based on the Court's feedback, I figured out a different way to approach the issue by asking Agent Jones to admit that he kept after Mr. Schrock until Mr. Schrock identified what Agent Jones had deemed to be the right number of guns on the Refuge. Eventually, Agent Jones admitted that, with Mr. Schrock and other witnesses, he only stopped asking questions about the number of guns they observed on the Refuge during the occupation after those individuals increased the number of guns they observed. (130-37)

To the extent OSC ¶ 2 intended this exchange as an example of improper arguments in the presence of the jury, this example proves the opposite. Agent Jones admitted that he pressed

Mr. Schrock and other witnesses to overstate (from what their testimony would have been) the prevalence of guns on the Refuge during the occupation. My questioning may have briefly ventured into the argumentative, but it was more than defensible to ask what standard Agent Jones used in determining when he could stop pressing witnesses to conform their testimony to a more pro-government version of the facts. Judge Brown made the right call in overruling the government's argumentative objections to conclude that it was legitimate cross examination.

## VII.    Response to OSC ¶ 3, RC #__ (Exhibit 2069-20 at 14-15)

OSC ¶ 3, RC #__ cites to Exhibit 2069-20 at 14:9-15:2 and orders me to show cause why I should not be disciplined for having made "[i]nappropriate commentary on the testimony of a witness in the presence of the jury." As an initial matter, OSC ¶ 3 does not specify, any better than the other conclusory allegations in the OSC, the rule that I purportedly violated, or why the conduct evidenced in the referenced portion of trial proceedings warrants disbarment. In those proceedings, coming on one of the last days of trial, the government called Harney County Deputy Sheriff Lucas McLain back to the stand to rebut testimony presented by at least two witnesses[63] in the defendants' case-in-chief describing the presence of a deputy county sheriff – who Mr. Bundy identified as Deputy McLain – during a critical January 2, 2016, meeting where the alleged co-conspirators agreed to the plan to occupy the Refuge. (10/3/2016 Rough Tr. at 225-26; 10/5/2016 Rough Tr. at 172-73, 175-76) As I explained in my opening statement, the fact that Mr. Bundy and others would openly discuss and agree to such a plan with a deputy

---

[63] And three if Judge Brown would have allowed us to play the video that Lavoy Finnicum recorded days before his murder, where he further corroborated the presence of a local sheriff's deputy at the January 2, 2016, meeting at the Ye Olde Castle restaurant. (10/17/2016 Rough Tr. at 19) As I argued in briefing filed with Judge Brown on the issue [REFERENCE BRIEF RE HEARSAY] . – and yet she excluded that portion of the video a few hours before the exchange at issue in this section where she precluded (based on a restrictive scope objection) my efforts to cross examine Deputy McLain's testimony denying his presence at that meeting.

county sheriff in attendance helped prove their lack of any criminal intent. (9/13/2016 Rough Tr. at 96) I returned to this theme in closing argument, contrasting Mr. Bundy's approach to conduct these matters in the light with the government's deceptive and fear-inducing conduct. (10/18/2016 Rough Tr. at 179-80, 202; see also 10/4/2016 Rough Tr. at 156)

On direct examination in the government's rebuttal case, Deputy McLain denied being at the Ye Olde Castle restaurant on January 2, 2016, when Mr. Bundy proposed his plan to occupy the Refuge, but otherwise provided little detail regarding his whereabouts that day: he came on duty at approximately 6:45 a.m., attended a briefing at City Hall from approximately 7 to 9 or 9:30 a.m., and thereafter drove with another officer to take up a position approximately 10 miles outside of town. (10/17/2016 Rough Tr. at 170-73) Deputy McLain and others had been ordered not to use their radios that day, which meant that they communicated via cell phone. (Id. at 172)

On cross-examination, I challenged Deputy McLain's denial of being in attendance at the January 2, 2016, meeting. It had already been established that Deputy McLain attended a meeting with Sheriff Ward, Ammon Bundy, and others at the same Ye Olde Castle restaurant a few days earlier, on December 29, 2016, where they discussed Mr. Bundy's involvement in the upcoming January 2nd protest. (9/14/2016 Rough Tr. at 66-67, 115-18) And Sheriff Ward's testimony earlier in the trial about when he first learned about the occupier's plans, and whether his deputy attended the January 2 meeting seemed evasive and less than unequivocal. (Id. at 115-16) Among other things, Sheriff Ward testified that he did not know where Deputy McLain was before the parade started that morning, which is when the meeting at the Ye Olde Castle restaurant would have taken place. (9/14/2016 Rough Tr. at 121-22; 10/5/2016 Rough Tr. at 191) And Deputy McLain's brief rebuttal testimony generated at least two glaring inconsistencies in the government's narrative. For example, he testified that Sheriff Ward was on time for the

123

briefing at 7 a.m. that morning, (Exhibit 2069-20 at 8:13-17), but Sheriff Ward testified that he had been at least an hour late because his police car at home had been buried in a three-foot snow bank. (9/14/2016 Rough Tr. at 121-23) Also, Ward testified that McLain and Jenkins were posted that morning at a vantage point outside Burns called Wright's Point, which is where McLain said they were when he called Ward with news of seeing Mr. Bundy's truck driving toward the Refuge, (9/14/2016 Rough Tr. at 72, 118-19), but McLain testified that he was posted at a completely different location that morning, and that he called Ward from that other location. (10/17/2016 Rough Tr. at 176, 188) By sustaining the government's "scope" objections, Judge Brown unfairly precluded me from uncovering more inconsistencies in the government's narrative.

] By presenting Deputy McLain's testimony to dispute Mr. Bundy's version of events on January 2nd, the government put his credibility concerning his whereabouts that morning. And the transcript included with Judge Mosman's OSC omitted the part where Judge Brown initially recognized the legitimate nature of cross examination on these issues, including questions into any phone calls McLain made to reveal more detail about those whereabouts. (10/17/2016 Rough Tr. at 176) Deputy McLain confirmed that the only records that might corroborate (or contradict) his testimony concerning his whereabouts would be phone records and the Harney County Computer Aided Dispatch (CAD) report for January 2nd.

> Q. Other than your phone and your dispatch [i.e., the CAD], is there any other
> place where there's a record of where you would have been that day?
> A. No, sir.

(Exhibit 2069-20 at 8:24-9:2) Over the government's objection, Deputy McLain acknowledged that the CAD report, that was supposed to have documented the events of that day if there was ever a need to research later, did not show any data regarding his location or movement.

(10/17/2016 Rough Tr. at 178-81) McLain attributed the lack of CAD report data to the fact that

he was ordered not to use the radio, and because the information he would have been sharing that

morning with other officers was via cell phone, but note the words he used in his answer:

> Q. Why is nothing reflected on the CAD report the day of January 2, 2016, sir?
> A. Because the information that we were sharing with each other was via cell
> phone.

(Exhibit 2069-20 at 6:17-20) So, McLain was sharing information with other officers via his cell

phone. But, in another exchange that Judge Mosman's OSC omits, McLain testified that, besides

a call to Sheriff Ward at 12:45 p.m. to report Mr. Bundy's truck driving toward the Refuge, he

did not recall if he made any other calls between 9:30 and 12:45. (10/17/2016 Rough Tr. at 176-

77) That left McLain's phone records as the sole evidence that might impeach his rebuttal

testimony about not being at the Ye Olde Castle meeting. And yet, Judge Brown sustained every

one of the government's objections regarding those phone records and what they would show,

including whether McLain had reviewed his January 2nd phone records in advance of his

testimony. (*See* Exhibit 2069-20 at 6:21-7:10, 9:3-10:2, 10:15-11:7, 12:17-22, 13:6-15, 14:3-7)

> Q. And have you checked your phone recently for that day?
> MR. BARROW: Object with the phone. It's not about his phone.
> THE COURT: The objection is sustained, Counsel.

(Exhibit 2069-20 at 10:15-18) When I pointed out that the government had put Deputy McLain's

phone records at issue by having him testify about how he had been ordered to communicate via

cell phone instead of radio, Judge Brown accused me of conducting a fishing expedition and told

me to move on, as if Deputy McLain's communications on January 2nd between 9:30 and 12:45

had suddenly become irrelevant because McLain did not remember whether he made any calls in

that time period. (*Id*. at 10:15-11:7)

It was in that context, and also in the context of the government's repeated speaking

objections,[64] that I made the statement thanking Deputy McLain "for not saying anything." I will admit that it was the wrong time to make such a statement, as my closing argument in the case would not be until the following day, October 18, 2016. But the government's reaction was overwrought and false. If I had been making that kind of "commentary" all trial, we can presume that Judge Mosman would have included it in this section of his OSC. If anything, the Court can see from the entirety of the exchange how prevalent and continuous the government's speaking objections were. But Judge Brown sustained the government's objection, struck my statement, and instructed the jury to disregard it. (Exhibit 2069-20 at 14:25-15:2) I did not challenge her ruling in that respect, and I do not here – I should have saved my brief comment on Deputy McLain's rebuttal testimony for closing argument. I hope the Court can see that some of Judge Brown's rulings during my cross-examination of Deputy McLain were clearly erroneous, but as Judge Brown admitted at other points in the trial, court errors are as unavoidable as anyone

---

[64] In just the excerpted portion of the record on this issue, the government supplemented its objections with the following running commentary:

"The question isn't about phone calls. It's about where he was." (Exhibit 2069-20 at 7:8-9)

"This witness was called for a very specific purpose, to rebut an allegation that he was at Ye Olde Restaurant." (*Id*. at 8:19-21)

"It's not about his phone." (*Id*. at 10:16-17)

"[H]e wasn't asked about phone calls on direct at all." (*Id*. at 13:13-14)

"This is still beyond the scope of the direct examination about when he phoned someone." (*Id*. at 14:4-6)

[INSERT INAPPORRIATE SPEAKING OBJECTINOS] Perhaps the Court will respond to say that Judge Brown did not take any issue with the government's speaking objections at the time, but that is my point. The fact that Judge Mosman singles me out for "inappropriate commentary" in this exchange, without directing any similar order to the government's attorney, who may be one of his former associates for all I know, only confirms the biased nature of the OSC and is further reason substantiating my request for an investigation into how such a baseless order came to be issued in the first place.

else's. (*See, e.g.*, 10/5/2016 Rough Tr. at 78) But to now impose further sanctions of revoking

my admission *pro hac vice* or permanently barring me from the District of Oregon would

constitute malfeasance.

## VIII.   Response To OSC ¶ 2, RC #__ (Exhibit 21 at 27-33) And OSC ¶ 5

The OSC cites to Exhibit 2069-21at 27-33 (RC #__) in two instances – OSC ¶¶ 2 and 5.

at 32:18-34:16,

I fear that Judge Mosman, and perhaps Judge Brown, may have misinterpreted techniques

that I have employed to communicate notwithstanding my speech impediment to conclude that

my conduct is obstinate or somehow objectionable where in reality it is just part of the process I

have had to go through to .

First a little background.

The best explanation I can probably give to some of these techniques that I employ to

communicate notwithstanding my speech impediment is probably to cite the Court to a well-

regarded text book in the area of Speech Pathology: Self-Therapy for The Stutterer, by Malcolm

Fraser (8th Ed. 1993)

Two technicques in particular:

      1.      Do not give up on speech attempts.

      2.      Post-block correction, or cancellation.

OSC ¶ 5 raises three general allegations:

1. That I acted inappropriately in "[a]rguing for Ammon Bundy's release from custody after his

acquittal … without a good-faith basis to believe that the pre-existing custody order from the

District of Nevada in United States v. Ammon E. Bundy, 2: 16-cr-46-GMN-PAL, was not still in

effect (See Def.'s Motion (#881) to Consolidate Hearings Regarding Pretrial Release; Order

(#903) on Motion for Release

from Pretrial Detention);

2. That I "repeatedly refusing to accept the Court's rulings against release; and

3. That I "yell[] at the Court in objection to its rnlings against release. See Ex. 21 at 27-33.

Not accurate. See declarations and insert other explanation.


DATED:  October __, 2017

                                                    */s/ Marcus R. Mumford*_____
                                                    Marcus R. Mumford